1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DAVID L. NEALE (SBN 141225)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234; Facsimile: (310) 229-1244
Email: dln@lnbyb.com; kjm@lnbyb.com

Attorneys for Reorganized Debtors

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**LOS ANGELES DIVISION**

| | |
|---|---|
| In re:<br><br>EVEN ST. PRODUCTIONS LTD.,<br><br>          Reorganized Debtor.<br>_____<br><br>In re:<br><br>MAJOKEN, INC.,<br><br>          Reorganized Debtor.<br>_____<br><br>☒ Affects Both Reorganized Debtors<br><br>☐ Affects Even St. Productions Ltd. only<br><br>☐ Affects Majoken, Inc. only | Lead Case No. 2:13-bk-24363-WB<br><br>Jointly administered with:<br>Case No. 2:13-bk-24389-WB<br>(Majoken, Inc.)<br><br>Chapter 11<br><br>**DEBTORS' MOTION FOR ENTRY OF AN ORDER: (1) APPROVING SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; (2) APPROVING AGREEMENT TO MODIFY COMMISSION ARRANGEMENT; (3) WAIVING THE 14-DAY STAY PERIOD SET FORTH IN BANKRUPTCY RULE 6004(h); AND (4) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; DECLARATION OF GERALD GOLDSTEIN**<br><br>Date:   October 18, 2018<br>Time:  10:00 a.m.<br>Place:  Courtroom 1375<br>         255 East Temple Street<br>         Los Angeles, CA 90012 |

# TABLE OF CONTENTS

**MEMORANDUM OF POINTS AND AUTHORITIES** ........................................................4

**I.**      **STATEMENT OF FACTS**...........................................................................4

      **A.**     **Brief Description Of The Debtors' Business And Operations**......................4

      **B.**     **Significant Post-Bankruptcy Events** .................................................4

           **1.**     **The Turnover Of Royalties**....................................................4

           **2.**     **The Debtors' Settlement With FCBLA, LLC** ..................................5

           **3.**     **The Debtors' Settlement With Stewart** .................................5

           **4.**     **The Debtors' Settlement With The Pope Parties** .............................6

           **5.**     **The Debtors' Confirmed Plan** .................................................8

      **C.**     **The Proposed Sale Of The Debtors' Assets**.........................................8

      **D.**     **The Agreement To Modify Commission Arrangement** .................................11

**II.**     **DISCUSSION** .........................................................................11

      **A.**     **The Court Should Authorize The Debtors To Sell The Transferred Assets To The Purchaser** ....................................................... 11

      **B.**     **Section 363(f) of the Bankruptcy Code Permits the Sale of the Debtors' Assets to Be Free and Clear of Any and All Liens (as the Term Lien is Defined in the APA)** ..................................................... 18

      **C.**     **The Court Should Approve The Commission Modification And Authorize The Debtors To Pay The Modified Commissions At Closing From The Purchase Price** .......................................................21

      **D.**     **The Debtors Request the Court Waive the Fourteen-Day Waiting Period Set Forth in Bankruptcy Rule 6004(h)**.................................................21

**III.**    **CONCLUSION** .........................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re Abbotts Dairies of Pennsylvania, Inc.*,
    788 F.2d 143 (3d Cir. 1986) ..................................................................12, 15, 16

*In re Alpha Industries, Inc.*,
    84 B.R. 703 (Bankr. D. Mont. 1988) ..............................................................16

*In re Apex Oil Co.*,
    92 B.R. 847 (Bankr. E.D. Mo. 1988) ..............................................................16

*In re Atlanta Packaging Products, Inc.*,
    99 B.R. 124 (Bankr. N.D. Ga. 1988) ..............................................................15

*Clear Channel Outdoor, Inc. v. Knupfer* (*In re PW, LLC*),
    391 B.R. 25 (9th Cir. B.A.P. 2008) ............................................................20, 21

*Coastal Indus., Inc. v. U.S. Internal Revenue Service* (*In re Coastal Indus., Inc.*),
    63 B.R. 361 (Bankr. N.D. Ohio 1986) ............................................................15

*Comm. of Equity SEC Holders v. Lionel Corp.* (*In re Lionel Corp.*),
    722 F.2d 1063 (2d Cir. 1983) ....................................................................12, 13

*In re Continental Airlines, Inc.*,
    780 F.2d 1223 (5th Cir. 1986) ........................................................................13

*In re Delaware and Hudson Ry. Co.*,
    124 B.R. 169 (D. Del. 1991) ......................................................................12, 14

*In re Eliot*,
    94 B.R. 343 (E.D. Pa. 1988) ............................................................................19

*In re Ex-Cel Concrete Company, Inc.*,
    178 B.R. 198 (9th Cir. BAP 1995) ..................................................................19

*In re Filtercorp, Inc.*,
    163 F.3d 570 (9th Cir. 1998) ..........................................................................17

*In re Gabel*,
    61 B.R. 661 (Bankr. W.D. La. 1985) ..............................................................19

*In re Huntington, Ltd.*,
    654 F.2d 578 (9th Cir. 1981) ..........................................................................12

*In re Industrial Valley Refrig. and Air Cond. Supplies, Inc.*,
    77 B.R. 15 (Bankr. E.D. Pa. 1987) ..................................................................16

*In re Integrated Resources, Inc.*,
   135 B.R. 746 (Bankr. S.D.N.Y. 1992), *aff'd*, 147 B.R. 650 (S.D.N.Y. 1992) ........................15

*In re Karpe*,
   84 B.R. 926 (Bankr. M.D. Pa. 1988) .................................................................................14, 15

*In re Martin (Myers v. Martin)*,
   91 F.3d 389 (3d Cir. 1996) ..........................................................................................................12

*In re Paddlewheels, Inc.*,
   2007 WL 1035151 (Bankr. E.D.La. April 2, 2007) .................................................................19

*In re Qintex Entertainment, Inc.*,
   950 F.2d 1492 (9th Cir. 1991) .....................................................................................................12

*In re Rock Indus. Mach. Corp.*,
   572 F.2d 1195 (7th Cir. 1978) .....................................................................................................16

*In re Snyder*,
   74 B.R. 872 (Bankr. E.D. Pa. 1987) ..........................................................................................15

*In re The Seychelles, Partnership and Genius Corp. v. Banyan Corp.*,
   32 B.R. 708 (N.D. Tex. 1983) .....................................................................................................15

*Titusville Country Club v. Pennbank (In re Titusville Country Club)*,
   128 B.R. 396 (Bankr. W.D. Pa. 1991) .......................................................................................12

*In re Walter*,
   83 B.R. 14 (9th Cir. B.A.P. 1988) ........................................................................................12, 13

*In re Wilde Horse Enterprises*,
   136 B.R. 830 (Bankr. C.D. Cal. 1991) ................................................................................15, 16

*Willemain v. Kivitz*,
   764 F.2d 1019 (4th Cir. 1985) .....................................................................................................15

**Federal Statutes**

11 U.S.C. § 328 .....................................................................................................................2, 21

11 U.S.C. § 363 ................................................................................................................. *passim*

11 U.S.C. § 363(b) ................................................................................2, 11, 13, 14, 15

11 U.S.C. § 363(f) ...................................................................................................2, 10, 18

11 U.S.C. § 363(f)(2) ....................................................................................................19

11 U.S.C. § 363(f)(5) ..............................................................................................20, 21

iii

11 U.S.C. § 363(m) ...........................................................................................3, 10, 18, 22

**Federal Rules**

Fed. R. Bankr. P. 6004(a) ...........................................................................................14

Fed. R. Bankr. P. 6004(c) ...........................................................................................14

Fed. R. Bankr. P. 6004(h)...........................................................................2, 3, 21, 22

Fed. R. Bankr. P. 9019 ...........................................................................................5, 6

Even St. Productions Ltd. ("Even Street") and Majoken, Inc. ("Majoken", and collectively with Even Street, the "Debtors"), reorganized debtors in the above-entitled, jointly-administered, Chapter 11 bankruptcy cases, hereby file this motion (the "Motion") seeking the entry of an order of the Court:

(A) pursuant to 11 U.S.C. § 363(b) and (f), approving the sale free and clear of all liens, claims, interests, charges, mortgages, encumbrances, security interests, proxies, pledges, equity, tax or other restriction or third party right of any kind (collectively, "Liens") in or against the Debtors' assets identified as the "Transferred Assets" in that certain "Asset Purchase Agreement" (the "APA"), a true and correct copy of which is attached as Exhibit "1" hereto, to Primary Wave Music IP Fund 1, LP (the "Purchaser");

(B) pursuant to 11 U.S.C. §§ 328 and 363, approving that certain "Agreement To Modify Commission Arrangement" (the "Commission Modification") by and between R. Eli Ball dba Acklen Advisory Services, LLC and Loeb & Loeb LLP, a true and correct copy of which is attached as Exhibit "2" hereto;

(C) waiving the 14-day stay period set forth in Rule 6004(h) of the Federal Rules of Bankruptcy Procedure; and

(D) granting certain other related relief.

A more detailed analysis of the status of these cases and the bases for this Motion are set forth below in the annexed Memorandum of Points and Authorities and Declaration of Gerald Goldstein.

WHEREFORE, the Debtors respectfully request that this Court enter a Sale Order[1] in a form substantially similar to the proposed Sale Order attached as Exhibit "3" hereto, among other things:

1.    approving the APA;

2.     authorizing the sale of the Transferred Assets to the Purchaser, free and clear of all Liens;

---

[1] Capitalized terms not otherwise defined have the same meaning ascribed to such terms in the APA.

2

3.    authorizing the Debtors to implement the APA without further Court order;

4.    authorizing the Debtors to close the Contemplated Transactions without further Court order;

5.    authorizing the Debtors to take any further action necessary to implement and enforce the Contemplated Transactions without further Court order;

6.    directing the deposit of the Purchase Price into Even St.'s debtor in possession account;

7.    authorizing the Debtors to distribute the Purchase Price pursuant to the Sale Order and the Debtors' confirmed *First Amended Plan Of Reorganization (Dated February 10, 2017), As Modified*;

8.    finding that the Purchaser is a good faith buyer entitled to all of the protections afforded by Section 363(m) of the Bankruptcy Code;

9.    approving the Commission Modification and authorizing the Debtors to pay from the Purchase Price, at the Closing, the commissions set forth in the Commission Modification;

10.    waiving the 14-day stay periods set forth in Bankruptcy Rule 6004(h); and

10.    granting such other and further relief as the Court deems just and proper.

Dated: September 27, 2018       EVEN ST. PRODUCTIONS LTD; MAJOKEN, INC.


By:   */s/ David L. Neale*
        DAVID L. NEALE
        KRIKOR J. MESHEFEJIAN
      LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
      Counsel for Chapter 11 Debtors and Debtors in
      Possession

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    STATEMENT OF FACTS

**A.    Brief Description Of The Debtors' Business And Operations.**

Even St. Productions Ltd. ("Even Street") and Majoken, Inc. ("Majoken", and together with Even Street, the "Debtors") manage, promote, and monetize the rights and interests emanating from the skills and talents of Sylvester Stewart p/k/a Sly Stone ("Stewart"), and the musical group Sly & the Family Stone.  Stewart is a fifty percent (50%) equity owner of Even Street and T.A.G. Management, Inc. is a fifty percent (50%) equity owner of Even Street.  The master recordings and musical compositions of Stewart have generated royalties and licensing income for over forty (40) years.  The equity owners consent to the terms of the sale proposed by this Motion.

**B.    Significant Post-Bankruptcy Events.**

**1.    The Turnover Of Royalties**

During their bankruptcy cases, the Debtors sought the turnover of the royalties assigned to the Debtors.  On July 13, 2015, the Bankruptcy Court entered its *Order Directing Release of Interpleaded Funds to Even St. Productions Ltd. and Directing Payment of Royalties to Even St. Productions Ltd.* (the "Turnover Order").  Pursuant to the Turnover Order, all of the funds held in the State Court interpleader account were delivered to Even Street and placed into a segregated debtor-in-possession bank account (the "Royalty Account").  All additional royalty payments that have been received by the Debtors since the entry of the Turnover Order have been deposited into the Royalty Account.

Following hearings on January 12, 2017 and February 2, 2017, the Bankruptcy Court granted the Debtors' motion seeking turnover of all royalties held by Broadcast Music, Inc. ("BMI"), both those currently in possession of BMI as well as future royalties payable.  BMI has turned over to the Debtors the royalties in its possession as continues to pay to the Debtors royalties as they are earned from time to time.  BMI and the Pope Parties (as defined below) have appealed this Court's order to turnover the royalties held by BMI.  That appeal has been placed on hold pending this Court's approval of a settlement agreement between the parties to

1  that appeal.

2      **2.**      **The Debtors' Settlement With FCBLA, LLC**

3      On May 29, 2015, the Debtors filed a complaint in the Bankruptcy Court against FCBLA,

4  LLC ("FCBLA") which was the purchaser of all of the Debtors' secured debt (originally owned

5  by First California Bank), for disallowance of FCBLA's claims and equitable subordination of

6  FCBLA's claims.    The Debtors and FCBLA thereafter engaged in substantial settlement

7  discussions in connection with all of the parties' respective claims, including FCBLA's claims

8  filed against the Debtors, and entered into a settlement agreement resolving their disputes.    The

9  Court approved that settlement agreement and the parties have effectuated that settlement

10  agreement, pursuant to which the claims of FCBLA have been satisfied in their entirety and the

11  complaint against FCBLA has been dismissed.

12      **3.**      **The Debtors' Settlement With Stewart**

13      Since approximately 2010, the Debtors and Stewart, among other parties, engaged in

14  extensive litigation (the "Royalty Litigation") in the Los Angeles Superior Court (the "State

15  Court") regarding, among other things, the royalties Stewart assigned to the Debtors in February

16  1989 (the "1989 Assignment").

17      On September 20, 2016, the Debtors, Stewart and other parties in the Royalty Litigation

18  engaged in mediation before the Honorable Meredith A. Jury, United States Bankruptcy Judge

19  for the Central District of California – Riverside Division.    The mediation was successful, in that

20  the Debtors and Stewart agreed to settle their disputes, including the allowed amount and

21  treatment of Stewart's claim, the manner in which claims would get paid in this case (by a

22  disposition of certain assets), and mutual and general releases. The terms of settlement were

23  stated on the record before Judge Jury.

24      On October 13, 2016, the Debtors filed that certain *Motion For Entry Of An Order*

25  *Approving Settlement Agreement And Mutual Release Pursuant To Rule 9019 Of The Federal*

26  *Rules Of Bankruptcy Procedure* (the "Stewart Settlement Motion") pursuant to which the

27  Debtors asked the Court to approve that certain *Settlement Agreement And Mutual General*

28  *Release* (the "Stewart Settlement Agreement").    A true and correct copy of the Stewart

Settlement Agreement is attached as Exhibit "4" hereto.

On November 15, 2016, the Court entered that certain *Order Approving Settlement Agreement And Mutual Release Pursuant To Rule 9019 Of The Federal Rules Of Bankruptcy Procedure* [Docket No. 595].   On November 30, 2016, the Stewart Settlement Agreement became effective.

Pursuant to the Stewart Settlement Agreement, among other things, the Debtors are required to propose a plan of reorganization "which shall incorporate the terms of this Agreement and provide, in addition to terms and conditions consistent with the requirements of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure and Local Rules of Bankruptcy Procedure, that the Debtors shall transfer all right, title and interest in and to certain specified assets pursuant to Section 363 of the Bankruptcy Code[.]"

### 4.    The Debtors' Settlement With The Pope Parties

In the Royalty Litigation, Kenneth Roberts ("Roberts") and Majoken Inc. ("Nondebtor Majoken") claimed one or the other was entitled to receive any performance royalties payable by BMI (the "BMI Royalties") which had been assigned by Stewart to Even Street in the 1989 Assignment.  Virginia Pope ("Pope" and collectively with Roberts and Nondebtor Majoken, the "Pope Parties") subsequently claimed that she is the successor in interest to Roberts.  From 1996 until 2009 BMI paid the BMI Royalties to Majoken (to which they had been assigned by Even Street in 1996).  As a result, Roberts, Pope, and Nondebtor Majoken asserted claims against BMI, Even Street, Majoken and others to recover the amount of the BMI Royalties which had been paid by BMI to Majoken.

On August 23, 2016, this Court entered that certain *Order Re Motion To Disallow Proofs Of Claim Of Virginia Pope, Successor To Ken Roberts And Majoken Inc.; Or, In The Alternative, Estimate Such Claims*.  Pursuant to that order, the claims filed by Nondebtor Majoken have been disallowed, the claim filed by Virginia Pope against Even Street has been estimated at $0.00 for all purposes in Even Street's bankruptcy case, and the claim filed by Ken Roberts against Majoken has been estimated at $0.00 for all purposes in Majoken's bankruptcy case.

1    On February 17, 2017, the Debtors, BMI, and Pope engaged in a mediation conference

2 before the Honorable Meredith A. Jury, United States Bankruptcy Judge.  Ultimately, the parties

3 came to a general agreement regarding the terms of a mutually agreeable settlement.  Thereafter,

4 in around late March 2017 through early April 2017, the parties attempted to negotiate and

5 finalize a written settlement agreement.  However, BMI and the Debtors then discovered that the

6 estate of Roberts was subject to probate in New York County Surrogate's Court, and that there

7 were certain creditors of Roberts who could potentially prevent the parties from implementing

8 their settlement.

9    October 13, 2017, the Debtors, BMI, and Pope, among other parties, engaged in a second

10 mediation conference before Judge Jury.  At that time, the Debtors were  informed that Pope had

11 reached, or was close to reaching, a settlement with the creditors' of Roberts' estate regarding

12 Pope's claims to the BMI Royalties and to any settlement proceeds received by Pope from BMI

13 or the Debtors' estates.  At the second mediation conference, the Debtors, BMI, and Pope

14 reached a global agreement to settle all of their disputes, including ownership of the BMI

15 Royalties.  The terms of the parties' settlement were recited into the record and confirmed by

16 representatives of all settling parties.

17    During the process of negotiating and drafting a written settlement agreement, issues

18 arose concerning the procedural mechanism by which the parties could obtain necessary

19 approvals from the Surrogate's Court in New York.  The Debtors spent considerable time and

20 effort, including with the assistance of Judge Jury, to work through those issues to implement the

21 settlement as promptly as possible.  The Debtors' probate counsel worked with BMI's and

22 Pope's probate counsel to prepare language for the settlement agreement designed to address the

23 probate issues.

24    On or about February 9, 2018, Pope, BMI, and the Debtors, among other parties,

25 executed a settlement agreement (the "BMI Settlement Agreement") pursuant to which Pope

26 (and related parties) agreed, subject to the terms of the settlement, that the "Pope Parties" have

27 no claim whatsoever to the BMI Royalties.  The Debtors are required to seek Bankruptcy Court

28 approval of the BMI Settlement Agreement within five business days after the New York

Surrogate's Court enters an accounting decree in the probate action.  The Debtors are presently waiting for the Surrogate's Court to issue an accounting decree.  A true and correct copy of the BMI Settlement Agreement is attached as Exhibit "5" hereto.

**5.    The Debtors' Confirmed Plan**

On August 24, 2017, the Court entered that certain *Order Confirming Debtors' First Amended Plan Of Reorganization (Dated February 10, 2017), As Modified* (the "Plan Confirmation Order") [docket entry no. 864].  On September 8, 2017, the *Debtors First Amended Plan Of Reorganizaed (Dated February 10, 2017), As Modified* (the "Plan") went into effect.

Pursuant to the Plan, the Debtors are required to proceed with a transaction under 11 U.S.C. § 363 for sale of the Sale Assets (as defined in the Plan and the Stewart Settlement Agreement) by public auction subject to overbidding and approval of the Bankruptcy Court, unless the equity holders of the Debtors, including Mr. Stewart, provide advance written consent to conduct an Asset Disposition other than a sale by way of public auction subject to overbidding and approval of the Bankruptcy Court.  The Debtors' equity holders have consented to the sale proposed by this Motion, and have agreed to forego an auction of the Sale Assets.

Under the Plan, all creditors other that Glenn Stone have been paid the full amount of their claims.  Mr. Stone supports and consents to the sale proposed by this Motion.  BMI's claim reserve has been funded as required under the Plan and, to the extent required under the Plan and the BMI Settlement Agreement at the time that a sale closes, will continue to be funded per the terms of the Plan and the BMI Settlement Agreement.

**C.    The Proposed Sale Of The Debtors' Assets.**

On or about September 21, 2018, the Debtors, on the one hand, and Primary Wave Music IP Fund 1, LP (the "Purchaser"), on the other hand, executed that certain "Asset Purchase Agreement" (the "APA"), a true and correct copy of which is attached as Exhibit "1" hereto.

The APA sets forth the terms of the Purchaser's acquisition of the Transferred Assets[2]

---

[2] Capitalized terms not otherwise defined have the meaning ascribed to such terms in the APA. To the extent there is any discrepancy between the terms of the APA and this Motion's description of the terms of the APA, the terms of the APA shall govern.

from the Debtors and/or any and all other affiliated companies owning such rights and parties to the Stewart Settlement Agreement (collectively, the "<u>Seller</u>") on the terms and conditions summarized as follows:

1.    <u>Transferred Assets</u>. The term "<u>Transferred Assets</u>" shall mean the following:

(a)    An undivided one hundred percent (100%) interest in and to all of Seller's right, title and interest in and to the Composition Royalties and BMI Royalties payable or becoming payable from and after the Cash Date pursuant to the Even St. Agreements or otherwise.

(b)    An undivided one hundred percent (100%) interest in and to all of Seller's right, title and interest in and to the Master Royalties, the SoundExchange Royalties and the Consulting Fees payable or becoming payable from and after the Cash Date pursuant to the Even St. Agreements.

2.    <u>Reserved Rights</u>.

(a)    For the avoidance of any ambiguity, the Transferred Assets shall not include, and Purchaser shall have no rights in and to, (i) any musical compositions or sound recordings created by or on behalf of Stewart on or after January 1, 1989 other than Derivative Works, (ii) any monies, revenues, royalties or other amounts payable or becoming payable to Stewart or his successors or Affiliates by AFM, AFTRA, SAG, Talent Partners, Public Performance Malaysia Sdn Bhd for live public performance in Malaysia, or by any Entity other than the Publishers, the Labels, BMI and SoundExchange, (iii) any monies, revenues or royalties payable or becoming payable to Stewart or his Affiliates or successors in connection with services rendered by Stewart as a producer of any of the Masters, or (iv) the Reserved Product Royalties to which all right, title and interest in and to and the right to collect the Reserved Product Royalties are payable to Stewart or his assignees pursuant to the terms of the APA (individually and collectively, the "<u>Excluded Assets</u>").    Notwithstanding the foregoing, in the event that on or before the date that is five (5) Business Days following the Closing Date (the "<u>Reserved Product Royalties Assignment Date</u>"), Seller elects to assign to Purchaser the Reserved Product Royalties, then the Reserved Product Royalties shall be deemed to be included in the Transferred Assets and excluded from the Excluded Assets.  The parties agree that in the event that Seller does not elect to assign the Reserved Product Royalties to Purchaser on or before the Reserved Product Royalties Assignment Date, then from and after the Reserved Product Royalties Assignment Date the Reserved Product Royalties shall be deemed to be Excluded Assets solely owned by and payable to Stewart.

(b)    It is understood and agreed that nothing contained in the APA shall limit the right of Stewart or his Statutory Heirs to exercise any Statutory Termination Rights and, except as set forth in Section 2.02(c) of the APA, Purchaser shall have no rights in and to the rights recaptured by Stewart or Stewart's Heirs in connection with such Statutory Termination Rights, including the Publisher Royalties derived in connection with such rights (the "<u>Publisher's Share of Recaptured Revenues</u>").

(c)    Notwithstanding anything in the APA to the contrary, the Publisher's Share of Recaptured Revenues shall not include the monies, revenues, royalties and other amounts that Purchaser would have received pursuant to the Publishing Agreements, the Recording Agreements, the Sony Entertainment Agreement, the Sony Consulting Agreement, the SoundExchange Agreements and the BMI Agreements if the exercise of that Statutory

Termination Rights had not occurred, calculated on a no less favorable basis than such royalties are payable as of the Closing Date.

      3.    <u>Excluded Liabilities</u>.

        (a)    Purchaser will not assume or be obligated to pay, perform, or otherwise discharge any liabilities or obligations of Seller in connection with the Transferred Assets, whether direct or indirect, known or unknown, absolute or contingent, to the extent arising from or relating to periods prior to the Closing Date or otherwise with respect to the Bankruptcy Cases (collectively, the "<u>Excluded Liabilities</u>").

        (b)    All of the Excluded Liabilities shall be retained by Seller and shall remain Seller's sole and exclusive obligations.

      4.    <u>Purchase Price</u>.  In consideration of the sale of the Transferred Assets, the rights granted in Article II of the APA, the warranties and representations of Seller under the APA and Seller's performance of all obligations under the APA, Purchaser shall pay to Seller Thirteen Million Dollars ($13,000,000) (the "<u>Purchase Price</u>") in accordance with the payment instructions attached as Exhibit 1 to the APA.

      5.    <u>Conditions to Closing</u>.  Purchaser's obligation to enter into the Contemplated Transactions shall be conditioned upon:

        (a)    Seller delivering to Purchaser, on or before the Closing Date, Stewart's written acknowledgement and agreement, in a form attached as Exhibit 2 to the APA;

        (b)    Seller delivering to Purchaser, on or before the Closing Date, a duly executed agreement between Stewart and SoundExchange with respect to Stewart's services as a performer on the Masters and evidence of SoundExchange's acceptance of instructions from Stewart directing all Sound Exchange Royalties to an account designated by Purchaser, in a form acceptable to Purchaser;

        (c)    Seller delivering to Purchaser, on or before the Closing Date, a duly executed affiliation agreement between Stewart and BMI;

        (d)    Entry of an order of the Bankruptcy Court approving this Motion (the "Order"), which provides that Purchaser is acquiring the Transferred Assets from Seller pursuant to Section 363(f) of the Bankruptcy Code free and clear of any Liens and that Purchaser is a "good faith" purchaser (as such term is used in Section 363(m) of the Bankruptcy Code; and

        (w)    Purchaser being reasonably satisfied that all material representations and warranties of Seller pursuant to this Agreement are true and accurate on the Closing Date.

      6.    <u>The Closing</u>.

        (a)    Provided Seller's obligations under Section 4.01 of the APA have been fulfilled or Purchaser notifies Seller in writing that it elects to waive any applicable unfulfilled obligation(s), the closing of the Contemplated Transactions (the "<u>Closing</u>") shall take place no later than five (5) Business Days after the issuance of the Order by the Bankruptcy Court on a date to be agreed by the parties (the "<u>Closing Date</u>") at the office of Loeb & Loeb, 10100 Santa Monica Blvd., Suite 2200, Los Angeles, CA, 90067 or remotely or electronically as the parties may jointly elect in writing.  Notwithstanding anything to the contrary herein, in the event that the Closing does not occur within sixty (60) days following the date of full execution of the APA, Purchaser shall have the right but not the obligation to terminate the

1    APA.

2           (b)    At the Closing, Seller shall deliver or cause to be delivered to Purchaser the
items set forth in Section 4.02(b)(i) – (xi) of the APA.

           (c)    At the Closing, Purchaser shall deliver or cause to be delivered to Seller
payment of the Purchase Price by wire transfer of immediately available funds in the amounts
and to the accounts set forth in the payment instructions attached as Exhibit 1 to the APA.

**D.**    **The Agreement To Modify Commission Arrangement**.

On February 21, 2017, the Debtors filed an application seeking to employ Loeb & Loeb
LLP ("Loeb") as the Debtors' special counsel and to modify the terms of their employment of E.
Eli Ball dba Acklen Advisory Services LLC (collectively, "Ball") as sale agent and broker to the
Debtors.  Pursuant to that application, which was approved by the Court by an order entered on
April 4, 2017 (Docket No. 714), Loeb and Ball agreed to a commission fee of 2.25% each, of the
gross proceeds of the sale of the Debtors' assets, for a total commission payment by the Debtors
of 4.5% of the gross proceeds of the sale of the Debtors' assets (subject to application of retainers
toward commissions earned).  Pursuant to the "Agreement To Modify Commission Arrangement"
(the "Commission Modification"), a true and correct copy of which is attached as Exhibit "2"
hereto, Loeb and Ball have agreed to split the 4.5% total commission, as follows: (1) Loeb will
receive a 3.0% commission (subject to all other terms and conditions of Loeb's employment); and
(2) Ball will receive a 1.5% commission (subject to all other terms and conditions of Loeb's
employment).  The Commission Modification does not change the financial impact to the Debtors
or the Debtors' estates of paying a 4.5% commission.  The Commission Modification is an
agreement between the two professionals tasked with assisting the Debtors with the Debtors' sale
efforts, which the Debtors support.  The proposed modified commissions are proposed to be paid
at the Closing from the Purchase Price.

**II.**    **DISCUSSION**

**A.**    **The Court Should Authorize The Debtors To Sell The Transferred Assets To The
Purchaser.**

Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing,
may use, sell or lease, other than in the ordinary course of business, property of the estate."  To

1  approve a use, sale or lease of property other than in the ordinary course of business, the court

2  must find "some articulated business justification." *See, e.g., In re Martin (Myers v. Martin)*, 91

3  F.3d 389, 395 (3d Cir. 1996) citing *In re Schipper (Fulton State Bank v. Schipper)*, 933 F.2d 513,

4  515 (7th Cir. 1991); *Comm. of Equity SEC Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d

5  1063, 1070 (2d Cir. 1983); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir.

6  1986) (implicitly adopting the "sound business judgment" test of *Lionel Corp.* and requiring good

7  faith); *In re Delaware and Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991) (concluding that the

8  Third Circuit adopted the "sound business judgment" test in the *Abbotts Dairies* decision).

9      In the Ninth Circuit, "cause" exists for authorizing a sale of estate assets if it is in the best

10 interest of the estate, and a business justification exists for authorizing the sale. *In re Huntington,*

11 *Ltd.*, 654 F.2d 578 (9th Cir. 1981); *In re Walter*, 83 B.R. 14, 19-20 (9th Cir. B.A.P. 1988).  The

12 Ninth Circuit has also held that section 363 allows the sale of substantially all assets of a debtor's

13 bankruptcy estate after notice and a hearing.  *In re Qintex Entertainment, Inc.*, 950 F.2d 1492 (9th

14 Cir. 1991).

15     In determining whether a sale satisfies the business judgment standard, courts have held

16 that: (1) there be a sound business reason for the sale; (2) accurate and reasonable notice of the

17 sale be given to interested persons; (3) the sale yield an adequate price (i.e., one that is fair and

18 reasonable); and (4) the parties to the sale have acted in good faith.  *Titusville Country Club v.*

19 *Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *see also, In*

20 *re Walter*, 83 B.R. at 19-20.

21     The Debtors submit that their proposed sale of the Transferred Assets to the Purchaser

22 clearly comports with each of these four criteria and demonstrates that the Debtors' business

23 judgment to proceed with the sale is sound; indeed, a sale of the Debtors' assets is *required* under

24 the Debtors' confirmed Plan by August 6, 2018 (*see Reorganized Debtors' Motion For An Order*

25 *Further Extending Asset Disposition Deadline Pursuant To Confirmed Plan Of Reorganiz*ation

26 (Docket No. 990)).

27     1.    <u>Sound Business Purpose</u>.

28     There must be some articulated business justification, other than appeasement of major

12

creditors, for using, selling or leasing property out of the ordinary course of business before the

bankruptcy court may order such disposition under Section 363(b). *In re Lionel Corp.*, 722 F.2d

at 1070. The Ninth Circuit Bankruptcy Appellate Panel in *Walter v. Sunwest Bank (In re Walter)*,

83 B.R. 14, 19 (9th Cir. B.A.P. 1988) has adopted a flexible case-by-case test to determine

whether the business purpose for a proposed sale justifies disposition of property of the estate

under Section 363(b). In *Walter*, the Bankruptcy Appellate Panel, adopting the reasoning of the

Fifth Circuit in *In re Continental Airlines, Inc.*, 780 F.2d 1223 (5th Cir. 1986) and the Second

Circuit in *In re Lionel Corp.*, *supra*, articulated the standard to be applied under Section 363(b) as

follows:

> Whether the proffered business justification is sufficient depends on
> the case. As the Second Circuit held in <u>Lionel</u>, the bankruptcy
> judge should consider all salient factors pertaining to the proceeding
> and, accordingly, act to further the diverse interests of the Debtor,
> creditors and equity holders, alike. He might, for example, look to
> such relevant facts as the proportionate value of the asset to the
> estate as a whole, the amount of elapsed time since the filing, the
> likelihood that a plan of reorganization will be proposed and
> confirmed in the near future, the effect of the proposed disposition
> on future plans of reorganization, the proceeds to be obtained from
> the disposition vis-a-vis any appraisals of the property, which of the
> alternatives of use, sale or lease the proposal envisions and, most
> importantly perhaps, whether the asset is increasing or decreasing in
> value. This list is not intended to be exclusive, but merely to
> provide guidance to the bankruptcy judge.

*In Re Walter*, 83 B.R. at 19-20, *citing In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th

Cir. 1986).

The facts pertaining to the Debtors' proposed sale of the Transferred Assets clearly

substantiate the Debtors' business decision that such contemplated sale serves the best interests of

the Debtors' estates and their remaining creditor(s) and merits the approval of the Court.

As indicated above, the Stewart Settlement Agreement and the Debtors' confirmed Plan

*require* the Debtors to sell the Transferred Assets pursuant to section 363 of the Bankruptcy

Code. The Debtors' equity interest holders, who are at this point the primary parties in interest,

given that virtually all of the Debtors' creditors have been paid the full amount of their claims

under the Debtors' Plan, both agree to proceed with the proposed sale to the Purchaser under the

terms of the APA.  Indeed, the Debtors and the Debtors' equity holders engaged in substantial

negotiations, both among themselves, and with the Purchaser, in connection with the terms of the

APA, and have determined to proceed with the Contemplated Transactions.  Accordingly, the

Debtors submit that their proposed sale is justified by sound business purposes, satisfying the first

requirement for a sale under Section 363(b) of the Bankruptcy Code.

       2.    <u>Accurate and Reasonable Notice</u>.

In connection with a proposed sale under Section 363 of the Bankruptcy Code, "four

pieces of information must be presented to the creditors.  The notice should: place all parties on

notice that the debtor is selling its business; disclose accurately the full terms of the sale; explain

the effect of the sale as terminating the debtor's ability to continue in business; and explain why

the proposed price is reasonable and why the sale is in the best interest of the estate." *In re*

*Delaware & Hudson Railway Co.*, 124 B.R. 169, 180 (D. Del. 1991).  A notice is sufficient if it

includes the terms and conditions of the sale and if it states the time for filing objections.  *In re*

*Karpe*, 84 B.R. 926, 930 (Bankr. M.D. Pa. 1988).  The purpose of the notice is to provide an

opportunity for objections and hearing before the court if there are objections.  *Id.*

The Debtors are providing notice of this Motion on all of the Debtors' creditors, the UST,

those parties who have requested special notice and all other parties in interest in these

bankruptcy cases.

The Debtors submit that the foregoing satisfies the requirements of Bankruptcy Rules

6004(a) and (c), which provide as follows:

> "(a) ... Notice of a proposed ... sale ... of property ... not in the
> ordinary course of business shall be given pursuant to Rule
> 2002(a)(2),(c)(1),(i) and (k) ...
> (c) ... A motion for authority to sell property free and clear of liens
> or other interests shall be made in accordance with Rule 9014 and
> shall be served on the parties who have liens or other interests in the
> property to be sold.  The notice required by subdivision (a) of this
> rule shall include the date of the hearing on the motion and the time
> within which objections may be filed and served on the debtor in
> possession..."

Fed. R. Bankr. P. 6004(a)(c).  The Debtors have complied with all noticing procedures required

1   by the Bankruptcy Rules and the Court.

2          3.    Fair and Reasonable Price.

3          In order to be approved under Section 363(b) of the Bankruptcy Code, the purchase price

4   must be fair and reasonable. *Coastal Indus., Inc. v. U.S. Internal Revenue Service (In re Coastal*

5   *Indus., Inc.)*, 63 B.R. 361, 368 (Bankr. N.D. Ohio 1986). Several courts have held that "fair

6   value" is given for property in a bankruptcy sale when at least 75% of the appraised value of such

7   property is paid. *See In re Karpe*, 84 B.R. at 933; *In re Abbotts Dairies of Pennsylvania, Inc.*, 788

8   F.2d 143, 149 (3d Cir. 1986); *Willemain v. Kivitz*, 764 F.2d 1019 (4th Cir. 1985); *In re Snyder*, 74

9   B.R. 872, 878 (Bankr. E.D. Pa. 1987); *In re The Seychelles, Partnership and Genius Corp. v.*

10  *Banyan Corp.*, 32 B.R. 708 (N.D. Tex. 1983). However, the Debtor also realizes that "its main

11  responsibility, and the primary concern of the bankruptcy court, is the maximization of the value

12  of the asset sold." *In re Integrated Resources, Inc.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992),

13  *aff'd*, 147 B.R. 650 (S.D.N.Y. 1992). "It is a well-established principle of bankruptcy law that the

14  objective of bankruptcy rules and the [debtor's] duty with respect to such sales is to obtain the

15  highest price or greatest overall benefit possible for the estate." *In re Atlanta Packaging*

16  *Products, Inc.*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988); *see also In re Wilde Horse Enterprises*,

17  136 B.R. 830, 841 (Bankr. C.D. Cal. 1991) ["in any sale of estate assets, the ultimate purpose is to

18  obtain the highest price for the property sold"].

19          Pursuant to the Stewart Settlement Agreement, the Debtors and the Debtors' equity

20  interest holders, including Stewart, agreed upon a minimum purchase price for the sale of the

21  Debtors' assets (which minimum purchase price has been submitted to the Court under seal). The

22  Purchase Price reflected in the APA exceeds the minimum purchase price set forth in the Stewart

23  Settlement Agreement; all creditors have been paid or will be paid in full (bearing in mind that the

24  Debtors intend to set aside reserves from the Purchase Price as required under the Plan); and

25  equity interest holders will receive their share of the Purchase Price as set forth in the Plan. Given

26  that the Plan specifically authorizes the Debtors to avoid an auction if the Debtors' equity interest

27  holders both consent, and given that the Purchase Price exceeds the required minimum amount

28  (significantly), the Debtors submit that the Purchase Price is fair and reasonable, and an auction is

not necessary.

The sale process undertaken by the Debtors was specifically designed to insure that the highest price possible is obtained for the Transferred Assets. The Debtors engaged in an extensive and broad marketing and sale process for months, having facilitated due diligence with numerous parties. All interested and viable buyers were provided with equal access to the Debtors and their financial information. All prospective bidders had the equal opportunity to participate in the sale process conducted by highly experienced and competent transactions counsel (John Frankenheimer, Esq. of Loeb & Loeb LLP). The Debtors negotiated with interested parties and the Purchaser ultimately submitted a preemptive bid for the Transferred Assets which the Debtors believe is a fair and reasonable price for the Transferred Assets.

4.    Good Faith.

When a bankruptcy court authorizes a sale of assets pursuant to Section 363(b)(1), it is required to make a finding with respect to the "good faith" of Purchaser. *In re Abbotts Dairies*, 788 F.2d at 149. Such a procedure ensures that Section 363(b)(1) will not be employed to circumvent the creditor protections of Chapter 11, and as such, it mirrors the requirement of Section 1129, that the Bankruptcy Court independently scrutinizes the debtor's reorganization plan and makes a finding that it has been proposed in good faith. *Id.* at 150.

"Good faith" encompasses fair value, and further speaks to the integrity of the transaction. *In re Wilde Horse Enterprises*, 136 B.R. at 842. With respect to the debtor's conduct in conjunction with the sale, the good faith requirement "focuses principally on the element of special treatment of the Debtor's insiders in the sale transaction." *See In re Industrial Valley Refrig. and Air Cond. Supplies, Inc.*, 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987). With respect to the buyer's conduct, this Court should consider whether there is any evidence of "fraud, collusion between the purchaser and other bidders or the [debtor], or an attempt to take grossly unfair advantage of other bidders." *In re Abbotts Dairies*, 788 F.2d at 147, *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978); *In re Wilde Horse Enterprises, Inc.*, 136 B.R. at 842; *In re Alpha Industries, Inc.*, 84 B.R. 703, 706 (Bankr. D. Mont. 1988). In short, "[l]ack of good faith is generally determined by fraudulent conduct during the sale proceedings." *In re Apex Oil*

*Co.*, 92 B.R. 847, 869 (Bankr. E.D. Mo. 1988), *citing In re Exennium, Inc.*, 715 F.2d 1401, 1404-05 (9th Cir. 1983).

In *In re Filtercorp, Inc.*, 163 F.3d 570 (9th Cir. 1998), the Ninth Circuit set forth the following test for determining whether a buyer is a good faith purchaser:

> A good faith buyer "is one who buys 'in good faith' and 'for value.'"  [citations omitted.]  [L]ack of good faith is [typically] shown by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'" [citations omitted.]

*Filtercorp*, 163 F.3d at 577.

The Debtors' negotiations with the Purchaser were conducted at arms' length.  There is no insider relationship between the Debtors and the Purchaser.  While the Debtors' principal, Gerald Goldstein, has engaged and is engaged in other transactions and dealings with the Purchaser that are completely unrelated to the proposed Transaction, the Purchaser is not an insider of the Debtors, and neither the Debtors nor Mr. Goldstein will have any involvement with the ownership or operation of the Purchased Assets after they are sold to the Purchaser.  Indeed, the APA specifically provides that Mr. Goldstein "shall not have any interest in or to the Transferred Assets or any revenues, royalties or other amounts derived therefrom, other than any consideration paid to Goldstein by T.A.G. Management, Inc. as an equity owner of Seller.  Moreover, Goldstein shall not be involved in any way with the management, marketing, exploitation, or promotion of the Transferred Assets from and after the Closing Date." *See* APA, Article IX.

During the negotiation process, the Debtors and the Purchaser were actively represented by capable, separate counsel, and exchanged offers and counteroffers prior to ultimately agreeing to the general terms and conditions of a transaction.  The general agreement was then memorialized in a letter of intent, which was also negotiated between the parties.  The letter of intent was ultimately transformed into an offer sheet, the final terms and conditions of which were negotiated between the parties.  The offer sheet was ultimately transformed into the APA.  In summary, the Debtors and the Purchaser engaged in a lengthy negotiation process emblematic of

1  an arms-length transaction.  Based on the foregoing, the Debtors submit that the Court should find

2  that the Purchaser is entitled to all of the protections afforded by Section 363(m) of the

3  Bankruptcy Code.

4  **B.**  **Section 363(f) of the Bankruptcy Code Permits the Sale of the Debtors' Assets to Be**

5  **Free and Clear of Any and All Liens (as the Term Lien is Defined in the APA).**

6  Section 363(f) of the Bankruptcy Code provides, in relevant part, as follows:

7  The trustee may sell property under subsection (b) . . . of this section free and clear

8  of any interest in such property of an entity other than the estate, only if—

9  (1)  applicable non-bankruptcy law permits the sale of such property free and

10  clear of such interest; ...

11  (2)  such entity consents;

12  (3)  such interest is a lien and the price at which such property is to be sold is

13  greater than the aggregate value of all liens on such property;

14  (4)  Such interest is in bona fide dispute; or

15  (5)  such entity could be compelled, in a legal or equitable proceeding, to

16  accept a money satisfaction of such interest.

17  11 U.S.C. § 363(f).

18  Section 363(f) of the Bankruptcy Code was drafted in the disjunctive.  Thus, a debtor need

19  only meet the provisions of one of the five subsections of Section 363(f) in order for a sale of

20  property to be free and clear of any and all interests.  Here, the Debtors request that the Court

21  approved the sale of the Transferred Assets to the Purchaser free and clear of all liens, claims,

22  interests, charges, mortgages, encumbrances, security interests, proxies, pledges, equity, tax or

23  other restriction or third party right of any kind (collectively, "Liens").

24  1.  363(f)(1)

25  The Debtors' assets may be sold free of unsecured claims under applicable law.  Claims

26  which assert rights to payment on an unsecured basis (whether or not disputed) are simply claims

27  against the Debtors and do not legally attach to the Debtors' assets after sale.  Given that such

28  claims are claims for monetary relief which do not attach to the Debtors' assets, the Debtors'

assets may therefore be sold free and clear of such claims.  Moreover, there are no remaining secured claims against the Debtors, and all of the Debtors' general unsecured creditors, except for Glenn Stone, who consents to the sale and will be paid the full amount of his allowed claim, have been paid in full.  Moreover, sufficient funds will be set aside to address any reserves required to be set aside for BMI, and the funds required to be set aside by the BMI Settlement Agreement.

2.    363(f)(2)

In the event none of the Debtors' creditors file a timely objection to the Debtors' proposed sale, the Debtors submit that the "consent" of an entity asserting an interest in the property sought to be sold, as referenced in Section 363(f)(2) of the Bankruptcy Code, can be implied if such entity fails to make a timely objection to the sale after receiving notice of the sale.  *In re Eliot*, 94 B.R. 343, 345 (E.D. Pa. 1988).  In its ruling, the *Eliot* court relied on *In re Gabel*, 61 B.R. 661 (Bankr. W.D. La. 1985), which held that implied consent is sufficient to authorize a sale under § 363(f)(2).  *See also*, *In re Ex-Cel Concrete Company, Inc.*, 178 B.R. 198, 203 (9th Cir. BAP 1995) ["The issue here is whether there was consent or non-opposition by Citicorp."]; *In re Paddlewheels, Inc.*, 2007 WL 1035151 (Bankr. E.D.La. April 2, 2007) ["The Sale Motion complies with section 363(f) of the Bankruptcy Code, in that the Trustee either obtained the consent of Whitney to the sale of the Vessel to Purchaser or Whitney had no objection to the Sale."].

As a result of the foregoing, the Debtors submit that the Court should approve the sale of the Debtors' Purchased Assets free and clear of any and all Liens of those parties who do not file a timely objection to the sale, by deeming all such parties to have consented to the proposed sale pursuant to Section 363(f)(2) of the Bankruptcy Code.

3.    363(f)(3)

The Debtors do not believe that this subsection applies, because the Debtors do not believe that there are any liens against any of the Debtors' assets.

4.    363(f)(4)

If any party claims an alleged Lien against or in the Debtors' assets, such Liens are

disputed by the Debtors and would be in bona fide dispute.  To the extent the Pope Parties claim

any interest in the Debtors' assets, those interests are limited solely to the Pope Parties' interest in

the BMI Settlement Agreement.  The Debtors will honor the terms of the BMI Settlement

Agreement, and the proposed sale of the Debtors' assets to the Purchaser comports with the terms

of the BMI Settlement Agreement.

     5.    <u>363(f)(5)</u>

Section 363(f)(5) of the Bankruptcy Code permits a sale of property free and clear of liens

and interests if "such entity could be compelled, in a legal or equitable proceeding, to accept a

money satisfaction of such interest."  11 U.S.C. § 363(f)(5).

The Bankruptcy Appellate Panel for the Ninth Circuit has scrutinized § 363(f)(5) in the

context of the sale of real property.  *See Clear Channel Outdoor, Inc. v. Knupfer* (*In re PW,*

*LLC*), 391 B.R. 25 (9th Cir. B.A.P. 2008) ("*Clear Channel*").  In *Clear Channel*, the senior

secured creditor attempted to purchase the debtor's real property by way of a credit bid, free and

clear of the interest of a nonconsenting junior lienholder outside of a plan of reorganization.  The

Bankruptcy Court approved the sale to the senior lender under § 363(f)(5), finding that

§ 363(f)(5) permits a sale free and clear of the creditor's interest in property "whenever a claim

can be paid with money."  391 B.R. at 42.

In reversing the Bankruptcy Court's decision, the Bankruptcy Appellate Panel found that

§ 363(f)(5) requires that "(1) a proceeding exists or could be brought, in which (2) the nondebtor

could be compelled to accept a money satisfaction of (3) its interest."  *Id*. at 41.  Taking up these

factors in reverse order, the Bankruptcy Appellate Panel concluded that a lien, such as the lien of

a secured lender, constitutes an "interest" for purposes of § 363(f)(5).  With respect to the second

factor, the Bankruptcy Appellate Panel ruled that § 363(f)(5) refers to those proceedings in

which the creditor "could be compelled to take less than the value of the claim secured by the

interest."  *Id*.  In order to approve a sale free and clear under § 363(f)(5), the Court must "make a

finding of the existence of … a mechanism [to address extinguishing the lien or interest without

paying such interest in full] and the [debtor in possession] must demonstrate how satisfaction of

the lien 'could be compelled.'"  *Id*. at 45.  Finally, the Bankruptcy Appellate Panel held that §

363(f)(5) requires that there be, "or that there be the possibility of, some proceeding, either at law or at equity, in which the nondebtor could be forced to accept money in satisfaction of its interest." *Id.*

Here, all of the factors set forth in *Clear Channel* for a sale free and clear of Liens are satisfied.  Specifically, any party who asserts a Lien in the Debtors' assets could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of its Lien.   Similarly, any creditor of the Debtor's estate could undeniably be forced to accept, via court proceedings whereby such creditors could obtain money judgments against the Debtor, money satisfaction of their Liens.

**C.    The Court Should Approve The Commission Modification And Authorize The Debtors To Pay The Modified Commissions At Closing From The Purchase Price.**

Pursuant to 11 U.S.C. §§ 328 and 363, the Court should approve the Commission Modification, and authorize the Debtors to pay the modified commission amounts set forth therein to Loeb and Ball (subject to application of retainers toward commissions earned), at the Closing, from the Purchase Price.  The Commission Modification does not change the financial impact to the Debtors or the Debtors' estates of paying a 4.5% commission.  The Commission Modification is an agreement between the two professionals tasked with assisting the Debtors with the Debtors' sale efforts, which the Debtors support.

**D.    The Debtors Request the Court Waive the Fourteen-Day Waiting Period Set Forth in Bankruptcy Rule 6004(h).**

Bankruptcy Rule 6004(h) provides, among other things, that an order authorizing the use, sale or lease of property . . . is stayed until the expiration of fourteen days after entry of the Court order, unless the Court orders otherwise.

For all of the reasons set forth above, to make sure that the sale closing occurs within five Business Days of the entry of an order granting this Motion, the Debtors request that any order granting this Motion be effective immediately upon entry by providing that the fourteen-day waiting period of Bankruptcy Rule 6004(h) is waived.

## III.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter a Sale Order[3] in a form substantially similar to the proposed Sale Order attached as Exhibit "3" hereto, among other things:

1.      approving the APA;

2.       authorizing the sale of the Transferred Assets to the Purchaser, free and clear of all Liens;

3.      authorizing the Debtors to implement the APA without further Court order;

4.      authorizing the Debtors to close the Contemplated Transactions without further Court order;

5.      authorizing the Debtors to take any further action necessary to implement and enforce the Contemplated Transactions without further Court order;

6.      directing the deposit of the Purchase Price into Even St.'s debtor in possession account;

7.      authorizing the Debtors to distribute the Purchase Price pursuant to the Sale Order and the Debtors' confirmed *First Amended Plan Of Reorganization (Dated February 10, 2017), As Modified*;

8.      finding that the Purchaser is a good faith buyer entitled to all of the protections afforded by Section 363(m) of the Bankruptcy Code;

9.      approving the Commission Modification and authorizing the Debtors to pay from the Purchase Price, at the Closing, the commissions set forth in the Commission Modification;

10.      waiving the 14-day stay periods set forth in Bankruptcy Rule 6004(h); and

/ / /

/ / /

/ / /

---

[3] Capitalized terms not otherwise defined have the same meaning ascribed to such terms in the Purchase Agreement.

1      11.      granting such other and further relief as the Court deems just and proper.

2

3    Dated: September 27, 2018            EVEN ST. PRODUCTIONS LTD; MAJOKEN, INC.

4

5                                        By:    /s/ David L. Neale
                                                DAVID L. NEALE
6                                               KRIKOR J. MESHEFEJIAN
                                         LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
7                                        Counsel for Reorganized Debtors

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>DECLARATION OF GERALD GOLDSTEIN</u>**

I, Gerald Goldstein, hereby declare as follows:

1.      I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.      I am the President, and authorized representative of Even St. Productions Ltd. ("<u>Even Street</u>") and Majoken, Inc. ("<u>Majoken</u>" and together with Even Street, the "<u>Debtors</u>").

3.      The Debtors manage, promote, and monetize the rights and interests emanating from the skills and talents of Sylvester Stewart p/k/a Sly Stone ("<u>Stewart</u>"), and the musical group Sly & the Family Stone.  Stewart is a fifty percent (50%) equity owner of Even Street and T.A.G. Management, Inc. is a fifty percent (50%) equity owner of Even Street.  The master recordings and musical compositions of Stewart have generated royalties and licensing income for over forty (40) years.  The equity owners consent to the terms of the sale proposed by this Motion.

4.      During their bankruptcy cases, the Debtors sought the turnover of the royalties assigned to the Debtors.  On July 13, 2015, the Bankruptcy Court entered its *Order Directing Release of Interpleaded Funds to Even St. Productions Ltd. and Directing Payment of Royalties to Even St. Productions Ltd.* (the "<u>Turnover Order</u>").  Pursuant to the Turnover Order, all of the funds held in the State Court interpleader account were delivered to Even Street and placed into a segregated debtor-in-possession bank account (the "<u>Royalty Account</u>").  All additional royalty payments that have been received by the Debtors since the entry of the Turnover Order have been deposited into the Royalty Account.

5.      Following hearings on January 12, 2017 and February 2, 2017, the Bankruptcy Court granted the Debtors' motion seeking turnover of all royalties held by Broadcast Music, Inc. ("<u>BMI</u>"), both those currently in possession of BMI as well as future royalties payable.  BMI has turned over to the Debtors the royalties in its possession as continues to pay to the Debtors royalties as they are earned from time to time.  BMI and the Pope Parties (as defined below) have appealed this Court's order to turnover the royalties held by BMI.  That appeal has been placed on hold pending this Court's approval of a settlement agreement between the parties to that appeal.

6.      On May 29, 2015, the Debtors filed a complaint in the Bankruptcy Court against

FCBLA, LLC ("FCBLA") which was the purchaser of all of the Debtors' secured debt (originally owned by First California Bank), for disallowance of FCBLA's claims and equitable subordination of FCBLA's claims.  The Debtors and FCBLA thereafter engaged in substantial settlement discussions in connection with all of the parties' respective claims, including FCBLA's claims filed against the Debtors, and entered into a settlement agreement resolving their disputes.  The Court approved that settlement agreement and the parties have effectuated that settlement agreement, pursuant to which the claims of FCBLA have been satisfied in their entirety and the complaint against FCBLA has been dismissed.

7.    Since approximately 2010, the Debtors and Stewart, among other parties, engaged in extensive litigation (the "Royalty Litigation") in the Los Angeles Superior Court (the "State Court") regarding, among other things, the royalties Stewart assigned to the Debtors in February 1989 (the "1989 Assignment").

8.    On September 20, 2016, the Debtors, Stewart and other parties in the Royalty Litigation engaged in mediation before the Honorable Meredith A. Jury, United States Bankruptcy Judge for the Central District of California – Riverside Division.  The mediation was successful, in that the Debtors and Stewart agreed to settle their disputes, including the allowed amount and treatment of Stewart's claim, the manner in which claims would get paid in this case (by a disposition of certain assets), and mutual and general releases. The terms of settlement were stated on the record before Judge Jury.

9.    On October 13, 2016, the Debtors filed that certain *Motion For Entry Of An Order Approving Settlement Agreement And Mutual Release Pursuant To Rule 9019 Of The Federal Rules Of Bankruptcy Procedure* (the "Stewart Settlement Motion") pursuant to which the Debtors asked the Court to approve that certain *Settlement Agreement And Mutual General Release* (the "Stewart Settlement Agreement").  A true and correct copy of the Stewart Settlement Agreement is attached as Exhibit "4" hereto.

10.    On November 15, 2016, the Court entered that certain *Order Approving Settlement Agreement And Mutual Release Pursuant To Rule 9019 Of The Federal Rules Of Bankruptcy Procedure* [Docket No. 595].  On November 30, 2016, the Stewart Settlement Agreement became

effective.

11.     Pursuant to the Stewart Settlement Agreement, among other things, the Debtors are required to propose a plan of reorganization "which shall incorporate the terms of this Agreement and provide, in addition to terms and conditions consistent with the requirements of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure and Local Rules of Bankruptcy Procedure, that the Debtors shall transfer all right, title and interest in and to certain specified assets pursuant to Section 363 of the Bankruptcy Code[.]"

12.     In the Royalty Litigation, Kenneth Roberts ("Roberts") and Majoken Inc. ("Nondebtor Majoken") claimed one or the other was entitled to receive any performance royalties payable by BMI (the "BMI Royalties") which had been assigned by Stewart to Even Street in the 1989 Assignment.  Virginia Pope ("Pope" and collectively with Roberts and Nondebtor Majoken, the "Pope Parties") subsequently claimed that she is the successor in interest to Roberts.  From 1996 until 2009 BMI paid the BMI Royalties to Majoken (to which they had been assigned by Even Street in 1996).  As a result, Roberts, Pope, and Nondebtor Majoken asserted claims against BMI, Even Street, Majoken and others to recover the amount of the BMI Royalties which had been paid by BMI to Majoken.

13.     On August 23, 2016, this Court entered that certain *Order Re Motion To Disallow Proofs Of Claim Of Virginia Pope, Successor To Ken Roberts And Majoken Inc.; Or, In The Alternative, Estimate Such Claims*.  Pursuant to that order, the claims filed by Nondebtor Majoken have been disallowed, the claim filed by Virginia Pope against Even Street has been estimated at $0.00 for all purposes in Even Street's bankruptcy case, and the claim filed by Ken Roberts against Majoken has been estimated at $0.00 for all purposes in Majoken's bankruptcy case.

14.     On February 17, 2017, the Debtors, BMI, and Pope engaged in a mediation conference before the Honorable Meredith A. Jury, United States Bankruptcy Judge.  Ultimately, the parties came to a general agreement regarding the terms of a mutually agreeable settlement.  Thereafter, in around late March 2017 through early April 2017, the parties attempted to negotiate and finalize a written settlement agreement.  However, BMI and the Debtors then discovered that the estate of Roberts was subject to probate in New York County Surrogate's Court, and that there

1  were certain creditors of Roberts who could potentially prevent the parties from implementing

2  their settlement.

3  15.    October 13, 2017, the Debtors, BMI, and Pope, among other parties, engaged in a

4  second mediation conference before Judge Jury.  At that time, the Debtors were  informed that

5  Pope had reached, or was close to reaching, a settlement with the creditors' of Roberts' estate

6  regarding Pope's claims to the BMI Royalties and to any settlement proceeds received by Pope

7  from BMI or the Debtors' estates.  At the second mediation conference, the Debtors, BMI, and

8  Pope reached a global agreement to settle all of their disputes, including ownership of the BMI

9  Royalties.  The terms of the parties' settlement were recited into the record and confirmed by

10  representatives of all settling parties.

11  16.    During the process of negotiating and drafting a written settlement agreement,

12  issues arose concerning the procedural mechanism by which the parties could obtain necessary

13  approvals from the Surrogate's Court in New York.  The Debtors spent considerable time and

14  effort, including with the assistance of Judge Jury, to work through those issues to implement the

15  settlement as promptly as possible.  The Debtors' probate counsel worked with BMI's and Pope's

16  probate counsel to prepare language for the settlement agreement designed to address the probate

17  issues.

18  17.    On or about February 9, 2018, Pope, BMI, and the Debtors, among other parties,

19  executed a settlement agreement (the "BMI Settlement Agreement") pursuant to which Pope (and

20  related parties) agreed, subject to the terms of the settlement, that the "Pope Parties" have no

21  claim whatseover to the BMI Royalties.  The Debtors are required to seek Bankruptcy Court

22  approval of the BMI Settlement Agreement within five business days after the New York

23  Surrogate's Court enters an accounting decree in the probate action.  The Debtors are presently

24  waiting for the Surrogate's Court to issue an accounting decree.  A true and correct copy of the

25  BMI Settlement Agreement is attached as Exhibit "5" hereto.

26  18.    On August 24, 2017, the Court entered that certain  *Order Confirming Debtors'*

27  *First Amended Plan Of Reorganization (Dated February 10, 2017), As Modified* (the "Plan

28  Confirmation Order") [docket entry no. 864].  On September 8, 2017, the *Debtors First Amended*

*Plan Of Reorganizaed (Dated February 10, 2017), As Modified* (the "Plan") went into effect.

19.    Pursuant to the Plan, the Debtors are required to proceed with a transaction under 11 U.S.C. § 363 for sale of the Sale Assets (as defined in the Plan and the Stewart Settlement Agreement) by public auction subject to overbidding and approval of the Bankruptcy Court, unless the equity holders of the Debtors, including Mr. Stewart, provide advance written consent to conduct an Asset Disposition other than a sale by way of public auction subject to overbidding and approval of the Bankruptcy Court.  The Debtors' equity holders have consented to the sale proposed by this Motion, and have agreed to forego an auction of the Sale Assets.

20.    Under the Plan, all creditors other that Glenn Stone have been paid the full amount of their claims.  Mr. Stone supports and consents to the sale proposed by this Motion.  BMI's claim reserve has been funded as required under the Plan and, to the extent required under the Plan and the BMI Settlement Agreement at the time that a sale closes, will continue to be funded per the terms of the Plan and the BMI Settlement Agreement.

21.    On or about September 21, 2018, the Debtors, on the one hand, and Primary Wave Music IP Fund 1, LP (the "Purchaser"), on the other hand, executed that certain "Asset Purchase Agreement" (the "APA"), a true and correct copy of which is attached as Exhibit "1" hereto.

22.    The APA sets forth the terms of the Purchaser's acquisition of the Transferred Assets[4] from the Debtors and/or any and all other affiliated companies owning such rights and parties to the Stewart Settlement Agreement (collectively, the "Seller") on the terms and conditions set forth in the APA.

23.    On February 21, 2017, the Debtors filed an application seeking to employ Loeb & Loeb LLP ("Loeb") as the Debtors' special counsel and to modify the terms of their employment of E. Eli Ball dba Acklen Advisory Services LLC (collectively, "Ball") as sale agent and broker to the Debtors.  Pursuant to that application, which was approved by the Court by an order entered on April 4, 2017 (Docket No. 714), Loeb and Ball agreed to a commission fee of 2.25% each, of

---

[4] Capitalized terms not otherwise defined have the meaning ascribed to such terms in the APA. To the extent there is any discrepancy between the terms of the APA and this Motion's description of the terms of the APA, the terms of the APA shall govern.

the gross proceeds of the sale of the Debtors' assets, for a total commission payment by the Debtors of 4.5% of the gross proceeds of the sale of the Debtors' assets (subject to application of retainers toward commissions earned).  Pursuant to the "Agreement To Modify Commission Arrangement" (the "Commission Modification"), a true and correct copy of which is attached as Exhibit "2" hereto, Loeb and Ball have agreed to split the 4.5% total commission, as follows: (1) Loeb will receive a 3.0% commission (subject to all other terms and conditions of Loeb's employment); and (2) Ball will receive a 1.5% commission (subject to all other terms and conditions of Loeb's employment).  The Commission Modification does not change the financial impact to the Debtors or the Debtors' estates of paying a 4.5% commission.  The Commission Modification is an agreement between the two professionals tasked with assisting the Debtors with the Debtors' sale efforts, which the Debtors support.  The proposed modified commissions is proposed to be paid at the Closing from the Purchase Price.

24.    I respectfully submit that the facts pertaining to the Debtors' proposed sale of the Transferred Assets clearly substantiate the Debtors' business decision that such contemplated sale serves the best interests of the Debtors' estates and their remaining creditor(s) and merits the approval of the Court.

25.    As indicated above, the Stewart Settlement Agreement and the Debtors' confirmed Plan *require* the Debtors to sell the Transferred Assets pursuant to section 363 of the Bankruptcy Code.  The Debtors' equity interest holders, who are at this point the primary parties in interest, given that virtually all of the Debtors' creditors have been paid the full amount of their claims under the Debtors' Plan, both agree to proceed with the proposed sale to the Purchaser under the terms of the APA.  Indeed, the Debtors and the Debtors' equity holders engaged in substantial negotiations, both among themselves, and with the Purchaser, in connection with the terms of the APA, and have determined to proceed with the Contemplated Transactions.

26.    I understand that the Debtors are providing notice of this Motion on all of the Debtors' creditors, the UST, those parties who have requested special notice and all other parties in interest in these bankruptcy cases.

27.    Pursuant to the Stewart Settlement Agreement, the Debtors and the Debtors' equity

interest holders, including Stewart, agreed upon a minimum purchase price for the sale of the Debtors' assets (which minimum purchase price has been submitted to the Court under seal). The Purchase Price reflected in the APA exceeds the minimum purchase price set forth in the Stewart Settlement Agreement; all creditors have been paid or will be paid in full (bearing in mind that the Debtors intend to set aside reserves from the Purchase Price as required under the Plan); and equity interest holders will receive their share of the Purchase Price as set forth in the Plan. Given that the Plan specifically authorizes the Debtors to avoid an auction if the Debtors' equity interest holders both consent, and given that the Purchase Price exceeds the required minimum amount (significantly), I respectfully submit that the Purchase Price is fair and reasonable, and an auction is not necessary.

28. The sale process undertaken by the Debtors was specifically designed to insure that the highest price possible is obtained for the Transferred Assets. The Debtors engaged in an extensive and broad marketing and sale process for months, having facilitated due diligence with numerous parties. All interested and viable buyers were provided with equal access to the Debtors and their financial information. All prospective bidders had the equal opportunity to participate in the sale process conducted by highly experienced and competent transactions counsel (John Frankenheimer, Esq. of Loeb & Loeb LLP). The Debtors negotiated with interested parties and the Purchaser ultimately submitted a preemptive bid for the Transferred Assets which the Debtors believe is a fair and reasonable price for the Transferred Assets.

29. The Debtors' negotiations with the Purchaser were conducted at arms' length. There is no insider relationship between the Debtors and the Purchaser. While I have engaged and am engaged in other transactions and dealings with the Purchaser that are completely unrelated to the proposed Transaction, the Purchaser is not an insider of the Debtors, and neither the Debtors nor I will have any involvement with the ownership or operation of the Purchased Assets after they are sold to the Purchaser. Indeed, the APA specifically provides that I "shall not have any interest in or to the Transferred Assets or any revenues, royalties or other amounts derived therefrom, other than any consideration paid to Goldstein by T.A.G. Management, Inc. as an equity owner of Seller. Moreover, Goldstein shall not be involved in any way with the

1    management, marketing, exploitation, or promotion of the Transferred Assets from and after the

2    Closing Date." *See* APA, Article IX.

3        30.    During the negotiation process, the Debtors and the Purchaser were actively

4    represented by capable, separate counsel, and exchanged offers and counteroffers prior to

5    ultimately agreeing to the general terms and conditions of a transaction.  The general agreement

6    was then memorialized in a letter of intent, which was also negotiated between the parties.  The

7    letter of intent was ultimately transformed into an offer sheet, the final terms and conditions of

8    which were negotiated between the parties.  The offer sheet was ultimately transformed into the

9    APA.  In summary, the Debtors and the Purchaser engaged in a lengthy negotiation process

10   emblematic of an arms-length transaction.  Based on the foregoing, I respectfully submit that the

11   Court should find that the Purchaser is entitled to all of the protections afforded by Section

12   363(m) of the Bankruptcy Code.

13       31.    There are no remaining secured claims against the Debtors, and all of the Debtors'

14   general unsecured creditors, except for Glenn Stone, who consents to the sale and will be paid the

15   full amount of his allowed claim, have been paid in full.  Moreover, sufficient funds will be set

16   aside to address any reserves required to be set aside for BMI, and the funds required to be set

17   aside by the BMI Settlement Agreement.

18       32.    If any party claims an alleged Lien against or in the Debtors' assets, such Liens are

19   disputed by the Debtors and would be in bona fide dispute.  To the extent the Pope Parties claim

20   any interest in the Debtors' assets, those interests are limited solely to the Pope Parties' interest in

21   the BMI Settlement Agreement.  The Debtors will honor the terms of the BMI Settlement

22   Agreement, and the proposed sale of the Debtors' assets to the Purchaser comports with the terms

23   of the BMI Settlement Agreement.

24       33.    I respectfully submit that the Court should approve the Commission Modification,

25   and authorize the Debtors to pay the modified commission amounts set forth therein to Loeb and

26   Ball (subject to application of retainers toward commissions earned), at the Closing, from the

27   Purchase Price.  The Commission Modification does not have any financial impact upon the

28   Debtors or the Debtors' estates.  The Commission Modification is an agreement between the two

1 | professionals tasked with assisting the Debtors with the Debtors' sale efforts, which the Debtors

2 | support.

3 |     34.    For all of the reasons set forth above, to make sure that the sale closing occurs

4 | within five Business Days of the entry of an order granting this Motion, I respectfully request that

5 | any order granting this Motion be effective immediately upon entry by providing that the

6 | fourteen-day waiting period of Bankruptcy Rule 6004(h) is waived.

7 |     I declare under penalty of perjury that the foregoing is true and correct to the best of my

8 | knowledge. Executed this 26th day of September, 2018, at Los Angeles, California.

GERALD GOLDSTEIN

# EXHIBIT "1"

## ASSET PURCHASE AGREEMENT

This AGREEMENT (this "Agreement") dated as of _____ ____, 2018 is made by and between Even St. Productions Ltd., a New York corporation formerly known as Stone Fire Productions Ltd. ("Even St."), and Majoken, Inc., a New York corporation ("Majoken"), (Even St., Majoken and their respective Affiliates (as hereinafter defined) are sometimes hereinafter individually and jointly referred to as "Seller"), on the one hand, and Primary Wave Music IP Fund 1, LP ("Purchaser"), on the other hand.

### RECITALS

WHEREAS, Even St. and Majoken are currently being jointly administered in their respective bankruptcy cases (collectively, the "Bankruptcy Cases") filed under Chapter 11 of 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") in the Central District of California, Los Angeles Division (the "Bankruptcy Court").

WHEREAS, pursuant to Section 363 the Bankruptcy Code, Seller wishes to sell to Purchaser, and Purchaser wishes to purchase from Seller, all of Seller's right, title and interest in and to the Transferred Assets (as hereinafter defined), upon the terms and subject to the conditions set forth in this Agreement;

NOW, THEREFORE, in consideration of the promises and mutual covenants and agreements hereinafter set forth, Seller and Purchaser agree as follows:

### ARTICLE I

### DEFINITIONS; INTERPRETIVE PROVISIONS

Section 1.01    Definitions.

The following defined terms shall have the meanings ascribed to them in this Section 1.01 for all purposes of this Agreement:

"2016 Settlement Agreement" shall mean the Settlement and Mutual Release Agreement dated effective as of September 20, 2016 among Stewart, on the one hand, and Even St., Majoken, Goldstein, Audio Visual Entertainment, Inc. d/b/a Avenue Records, Far Out Productions, Inc., Jerry Goldstein Music, Inc., TMC Music, Inc., T.A.G. Management, Inc., Glenn Stone, and Gradstein & Marzano, P.C., on the other hand.

"Action" shall mean any action, claim, demand, arbitration, investigation, audit, examination, indictment, litigation, suit or other civil, criminal, administrative or investigative proceeding, in each case, by or before a Governmental Authority.

"Advance" shall mean any amounts paid to any Seller Related Entity or other Entity on Seller's behalf as a prepayment, advance or loan against future Royalties.

"Affiliate" shall mean with respect to any Entity, any other Entity controlling, controlled by or under common control with such Entity. As used in this definition, the term "control" (including the terms "controls", "controlled by" and "under common control with") means possession, directly or indirectly, including through one or more intermediaries, of the power to

direct or cause the direction of the management or policies of an Entity, whether through the ownership of voting securities, by Contract, or otherwise.

"Average Annual Net Income" shall mean the average annual net Royalties received by (or credited to the account of) Seller during the Base Period.

"Band" shall mean the musical group known as Sly and The Family Stone.

"Bankruptcy Cases" shall have the meaning set forth in the recitals.

"Bankruptcy Code" shall have the meaning set forth in the recitals.

"Bankruptcy Court" shall have the meaning set forth in the recitals.

"Base Period" shall mean the period commencing January 1, 2012 and continuing through December 31, 2017.

"BMI" shall mean Broadcast Music, Inc. and its successors and Affiliates.

"BMI Agreements" shall mean any and all agreements by and between Stewart, any successor or Affiliate of Stewart or any Seller Related Entity, on the one hand, and BMI, on the other hand, relating to the Compositions, including the agreement between Stewart and BMI executed by Stewart and dated May 26, 2018.

"BMI Royalties" shall mean any and all credits, monies, fees, royalties, revenues, amounts and sums of any kind or description payable or becoming payable by BMI pursuant to the BMI Agreements or otherwise with respect to the public performance of the Compositions in connection with Stewart's capacity as an author, songwriter, lyricist, composer or arranger of the Compositions.

"Box Set" shall mean the five (5) compact disc (or equivalent in other audio configurations) compilation album entitled *Sly & The Family Stone: Higher!* as previously released by Sony Entertainment pursuant to the Sony Entertainment Agreement.

"Business Day" shall mean shall mean any day other than a Saturday, a Sunday, legal holiday or other day on which commercial banks in the United States are authorized or required by Law to close.

"Cash Date" shall mean July 1, 2018.

"CBS Records" shall mean CBS Records, a Division of Columbia Broadcasting Systems, Inc.

"CBS Records Agreements" shall mean each of (i) the agreement dated June 6, 1967 between Stone Flower Productions and CBS Records, (ii) the agreement dated June 7, 1967 between Gerald L. Martini, Fredrick Stewart, Stewart, Lawrence Graham, Jr., Gregory Enrico and Cynthia Robinson, on the one hand, and CBS Records, on the other hand, (iii) the memorandum of agreement dated September 15, 1972, between Stewart, Fresh Productions, Inc., Stone Flower Productions, Inc., Stone Flower Music Co., Daly City Music Co., Illili Entities, Inc., Illili Music Company and David Kapralik, on the one hand, and CBS Records, on the other hand, and (iv) the memorandum of agreement dated December 1, 1977, between Stewart,

2

Fresh Productions, Inc., Stone Flower Productions, Inc., Stone Flower Music Co., Daly City Music Co., Illiii Entities, Inc., Illiii Music Company and David Kapralik, on the one hand, and CBS Records on the other hand, as any such CBS Records Agreements have been amended or extended.

"Claim" shall have the meaning set forth in Article X.

"Closing" shall have the meaning set forth in Section 4.02(a).

"Closing Date" shall have the meaning set forth in Section 4.02(a).

"Composition Assets" shall mean an undivided one hundred percent (100%) interest in and to all of Seller's right, title and interest in and to the Composition Royalties and BMI Royalties payable or becoming payable from and after the Cash Date pursuant to the Even St. Agreements or otherwise.

"Composition Royalties" shall mean any and all credits, monies, fees, royalties, revenues, amounts and sums of any kind or description derived in connection with the Compositions payable or becoming payable to Seller, as successor-in-interest to Stewart by any Publisher pursuant to the Publishing Agreements or otherwise with respect to the use or exploitation of the Compositions in connection with Stewart's capacity as an author, songwriter, lyricist, composer or arranger of the Compositions.

"Compositions" shall mean all musical compositions and musical works written in whole or in part by Stewart on or before December 31, 1988, whether the same were originally claimed or registered as a musical composition or as a musical part of a dramatico-musical work and any music, lyrics, titles or cues of the Compositions, whether domestic or foreign, or direct or indirect interests therein or other rights arising therefrom, respecting which any Seller Related Entity owns or controls any right, title or interest anywhere in the world (whether resulting from a Contract granting a right to participate in the proceeds or exploitation thereof, or otherwise), as well as any Derivative Works based on the Compositions now existing or hereafter created, in each instance to the extent of Seller's current or future interest therein. The Compositions shall include the Compositions listed on Schedule A.

"Consulting Fees" shall mean any and all credits, monies, fees, royalties, revenues, amounts and sums of any kind or description payable or becoming payable pursuant to the Sony Consulting Agreement.

"Contemplated Transactions" shall mean the transactions contemplated by this Agreement.

"Contract" shall mean any contract, agreement, indenture, note, bond, loan, lease, sublease, conditional sales contract, mortgage, license, sublicense, franchise agreement, obligation, promise, undertaking, commitment or other binding arrangement (in each case, whether written or oral).

"Copyrights" shall mean all rights under United States federal or state copyright or foreign copyright, including all renewals, extensions, continuations, restorations, revivals and reversions thereof (whether vested, contingent or inchoate, whether registered or unregistered and whether such renewals, extensions, continuations, restorations, revivals and reversions are now in existence or come into existence for any reason, including as a result of future legislation

3

or the interpretation thereof), in all countries of the world or otherwise throughout the universe, as well as all United States or foreign applications for copyright registration and all causes of action, including those for infringement, arising from the date of creation of the work subject to such Copyright, whether now known or unknown to Seller or Purchaser in all events.

"Derivative Work" shall mean, with respect to any musical composition, musical work or sound recording, any arrangement, adaptation, edition, translation, interpolation or sample thereof or any other derivative work based thereon, and all right, title and interest in and to such Derivative Work; provided, however, that any re-recording by Stewart of any musical composition included in a Master which re-recording is created on or after January 1, 1989 shall not be deemed to be a derivative work of the Master (as opposed to the Composition) for purposes of this Agreement.

"Entity" shall mean any individual, corporation, partnership, association, trust or any other organized group of persons or legal successors or representatives of the foregoing.

"Even St. Agreements" shall mean (i) the assignment dated February 27, 1989 from Stewart to Stone Fire Productions Ltd., and (ii) the 2016 Settlement Agreement.

"Excluded Assets" shall have the meaning set forth in Section 2.02(a).

"Excluded Liabilities" shall have the meaning set forth in Section 2.03(a).

"Governmental Authority" shall mean (i) any federal, provincial, state, local, municipal, national or international government or governmental authority, regulatory or administrative agency, governmental commission, department, board, bureau, agency or instrumentality, court, tribunal, arbitrator or arbitral body (public or private), or (ii) any self-regulatory organization.

"Goldstein" shall mean Gerald Goldstein a/k/a Jerry Goldstein.

"Indemnitee" shall have the meaning set forth in Article X.

"Indemnitor" shall have the meaning set forth in Article X.

"Label" shall mean any record label, distributor or other Entity authorized to collect and distribute the Master Royalties, including Sony Entertainment and Warner Bros.

"Law" shall mean any law, statute, ordinance, code, regulation, rule, or other requirement of any Governmental Authority.

"Lien" shall mean any lien, claim, charge, mortgage, encumbrance, security interest, proxy, pledge, equity, tax or other restriction or third party right of any kind.

"Live Albums" shall mean each of (i) the two (2) compact disc (or equivalent in other audio configurations) album comprised of Stewart's live performances at the Woodstock Festival in August of 1969 entitled *Sly & The Family Stone: The Woodstock Experience*, and (ii) the four (4) compact disc (or equivalent in other audio configurations) album comprised of Stewart's live performances at the Filmore East in October of 1968 entitled *Sly & The Family Stone: Live at the Filmore East*, as previously released by Sony Entertainment pursuant to the Sony Entertainment Agreement.

4

"Majoken" shall have the meaning sent forth in the preamble.

"Master Assets" shall mean an undivided one hundred percent (100%) interest in and to all of Seller's right, title and interest in and to the Master Royalties, the SoundExchange Royalties and the Consulting Fees payable or becoming payable from and after the Cash Date pursuant to the Even St. Agreements.

"Master Royalties" shall mean any and all credits, monies, fees, royalties, revenues, amounts and sums of any kind or description derived in connection with the Masters payable or becoming payable by any Label pursuant to the Recording Agreements, the Sony Entertainment Agreement or otherwise with respect to the use or exploitation of the Masters in connection with Stewart's capacity as a recording artist or performer of the Masters, specifically excluding (i) any monies, fees, royalties, revenues or other consideration payable to Stewart, or any Entity owned or controlled by Stewart, for Stewart's services as a producer of the Masters, and (ii) the Reserved Product Royalties.

"Masters" shall mean all audio-only and audiovisual recordings, master recordings, sound recordings and phonorecords (i) embodying the performance of Stewart (individually or together with other recording artists, including as a member of the Band), (ii) originally recorded on or before December 31, 1988, and (iii) respecting which any Seller Related Entity owns or controls any right, title or interest anywhere in the world, or any direct or indirect interests therein or other rights arising therefrom pursuant to the Recording Agreements, the Sony Entertainment Agreement or otherwise, to the extent of Seller's current or future interest therein. Without limiting the foregoing, the Masters shall include the audio-only and audiovisual recordings, master recordings, sound recordings and phonorecords listed on Schedule B.

"Material Adverse Effect" shall mean any event, circumstance, change in or effect on Seller that, individually or in the aggregate, is reasonably likely to be materially adverse to (i) the business of Seller taken as a whole, or (ii) the ability of Seller to perform its obligations under this Agreement or to consummate the Contemplated Transactions.

"Mijac" shall mean Michael Jackson, individually and doing business as Mijac Music, and Miran Publishing Corp. and each of their respective predecessors, successors and Affiliates, including Stone Flower Music, Stone Flower Productions, Inc., Daly City Music, Magic Mirror Management and Daedalus Productions, Inc.

"Motion" shall have the meaning set forth in Section 8.01.

"Notices of Termination" shall mean any and all notices of termination heretofore served by Stewart, or which may in the future be served by Stewart or his Statutory Heirs, pursuant to the United States Copyright Act, 17 U.S.C. Sections 203 or 304(c), in connection with one or more of the Compositions or Masters.

"Order" shall have the meaning set forth in Section 4.01(d).

"Organizational Document" shall mean, with respect to any Entity that is not a natural person, such Entity's charter, certificate or articles of incorporation or formation, bylaws, memorandum and articles of incorporation or association, operating agreement, limited liability company agreement, partnership agreement (whether limited or general) or other constituent or organizational document of such Entity.

5

"Publisher" shall mean any music publisher, subpublisher, administrator or other Entity authorized to collect and distribute the Composition Royalties, including Mijac, Warner/Chappell, Sony/ATV and, from and after the effective date of termination with respect to any Composition respecting which Stewart or Stewart's Statutory Heirs serve Notice of Termination, Stewart, Stewart's Heirs, or any of their designees.

"Publisher's Share of Recaptured Revenues" shall have the meaning set forth in Section 2.02(b).

"Publisher Non-Performance Royalties" shall mean any and all monies, fees, royalties, revenues, amounts and sums of any kind or description payable or becoming payable by any Entity anywhere in the universe in respect of the use or exploitation of the Compositions, excluding only the Publisher Performance Royalties and the Songwriter Royalties.

"Publisher Performance Royalties" shall mean any and all monies, fees, royalties, revenues, amounts and sums of any kind or description payable or becoming payable by any Entity anywhere in the universe in respect of the public performance of the Compositions, excluding only the Songwriter Performance Royalties, but including the so-called publisher's share of public performance credits, monies, fees, royalties, revenues, amounts and sums of any kind or description payable or becoming payable by BMI or any other performing rights organization or society throughout the world or any other Entity in connection with the public performance of any of the Compositions.

"Publisher Royalties" shall mean the Publisher Non-Performance Royalties and the Publisher Performance Royalties.

"Publishing Agreements" shall mean any and all agreements between Stewart, any successor or Affiliate of Stewart or any Seller Related Entity, on the one hand, and Mijac, on the other hand.

"Purchase Price" shall have the meaning set forth in in Section 3.01.

"Purchaser" shall have the meaning set forth in the preamble.

"Recording Agreements" shall mean any and all agreements between Stewart, any successor or Affiliate of Stewart or any Seller Related Entity, on the one hand, and Sony Entertainment, on the other hand, relating to Stewart's services as a performer on the Masters, whether alone or as a member of the Band, including the CBS Records Agreements specifically excluding Stewart's services as a producer of the Masters.

"Remix Album" shall mean the single compact disc (or equivalent in other audio configurations) album entitled *Sly Stone: I'm Back! Family and Friends* comprised of remixes of the Masters as previously released by Sony Entertainment pursuant to the Sony Entertainment Agreement.

"Reserved Product" shall mean the Box Set, Live Albums and Remix Album.

"Reserved Product Royalties" shall mean any and all credits, monies, fees, royalties, revenues, amounts and sums of any kind or description derived from the use or exploitation of the Masters in connection with the sale of the Reserved Product payable or becoming payable by Sony Entertainment pursuant to the Sony Entertainment Agreement.

6

"Reserved Product Royalties Assignment Date" shall have the meaning set forth in Section 2.02(a).

"Royalties" shall mean the Composition Royalties, the BMI Royalties, the Master Royalties, the Consulting Fees and the SoundExchange Royalties.

"Sanctions List" shall mean any list of prohibited individuals or entities enacted under any economic, financial or trade sanctions laws, executive orders, resolutions or regulations, including sanctions enacted under the laws and regulations of the European Union, United Kingdom, United Nations or United States, including the Office of Foreign Assets Control.

"Seller" shall have the meaning set forth in the preamble.

"Seller Related Entity" shall mean, individually and collectively, Seller and any predecessor or Affiliate of Seller, with the specific exception of Stewart. For purposes of clarification, references to and use of the term "Seller Related Entity" in this Agreement shall in each instance include, encompass and apply both jointly to all and severally to each such Seller Related Entity.

"Seller's Knowledge" shall mean the actual knowledge of Goldstein or Glenn Stone.

"Songwriter Non-Performance Royalties" shall mean any and all monies, fees, royalties, revenues, amounts and sums of any kind or description, excluding only the Songwriter Performance Royalties, payable or becoming payable by any Publisher anywhere in the universe in respect of Stewart's capacity as a songwriter, lyricist, composer or arranger of the Compositions in connection with the use or exploitation of the Compositions, whether pursuant to the Publishing Agreements or otherwise. To the extent any of the foregoing amounts are not allocated into separate songwriter and publisher shares by the Entity collecting or distributing the same, the Songwriter Non-Performance Royalties shall be deemed fifty percent (50%) of such gross income.

"Songwriter Performance Royalties" shall mean any and all public performance credits, monies, fees, royalties, revenues, amounts and sums of any kind or description payable or becoming payable by any Entity anywhere in the universe in respect of Stewart's capacity as a songwriter, lyricist, composer or arranger of the Compositions in connection with the public performance of any of the Compositions, including all of the Stewart share as a songwriter, lyricist, composer or arranger only of public performance credits, monies, fees, royalties, revenues, amounts and sums of any kind or description payable or becoming payable by BMI or any other performing rights organization or society throughout the world or any other Entity in connection with the public performance of the Compositions, whether pursuant to the BMI Agreements or otherwise. To the extent any of the foregoing amounts are not allocated into separate songwriter and publisher shares by the Entity collecting or distributing the same, the Songwriter Performance Royalties shall be deemed fifty percent (50%) of such gross income.

"Songwriter Royalties" shall mean the Songwriter Performance Royalties and the Songwriter Non-Performance Royalties.

"Sony/ATV" shall mean Sony/ATV Music Publishing, LLC and its successors and Affiliates.

"Sony Consulting Agreement" shall mean the consultation agreement dated as of December 18, 2002 by and between Even St. and Sony Entertainment.

"Sony Entertainment" shall mean Sony Music Group, a Group of Sony Music Entertainment Inc., and its predecessors, successors and Affiliates, including CBS Records.

"Sony Entertainment Agreement" shall mean the letter agreement dated December 18, 2002 between Even St. and Sony Entertainment.

"SoundExchange" shall mean SoundExchange, Inc. and its successors and Affiliates.

"SoundExchange Agreements" shall mean any and all agreements between Stewart, any successor or Affiliate of Stewart or any Seller Related Entity, on the one hand, and SoundExchange, on the other hand.

"SoundExchange Royalties" shall mean any and all credits, monies, fees, royalties, revenues, amounts and sums of any kind or description payable or becoming payable by SoundExchange pursuant to the SoundExchange Agreements or otherwise with respect to the public performance of the Masters in connection with Stewart's capacity as a recording artist or performer of the Masters only and not as a producer of the Masters, whether accorded pursuant to the laws and regulations currently in effect or hereinafter enacted in any country of the world or under any applicable collective bargaining or industrywide agreement.

"Statutory Heirs" shall mean the surviving spouse, children or grandchildren of a deceased author or, in the event any of the foregoing are not living, the author's executor, administrator, personal representative or trustee.

"Statutory Termination Rights" shall mean the right of Stewart or his Statutory Heirs to service Notices of Termination in connection with any one or more of the Compositions or the Masters pursuant the United States Copyright Act, 17 U.S.C. Sections 203 or 304(c).

"Stewart" shall mean Sylvester Stewart p/k/a Sly Stone.

"Stewart's Heirs" shall mean Stewart's Statutory Heirs, or, with respect to rights in any one or more of the Compositions or Masters respecting which Stewart served Notice of Termination but did not survive until the respective effective date of termination, Stewart's testamentary heirs.

"Tax" or "Taxes" shall mean all past, present and future federal, state, local and foreign taxes, including all levies, duties, imposts, deductions, charges, assessments, fees, liens or withholdings and all liabilities (including all interest, fines, assessments, penalties and additions to tax imposed in connection therewith or with respect thereto) imposed by any Governmental Authority.

"Transferred Assets" shall mean the Composition Assets and the Master Assets.

"Warner Bros." shall mean Warner Bros. Music, a division of Warner Bros. Inc., and its successors and Affiliates.

"Warner/Chappell" shall mean Warner/Chappell Music, Inc. and its successors and Affiliates.

8

Section 1.02  <u>Interpretative Provisions</u>.

Unless the express context otherwise requires:

(a)  the words "hereof", "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement;

(b)  words defined in the singular shall have a comparable meaning when used in the plural, and vice versa;

(c)  the words "Dollars" and "$" mean United States dollars;

(d)  references herein to a specific Article, Section, Subsection, Clause, Recital, Schedule or Exhibit shall refer, respectively, to Articles, Sections, Subsections, Clauses, Recitals, Schedules or Exhibits of or to this Agreement;

(e)  wherever the word "include", "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation";

(f)  reference to any gender shall include each other gender;

(g)  references to any Entity shall include such Entity's heirs, executors, personal representatives, administrators, successors and permitted assigns; provided, however, that nothing contained in this clause (g) is intended to authorize any assignment or transfer not otherwise permitted in this Agreement or create any third party beneficiaries;

(h)  with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding";

(i)  the word "or" shall be disjunctive and inclusive;

(j)  references herein to any Law shall be deemed to refer to such Law as amended, reenacted, supplemented or superseded in whole or in part and also to all rules and regulations promulgated thereunder;

(k)  references herein to any Contract means such Contract as amended, supplemented or modified (including any waiver thereto) in accordance with the terms thereof;

(l)  the headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement;

(m)  Seller and Purchaser have each participated in the negotiation and drafting of this Agreement and if an ambiguity or question of interpretation should arise, this Agreement shall be construed as if drafted jointly by the parties thereto and no presumption or burden of proof shall arise favoring or burdening either party by virtue of the authorship of any of the provisions in the Agreement;

(n)  any reference to "days" means calendar days unless Business Days are expressly specified; and

9

(o)    when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded, and if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice of the performance of such action shall be extended to the next succeeding Business Day.

## ARTICLE II

## SALE AND PURCHASE OF TRANSFERRED ASSETS

Section 2.01    Grant of Rights.

Effective as of 12:01 A.M. on the Closing Date, conditioned on payment of the Purchase Price, Seller sells, assigns, transfers and conveys to Purchaser, and Purchaser hereby agrees to purchase from Seller, all of Seller's right, title and interest in and to the Transferred Assets.

Section 2.02    Reserved Rights.

(a)    For the avoidance of any ambiguity, the Transferred Assets shall not include, and Purchaser shall have no rights in and to, (i) any musical compositions or sound recordings created by or on behalf of Stewart on or after January 1, 1989 other than Derivative Works, (ii) any monies, revenues, royalties or other amounts payable or becoming payable to Stewart or his successors or Affiliates by AFM, AFTRA, SAG, Talent Partners, Public Performance Malaysia Sdn Bhd for live public performances in Malaysia, or by any Entity other than the Publishers, the Labels, BMI and SoundExchange, (iii) any monies, revenues or royalties payable or becoming payable to Stewart or his Affiliates or successors in connection with services rendered by Stewart as a producer of any of the Masters, or (iv) the Reserved Product Royalties to which all right, title and interest in and to and the right to collect the Reserved Product Royalties are payable to Stewart or his assignees pursuant to the terms of this Agreement (individually and collectively, the "Excluded Assets").  Notwithstanding the foregoing, in the event that on or before the date that is five (5) Business Days following the Closing Date (the "Reserved Product Royalties Assignment Date"), Seller elects to assign to Purchaser the Reserved Product Royalties, then the Reserved Product Royalties shall be deemed to be included in Transferred Assets and excluded from the Excluded Assets.  The parties agree that in the event that Seller does not elect to assign the Reserved Product Royalties to Purchaser on or before Reserved Product Royalties Assignment Date, then from and after the Reserved Product Royalties Assignment Date the Reserved Product Royalties shall be deemed to be Excluded Assets solely owned by and payable to Stewart.

(b)    It is understood and agreed that nothing contained in this Agreement shall limit the right of Stewart or his Statutory Heirs to exercise any Statutory Termination Rights and, except as set forth in Section 2.02(c), Purchaser shall have no rights in and to the rights recaptured by Stewart or Stewart's Heirs in connection with such Statutory Termination Rights, including the Publisher Royalties derived in connection with such rights (the "Publisher's Share of Recaptured Revenues").

(c)    Notwithstanding anything herein to the contrary, the Publisher's Share of Recaptured Revenues shall not include the monies, revenues, royalties and other amounts that Purchaser would have received pursuant to the Publishing Agreements, the Recording

Agreements, the Sony Entertainment Agreement, the Sony Consulting Agreement, the SoundExchange Agreements and the BMI Agreements if the exercise of the Statutory Termination Rights had not occurred, calculated on a no less favorable basis than such royalties are payable as of the Closing Date.

Section 2.03    Excluded Liabilities.

(a)    Purchaser will not assume or be obligated to pay, perform, or otherwise discharge any liabilities or obligations of Seller in connection with the Transferred Assets, whether direct or indirect, known or unknown, absolute or contingent, to the extent arising from or relating to periods prior to the Closing Date or otherwise with respect to the Bankruptcy Cases (collectively, the "Excluded Liabilities").

(b)    All of the Excluded Liabilities shall be retained by Seller and shall remain Seller's sole and exclusive obligations.

## ARTICLE III

## PURCHASE PRICE

Section 3.01    Purchase Price.

In consideration of the sale of the Transferred Assets, the rights granted in Article II above, the warranties and representations of Seller hereunder and Seller's performance of all obligations hereunder, Purchaser shall pay to Seller Thirteen Million Dollars ($13,000,000) (the "Purchase Price") in accordance with the payment instructions attached hereto as Exhibit 1.

Section 3.02    Purchase Price Basis.

It is understood and agreed that the Purchase Price is calculated based on the Average Annual Net Income equaling One Million Sixty Thousand Seven Hundred Forty-Six Dollars ($1,060,746).

## ARTICLE IV

## CONDITIONS TO CLOSING; THE CLOSING

Section 4.01    Conditions to Closing.

Purchaser's obligation to enter into the Contemplated Transactions shall be conditioned upon:

(a)    Seller delivering to Purchaser, on or before the Closing Date, Stewart's written acknowledgement and agreement, in a form attached hereto as Exhibit 2;

(b)    Seller delivering to Purchaser, on or before the Closing Date, a duly executed agreement between Stewart and SoundExchange with respect to Stewart's services as a performer on the Masters and evidence of SoundExchange's acceptance of instructions from Stewart directing all Sound Exchange Royalties to an account designated by Purchaser, in a form acceptable to Purchaser;

(c)    Seller delivering to Purchaser, on or before the Closing Date, a duly executed affiliation agreement between Stewart and BMI;

(d)    Entry of an order of the Bankruptcy Court approving the Motion (the "Order"), which provides that Purchaser is acquiring the Transferred Assets from Seller pursuant to Section 363(f) of the Bankruptcy Code free and clear of any Liens and that Purchaser is a "good faith" purchaser (as such term is used in Section 363(m) of the Bankruptcy Code); and

(e)    Purchaser being reasonably satisfied that all material representations and warranties of Seller pursuant to this Agreement are true and accurate on the Closing Date.

Section 4.02    The Closing.

(a)    Provided Seller's obligations under Section 4.01 above have been fulfilled or Purchaser notifies Seller in writing that it elects to waive any applicable unfulfilled obligation(s), the closing of the Contemplated Transactions (the "Closing") shall take place no later than five (5) Business Days after the issuance of the Order by the Bankruptcy Court on a date to be agreed by the parties (the "Closing Date") at the offices of Loeb & Loeb, 10100 Santa Monica Blvd., Suite 2200, Los Angeles, CA, 90067 or remotely or electronically as the parties may jointly elect in writing. Notwithstanding anything to the contrary herein, in the event that the Closing does not occur within sixty (60) days following the date of full execution of this Agreement, Purchaser shall have the right but not the obligation to terminate this Agreement.

(b)    At the Closing, Seller shall deliver or cause to be delivered to Purchaser the following:

(i)    a duly executed General Letter of Direction in the form of Exhibit 3;

(ii)    a duly executed BMI Letter of Direction in the form of Exhibit 4;

(iii)    a duly executed Mijac Letter of Direction in the form of Exhibit 5;

(iv)    a duly executed Sony/ATV Letter of Direction in the form of Exhibit 6;

(v)    a duly executed Warner/Chappell Letter of Direction in the form of Exhibit 7;

(vi)    a duly executed Sony Entertainment Letter of Direction in the form of Exhibit 8;

(vii)    a duly executed Warner Bros. Letter of Direction in the form of Exhibit 9;

(viii)    a duly executed SoundExchange Account Authorization and Change of Address Instruction in the form of Exhibit 10;

(ix)    a duly executed Asset Assignment in the form of Exhibit 11;

(x)    any other assignments and other good and sufficient instruments of conveyance and transfer, in a form satisfactory to Purchaser, as shall be necessary to vest in Purchaser one hundred percent (100%) of Seller's right, title and interest in and to the Transferred Assets; and

12

(xi)    all consents necessary, if any, to authorize Seller to enter into this Agreement and perform all of its obligations hereunder.

(c)    At the Closing, Purchaser shall deliver or cause to be delivered to Seller payment of the Purchase Price by wire transfer of immediately available funds in the amounts and to the accounts set forth in the payment instructions attached hereto as Exhibit 1.

## ARTICLE V

## DURATION OF RIGHTS

Purchaser shall have the worldwide benefit of the Transferred Assets and all claims, demands, Actions and causes of action relating thereto for the full term of the Copyright therein, including all claims, demands, Actions and causes of action arising from the date of creation of each Composition or Master, as the case may be, whether now known or unknown to Seller or Purchaser, in each instance.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller jointly and severally represents and warrants to Purchaser as follows:

Section 6.01    Even St. Organization; Standing and Power.

Even St. is a duly formed corporation, validly existing and in good standing under the Laws of the state of New York and has all requisite power and authority to own, lease, and operate its properties and assets and to carry on its business as presently conducted and is qualified to do business and is in good standing in each jurisdiction where the ownership, leasing, or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so organized, qualified, or in such good standing, or to have such power or authority, would not, individually or in the aggregate, prevent, delay or impair the ability of Seller to carry out or consummate the Contemplated Transactions and enter into and carry out its obligations under this Agreement.

Section 6.02    Majoken Organization; Standing and Power.

Majoken is a duly formed corporation, validly existing and in good standing under the Laws of the state of New York and has all requisite power and authority to own, lease, and operate its properties and assets and to carry on its business as presently conducted and is qualified to do business and is in good standing in each jurisdiction where the ownership, leasing, or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so organized, qualified, or in such good standing, or to have such power or authority, would not, individually or in the aggregate, prevent, delay or impair the ability of Seller to carry out or consummate the Contemplated Transactions and enter into and carry out its obligations under this Agreement.

Section 6.03    Ownership of Transferred Assets; Seller's Interest.

(a)      Seller has good and marketable title to the Transferred Assets, free and clear of all Liens.

(b)      Seller has the unrestricted right to sell, transfer and assign to Purchaser all of the Transferred Assets throughout the universe.

(c)      The delivery to Purchaser of the Transferred Assets in accordance with the terms and provisions of this Agreement will transfer to Purchaser valid title thereto.

(d)      Seller's interest in each of the Compositions is set forth on Schedule A.

(e)      Seller's interest in each of the Masters is set forth on Schedule B.

Section 6.04   Due Authorization.

(a)      The execution and delivery by Seller of this Agreement and the consummation of the Contemplated Transactions have been duly and validly authorized and approved by all necessary organizational action on the part of Seller and its respective equity holders.

(b)      This Agreement has been duly and validly executed and delivered by Seller and, assuming due authorization, execution and delivery by the other parties hereto, constitutes and will constitute legal, valid and binding obligations of Seller, enforceable against Seller in accordance with its terms.

Section 6.05   No Conflict.

The execution, delivery and performance of this Agreement and the consummation of the Contemplated Transactions by Seller do not and will not:

(a)      violate or conflict with the Organizational Documents of Seller;

(b)      materially breach, violate, conflict with or result in a default under, or constitute an event that, after notice or lapse of time or both, would

(i)      result in a breach, violation, conflict or default under, or

(ii)     require any consent, approval or authorization under, or

(iii)    give rise to a right of acceleration, termination or cancellation of

any Contract to which any Seller Related Entity is a party or by which any Seller Related Entity is bound, in each case, in a manner that would materially impair the ability of Purchaser to enjoy the economic benefits of such Contract after Closing;

(c)      breach, violate, conflict with or result in a default under, or constitute an event that, after notice or lapse of time or both, would result in a breach or violation of or conflict or default under, in each case in any material respect, any Law or any order of any Governmental Authority binding upon or applicable to Seller; or

(d)      result in the creation or imposition of any Lien on the Transferred Assets or any other Lien that:

14

(i)      impairs the ability of Purchaser to use the Transferred Assets following the Closing in any material respect; or

(ii)      materially impairs the ability of Seller to perform its obligations hereunder.

Section 6.06    Required Notices, Authorizations and Consents.

(a)      Except as may be required by the Bankruptcy Court in connection with the Bankruptcy Cases as set forth herein, Seller is not required to provide any notice to, obtain any consent, approval or authorization of, or make any designation, declaration or filing with any Governmental Authority or any other Entity with respect to Seller's execution and delivery of this Agreement or the consummation of the Contemplated Transactions.

(b)      No Entity has the right of first negotiation, first or last refusal or matching or similar right with respect to the sale, transfer, assignment and conveyance of the Transferred Assets or the consummation of the Contemplated Transactions.

(c)      Without limitation of the foregoing and notwithstanding anything to the contrary set forth herein, Stewart is not entitled to any right of consent or approval with respect to the sale, transfer, assignment and conveyance of the Transferred Assets or the consummation of the Contemplated Transactions other than as an equity owner of Seller as mandated by Section 6.04(a).

Section 6.07    Absence of Certain Changes or Events.

Since January 1, 2018:

(a)      there has been no event or occurrence that has had or would, individually or in the aggregate, have a Material Adverse Effect; and

(b)      Seller has conducted its business only in the ordinary course of business consistent with past practice.

Section 6.08    No Audits.

Except as set forth on Schedule C, there are no royalty claims, requests for audits, audits or royalty disputes pending or, to Seller's Knowledge, threatened in writing against any Seller Related Entity relating to the Transferred Assets.

Section 6.09    No Litigation.

(a)      Other than the pending motion for sanctions by Stewart against T.A.G. Management, Inc. in the Bankruptcy Court in connection with the Bankruptcy Cases, there are no Actions pending or threatened (i) against any Seller Related Entity, or (ii) against Stewart or any Entity other than any Seller Related Entity relating to the Transferred Assets.

(b)      The litigation pending in the Los Angeles Superior Court as of the date of the 2016 Settlement Agreement regarding, among other things, the right to receive the Royalties, has been dismissed as of the date hereof.

15

(c)     Seller and Stewart have filed a stipulation with the Bankruptcy Court jointly dismissing the adversary proceeding commenced by Seller on or about May 29, 2015 to, among other things, avoid and recover allegedly fraudulent transfers made by Seller to Stewart, assigned Adv. Pro. No. 2:15-ap-01284-WB, a copy of which stipulation is attached hereto as Exhibit 12.

Section 6.10   Outstanding Advances.

Except as set forth on Schedule D, there are no outstanding Advances heretofore received by Seller or Stewart which are recoupable from earnings of the Compositions or the Masters.

Section 6.11   Royalty Statements.

(a)     All of the royalty statements previously delivered to Purchaser accurately and completely present the Royalties derived by Seller during the Base Period.

(b)     From January 1, 2018 through the Closing Date, Seller has not disposed of or agreed to dispose of all or any portion of any Composition Assets, Master Assets or any other material assets which other assets if held by Seller on the Closing Date would have constituted Transferred Assets hereunder.

Section 6.12   Average Net Income.

The Average Annual Net Income equals One Million Sixty Thousand Seven Hundred Forty-Six Dollars ($1,060,746).  Seller recognizes that this statement is a material representation made by Seller to Purchaser in inducing Purchaser to enter into this Agreement.

Section 6.13   Existing Contracts.

(a)     A true and complete copy of all Publishing Agreements is attached hereto as Exhibit 13.

(b)     A true and complete copy of all BMI Agreements is attached hereto as Exhibit 14.

(c)     A true and complete copy of all Recording Agreements is attached hereto as Exhibit 15.

(d)     A true and complete copy of the Sony Entertainment Agreement is attached hereto as Exhibit 16

(e)     A true and complete copy of the Sony Consulting Agreement is attached hereto as Exhibit 17.

(f)     A true and complete copy of all SoundExchange Agreements is attached hereto as Exhibit 18.

(g)     A true and complete copy of all Even St. Agreements is attached hereto as Exhibit 19.

Section 6.14   Notices of Termination.

16

A true and complete copy of all Notices of Termination received by Seller as of the Closing Date in connection with any of the Compositions or the Masters is attached hereto as <u>Exhibit 20</u>.

Section 6.15    <u>Compliance with Laws</u>.

Seller is not in violation of any Laws applicable to its business or by which Seller or the Transferred Assets are bound. None of the transfers contemplated by this Agreement, whether being made concurrently with the execution hereof or subsequent hereto, constitutes or shall constitute a fraudulent transfer or preference within the meaning of the Bankruptcy Code, as said Bankruptcy Code may have at such time been amended, supplemented, modified or replaced.

Section 6.16    <u>Taxes</u>.

There are no Liens on any of the Transferred Assets arising in connection with any failure (or alleged failure) by any Seller Related Entity to pay any Tax.

Section 6.17    <u>Sanctions Lists</u>.

None of the Entities constituting Seller or any of their respective officers, directors, beneficial owners, Affiliates or employees is on any Sanctions List nor located, organized or resident in a country or territory that is, or whose government is, the target of an embargo or countrywide sanctions.

Section 6.18    <u>Brokers</u>.

Except as set forth on <u>Schedule E</u>, there are no claims for brokerage, finders' or other advisory fees, costs, expenses, commissions or other similar payments in connection with the Contemplated Transactions based on any Contract made by any Seller Related Entity.

**ARTICLE VII**

**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser represents and warrants to Seller as follows:

Section 7.01    <u>Corporate Organization</u>.

Purchaser has been duly organized and is validly existing as a limited partnership in good standing under the Laws of the state of Delaware and has all requisite corporate power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted and is qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so organized, qualified or in such good standing, or to have such power or authority, would not, individually or in the aggregate, reasonably be likely to prevent, materially delay or materially impair the ability of Purchaser to carry out or consummate the Contemplated Transactions and enter into and carry out its obligations under this Agreement.

17

Section 7.02    <u>Due Authorization</u>.

(a)    The execution and delivery by Seller of this Agreement and the consummation of the Contemplated Transactions have been duly and validly authorized and approved by all necessary action on the part of Purchaser.

(b)    This Agreement has been duly and validly executed and delivered by Purchaser and, assuming the due authorization, execution and delivery by the other parties hereto, constitutes and will constitute, legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, except to the extent that their enforceability may be limited by public policy, bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium, receivership and other similar Laws affecting the enforcement of creditors' rights in general and general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Section 7.03    <u>No Conflict</u>.

The execution and delivery by Purchaser and the performance of this Agreement by Purchaser and the consummation of the Contemplated Transactions by Purchaser do not and will not:

(a)    violate or conflict with the Organizational Documents of Purchaser;

(b)    breach, violate, conflict with or result in a default under, or constitute an event that, after notice or lapse of time or both, would:

(i)    result in a breach or violation of or conflict or default under, or

(ii)    require any consent, approval or authorization under, any Contract to which Purchaser is a party or by which any of Purchaser's assets are bound, in each case, in a manner that would materially impair the ability of Purchaser to perform its obligations hereunder; or

(c)    breach, violate, conflict with or result in a default under, or constitute an event that, after notice or lapse of time or both, would result in a breach or violation of, or conflict or default under, in each case in any material respect, any Law or any order of any Governmental Authority binding upon or applicable to Purchaser.

Section 7.04    <u>No Authorization or Consents Required</u>.

Purchaser is not required to provide any notice to, obtain any consent, approval or authorization of, or make any designation, declaration or filing with, any Governmental Authority or any other Entity with respect to Purchaser's execution or delivery of this Agreement or the consummation of the Contemplated Transactions.

Section 7.05    <u>No Litigation</u>.

There are no Actions pending or, to Purchaser's knowledge, threatened in writing against Purchaser that would reasonably be expected to adversely affect the ability of Purchaser to enter into and perform Purchaser's obligations under this Agreement.

18

Section 7.06  Brokers.

There are no claims for brokerage, finders' or other advisory fees, costs, expenses, commissions or other similar payments in connection with the Contemplated Transactions based on any Contract made by Purchaser.

## ARTICLE VIII

## COVENANTS OF SELLER

Section 8.01  Motion to Approve Contemplated Transactions.

Within five (5) Business Days after the full execution of this Agreement, Seller will file a motion in the Bankruptcy Court for approval of the sale of the Transferred Assets hereunder (the "Motion") pursuant to Section 363 of the Bankruptcy Code and the applicable Federal Rules of Bankruptcy Procedure, local bankruptcy rules and orders entered in the Bankruptcy Cases.

Section 8.02  Notices of Termination.

Seller shall promptly furnish to Purchaser copies of any and all Notices of Termination received by any Seller Related Entity relating to any of the Compositions or Masters from and after the Closing Date.

Section 8.03  Income After Cash Date.

All Royalties paid or received by Seller on or after the Cash Date shall be the property of Purchaser and shall be held by Seller in trust for Purchaser. If any such sums are received by or on behalf of Seller after the Cash Date, Seller shall transmit the same to Purchaser within fifteen (15) days after receipt thereof together with all statements with respect to such Royalties.

Section 8.04  Third Party Audits.

Seller hereby agrees that, if for any reason any Entity, including any Publisher, Label, BMI or SoundExchange, shall refuse to allow Purchaser to exercise any audit right granted to Seller or Stewart pursuant to the Publishing Agreements, the BMI Agreements, the Recording Agreements, the Sony Entertainment Agreement, the Sony Consulting Agreement or the SoundExchange Agreements, with respect to the Royalties, Seller shall, at Purchaser's request and at Purchaser's sole cost and expense, undertake any and all audits as directed by Purchaser in Seller's name. Without limiting the foregoing, at Purchaser's request, Seller shall provide notice of audit in the form designated by Purchaser, engage auditors and attorneys selected by Purchaser to undertake such audits and, if necessary, commence litigation in connection therewith (provided that Purchaser shall be solely responsible for any fees and expenses payable in connection with any such audit or resulting litigation); provided that, as between Seller and Purchaser, Purchaser shall have the sole right to make any and all decisions in connection with any such audits and any resulting litigation or the settlement or resolution thereof.  Seller further agrees that any monies payable in connection therewith shall inure to the sole benefit of Purchaser and Purchaser shall have no obligation to Seller whatsoever in connection therewith.

Section 8.05  Approval Rights.

19

Seller hereby agrees that, if for any reason any Entity, including any Publisher, Label, BMI or SoundExchange, shall refuse to allow Purchaser to exercise any approval right granted to Seller pursuant to the Publishing Agreements, the BMI Agreements, the Recording Agreements, the Sony Entertainment Agreement, the Sony Consulting Agreement or the Sound Exchange Agreements, with respect to the Royalties, Seller shall, at Purchaser's request, grant or deny any and all approvals as directed by Purchaser in Seller's name. Without limiting the foregoing, Seller shall forward to Purchaser any and all such requests for approval within twenty-four (24) hours after such request is sent to Seller, and hereby authorizes Purchaser to respond to any such request in Seller's name and on Seller's behalf.

ARTICLE IX

COVENANTS OF PURCHASER

Purchaser acknowledges and agrees that it is the essence of this Agreement that from and after the Closing Date Goldstein shall not have any interest in or to the Transferred Assets or any revenues, royalties or other amounts derived therefrom, other than any consideration paid to Goldstein by T.A.G. Management, Inc., as an equity owner of Seller. Moreover, Goldstein shall not be involved in any way with the management, marketing, exploitation, or promotion of the Transferred Assets from and after the Closing Date.

ARTICLE X

INDEMNITY

Each party (for these purposes, "Indemnitor") shall indemnify, defend and hold the other party ("Indemnitee") harmless against and in respect of any third party claims, Actions, demands, losses, costs, expenses, obligations, liabilities, damages, recoveries, and deficiencies, including reasonable out-of-pocket attorneys' fees and litigation expenses (each a "Claim"), that Indemnitee may actually incur or suffer, which arise from or relate to, directly or indirectly (i) any breach of, or failure by Indemnitor to perform any of Indemnitor's representations, warranties, or covenants in this Agreement or in any schedule, certificate, exhibit, or other instrument furnished or to be furnished by Indemnitor under this Agreement, or (ii) the Excluded Liabilities, and which, in each case, such Claim is reduced to final judgment or settled with Indemnitor's prior written consent as provided herein. Indemnitee shall notify Indemnitor of any Claim presented to Indemnitee by a third party. Indemnitor shall defend any Claim, at its sole expense, with counsel reasonably approved by Indemnitee, and shall consult with Indemnitee as to the conduct of the proceeding. No Claim may be settled by Indemnitee without Indemnitor's prior written consent (such consent not to be unreasonably withheld or delayed), provided Indemnitor is actively defending such Claim in a manner consistent with industry norms. Notwithstanding the foregoing, if Indemnitor does not approve a settlement proposed by Indemnitee, Indemnitee may nonetheless settle the matter unless, within ten (10) Business Days after notice to Indemnitor, Indemnitor furnishes to Indemnitee a surety bond or letter of credit from a national surety company or bank, or other financial assurance instrument (e.g., copyright litigation insurance) in form and content satisfactory to Indemnitee, insuring Indemnitee against the amount of the Claim, in addition to reasonable out-of-pocket attorney's fees and litigation expenses expended in connection with the Claim, and a reasonable estimate of such fees and costs required to continue the defense.

ARTICLE XI

20

## PUBLIC ANNOUNCEMENT

Seller will not issue or cause the publication of any press release or other public announcement with respect to this Agreement or the Contemplated Transactions without the prior written consent of Purchaser; provided, however, that nothing herein will prohibit Seller from issuing or causing publication of any such press release or public announcement to the extent that such disclosure is required by Law, in which case Seller will use its commercially reasonable efforts to allow Purchaser reasonable time to comment on such release or announcement in advance of its issuance or publication and seek an order or other remedy for confidential treatment or deferral of any release or announcement; provided, further, that the foregoing shall not restrict (i) confidential communications between the Seller and those Entities who are required to execute Contracts or carry out any action in order for Seller to fulfill a condition set out in this Agreement, or (ii) confidential communications between Purchaser and the investors or potential investors of Purchaser in the ordinary course of business consistent with past practice. The filing of copyright assignments, letters of direction and other documents in the ordinary course of business and the enforcement by Purchaser of its rights in the Transferred Assets shall not be a violation of the restrictions contained in this Article XI. Purchaser shall have the right to issue a press release or other public announcement in connection with the acquisition of the Transferred Assets, which press release or other public announcement shall be subject to Seller's prior approval, not to be unreasonably withheld or delayed.

## ARTICLE XII

## MISCELLANEOUS

Section 12.01 Expenses.

Except as otherwise expressly provided herein, each party hereto shall pay all of its own fees, costs and expenses (including attorneys' and accountants' fees, costs and expenses) in connection with the negotiation of this Agreement, the performance of their obligations hereunder, and the consummation of the Contemplated Transactions.

Section 12.02 Notices.

Any notice, request, demand, instruction, payment or other communication given under or in connection with this Agreement shall be deemed to have been duly given and made if (a) in writing and served by personal delivery upon the party for whom it is intended, or (b) delivered by certified mail, registered mail, or courier service, return receipt requested, to the party at the address set forth below to the Entities indicated:

If to Seller:                    Even Street Productions Ltd. & Majoken, Inc.
                                 c/o Loeb & Loeb
                                 10100 Santa Monica Blvd., Suite 2200
                                 Los Angeles, CA 90067
                                 Attention:  John Frankenheimer and Johnathan Altschul
                                 Email:  jfrankenheimer@loeb.com ; jaltschul@loeb.com

With copies to:                  Loeb & Loeb
                                 10100 Santa Monica Blvd., Suite 2200
                                 Los Angeles, CA 90067
                                 Attention:  John Frankenheimer and Johnathan Altschul

|  | Email: jfrankenheimer@loeb.com ; jaltschul@loeb.com |
|---|---|
| If to Purchaser: | Primary Wave Music IP Fund I, LP<br>116 East 16th Street, 9th Floor<br>New York, NY 10003<br>Attention: Lawrence S. Mestel and Ramon Villa<br>Email: lmestel@primarywave.com ;<br>rvilla@primarywave.com |
| With copies to: | Alter, Kendrick & Baron, LLP<br>156 Fifth Avenue, Suite 1208<br>New York, NY 10010<br>Attention: Lisa Alter and Katie Baron<br>Email: lisa.alter@akbllp.com ; katie.baron@akbllp.com |

Section 12.03 No Third Party Beneficiaries.

This Agreement shall be binding upon and inure solely to the benefit of Purchaser and Seller and their successors and permitted assigns, and nothing in this Agreement, express or implied, is intended to or shall be construed to confer upon any other Entity any legal or equitable rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement. This Agreement may be amended or terminated, and any provision of this Agreement may be waived, in accordance with the terms hereof without the consent of any Entity other than Purchaser or Seller.

Section 12.04 Assignment.

Following the Closing, Purchaser may fully assign, license and transfer all or any portion of the Transferred Assets acquired pursuant to this Agreement or any of Purchaser's rights or obligations hereunder. In no event may Seller encumber, sell, assign, license or transfer, in whole or in part, any of its rights or contractual obligations under this Agreement without the prior written consent of Purchaser, and any purported assignment or delegation of any such contractual benefits or contractual obligations in contravention of this Section 12.04 shall be null and void and of no force and effect. This Agreement shall be binding upon, shall inure to the benefit of and shall be enforceable by the parties and their respective successors and permitted assigns.

Section 12.05 Entire Agreement.

This Agreement (including all Exhibits and Schedules) contains all of the terms, conditions, representations, and warranties agreed to by the parties relating to the subject matter of this Agreement and supersedes all prior and contemporaneous agreements, negotiations, correspondence, undertakings, and communications of the parties or their representatives, oral or written, respecting such subject matter.

Section 12.06 Waiver.

Waiver of any term or condition of this Agreement by any party shall only be effective if in writing and shall not be construed as a waiver of any subsequent breach or failure of the same term or condition or a waiver of any other term or condition of this Agreement.

22

Section 12.07 <u>Governing Law</u>.

This Agreement and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of, or related to any representation or warranty made in connection with this Agreement or as an inducement to enter into this Agreement) shall be governed by the Law of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction that would require the application of any other jurisdiction's Laws. All claims, disputes or disagreements that may arise out of the interpretation, performance or breach of this Agreement shall be submitted exclusively to the jurisdiction of the state courts of the State of New York or the Federal District courts located in New York County, New York.

Section 12.08 <u>Submission to Jurisdiction</u>.

Each of Purchaser and Seller hereby (i) agrees and irrevocably consents to submit itself to the exclusive jurisdiction of the courts of the State of New York and the federal courts of the United States of America located in the Borough of Manhattan in any legal proceeding arising out of or relating to this Agreement or the Contemplated Transactions; (ii) agrees that all claims in respect of any such legal proceeding may be heard and determined in any such court; (iii) agrees that it shall not attempt to deny or defeat such jurisdiction by motion or other request for leave from any such court; (iv) agrees not to bring or support any legal action arising out of or relating to this Agreement or any of the Contemplated Transactions (whether in contract, tort, common or statutory law, equity or otherwise) anywhere other than any such court; and (v) agrees that a final, non-appealable judgment in any such legal proceedings shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law. Each of the parties waives any defense of inconvenient forum to the maintenance of any such legal proceeding brought in any such court in accordance with this Section 12.08.

Section 12.09 <u>Remedies Cumulative; Specific Performance</u>.

Any and all remedies herein expressly conferred upon a party hereto shall be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by law or equity upon such party, and the exercise by a party hereto of any one remedy shall not preclude the exercise of any other remedy and nothing in this Agreement shall be deemed a waiver by any party of any right to specific performance or injunctive relief. Each party hereto agrees that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by them in accordance with the terms hereof or were otherwise breached and that each party hereto shall be entitled to an injunction or injunctions to prevent breaches of the provisions hereof and to specific performance of the terms hereof, in addition to any other remedy at law or equity.

Section 12.10 <u>Relationship Between the Parties</u>.

Nothing contained herein will constitute a partnership between or a joint venture by Seller and Purchaser. Neither party hereto will hold itself out contrary to the terms of this Section 12.10, and neither party will become liable for any obligations, act or omission of the other party contrary to the provisions hereof. Nothing in this Agreement will constitute Seller, or any other Entity, as Purchaser's partner, agent, employer or employee.

23

Section 12.11 <u>Severability</u>.

If any provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions of this Agreement will remain in full force and effect and shall in no way be affected, impaired or invalidated so long as neither the economic nor the legal substance of the Contemplated Transactions is affected in any manner materially adverse to any party hereto. Upon such a determination, Purchaser and Seller shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a reasonably acceptable manner so that the Contemplated Transactions may be consummated to the fullest extent possible.

Section 12.12 <u>Counterparts</u>.

This Agreement may be signed in any number of counterparts with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement. This Agreement shall become effective when, and only when, each party hereto shall have received a counterpart hereof signed by all of the other parties hereto. Delivery of an executed counterpart of this Agreement by facsimile or other electronic communication shall be effective as delivery of a manually executed counterpart of this Agreement.

[*Remainder of page intentionally left blank. Signature pages follow.*]

24

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date set forth above.

SELLER:

Even St. Productions Ltd.

By: _____

Its: _____

Majoken, Inc.

By: _____

Its: _____

PURCHASER:

Primary Wave Music IP Fund 1, LP

By: _____

Its: _____

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date set forth above.

SELLER:

Even St. Productions Ltd.

By: _____

Its: _____

Majoken, Inc.

By: _____

Its: _____

PURCHASER:

Primary Wave Music IP Fund 1, LP

By: _____

Its: _____

# EXHIBIT 1 TO  APA

# FUNDS DISBURSEMENT FROM SALES PROCEEDS

This serves as instructions to Primary Wave Music IP Fund 1, LP to disburse sale proceeds in the amount of Thirteen Million Dollars ($13,000,000) as follows:

**$12,465,000 to Even Street Productions, LTD**.

| | |
|---|---|
| Name on Account: | Even Street Productions, Ltd |
| | 7095 Hollywood Blvd, Ste 810 |
| | Los Angeles, CA 90028 |
| | |
| Account Number: | 179 186 2038 |
| Routing Number: | 121 000 248 |
| | |
| Account Type: | Checking |
| | |
| Bank Name: | Wells Fargo Bank |
| Branch: | 1600 Vine Street |
| | Los Angeles, CA 90028 |

**$365,000 to Loeb & Loeb**

| | |
|---|---|
| Name On Account | Beneficiary: Loeb & Loeb LLP – General Account |
| | |
| | 10100 Santa Monica Blvd., Suite 2200 |
| | Los Angeles, CA  90067 |
| | Direct Dial: 310.282.2080 |
| | |
| Account No: | 210-034722 |
| | |
| | ABA No:  122016066 |
| | Swift Code:  Cinaus6l |
| | Reference: 227982-10001 |
| | |
| Bank Name : | City National Bank |
| | 2029 Century Park East |
| | Los Angeles, Ca 90067 |

**$170,000 to** Acklen Advisory Services, LLC.


Name on Account:         Acklen Advisory Services, LLC
                         1107 8th Avenue S.
                         Nashville, TN 37203

Account number:         1000199459172
                        Routing: 061000104
                        Attn. Dustin Miller

Bank Name:              SunTrust Bank
                        1026 17th Ave. S
                        Nashville, TN 37212
                        (615) 748-4735
.

# EXHIBIT 2

## STEWART ACKNOWLEDGMENT AND AGREEMENT

## ACKNOWLEDGMENT AND AGREEMENT

AGREEMENT dated as of this ___ day of _____, 2018 between Primary Wave Music IP Fund 1, LP ("Purchaser") and Sylvester Stewart p/k/a Sly Stone ("Stewart").

WHEREAS, reference is made to the Asset Purchase Agreement (the "Definitive Agreement") dated _____ ____, 2018 between Even St. Productions Ltd. ("Even St.") and Majoken, Inc. ("Majoken") (Even St., Majoken and their respective affiliates are sometimes individually and collectively referred to herein as "Seller"), on the one hand, and Purchaser, on the other hand, a copy of which is annexed hereto as Exhibit A.  Except as expressly set forth herein to the contrary, defined terms as used herein shall have the same meaning as set forth in the Definitive Agreement;

WHEREAS, Even St. and Majoken are currently being jointly administered in their respective Bankruptcy Cases filed under Chapter 11 of the Bankruptcy Code; and

WHEREAS, pursuant to Section 363 of the Bankruptcy Code, Seller wishes to sell to Purchaser and Purchaser wishes to purchase from Seller, all of Seller's right, title and interest in the Transferred Assets; and

WHEREAS, upon entry of an Order of the Bankruptcy Court approving the Motion with respect to the sale of the Transferred Assets pursuant to the terms of the Definitive Agreement, Stewart is entitled to certain benefits arising under the 2016 Settlement Agreement and from the Definitive Agreement;

NOW THEREFORE, Stewart and Purchaser hereby agree as follows:

1.      As an inducement for Purchaser and Seller to enter into the Definitive Agreement and Seller to file the Motion for the approval of the Bankruptcy Court in connection with the sale of the Transferred Assets, and in exchange for other good and valuable consideration, receipt of which is hereby acknowledged which includes, but is not limited to, the rights Stewart is entitled to arising from the 2016 Settlement Agreement and the Definitive Agreement, Stewart hereby acknowledges, agrees, covenants, warrants and represents to Purchaser as follows:

(i)      Stewart shall be bound by the terms of the Definitive Agreement insofar as the Transferred Assets are concerned and shall execute any necessary documents directing the payor of any Royalties to remit the Royalties to Purchaser from and after the Cash Date;

(ii)     Stewart will not solicit or accept any advance(s) against Royalties payable pursuant to the Composition Agreements, the BMI Agreements, the Recording Agreements, the Sony Consulting Agreement or the SoundExchange Agreements, provided, however, that Stewart shall be entitled to negotiate an advance against the Publisher's Share of Recaptured Revenues, provided that no portion of such advance is recoupable from Royalties;

1

(iii)    In the event the Composition Agreements, the BMI Agreements, the Recording Agreements, the Sony Consulting Agreement or the SoundExchange Agreements are modified, expire, or otherwise terminate by operation of law or otherwise, including without limitation by reason of the exercise of Statutory Termination Rights by Stewart or Stewart's Heirs, Purchaser shall be entitled to collect and will continue to receive the revenues, royalties and other amounts Purchaser would have received if the modification, expiration or termination of the Composition Agreements, the BMI Agreements, the Recording Agreements, the Sony Consulting Agreement or the SoundExchange Agreements had not occurred, calculated on a no less favorable basis than such royalties are payable as of the Closing Date;

(iv)    Stewart will not authorize SoundExchange to allocate or otherwise direct any portion of the SoundExchange Royalties that are payable by SoundExchange as of the Cash Date with respect to Stewart's services as a performer on any of the Masters to any Entity in connection with such Entity's services as a producer of any of the Masters;

(v)    Stewart shall not terminate his affiliation with BMI with respect to the Compositions without the prior written agreement of Purchaser; and

(vi)    Without limiting anything set forth herein, Stewart hereby reaffirms the provisions of the 2016 Settlement Agreement pursuant to which in the event that the Statutory Termination Rights are exercised by Stewart or Stewart's Heirs, Stewart and his successors, assigns, heirs, licensees, executors and/or administrators, if any, including without limitation Stewart's Heirs, shall be bound and required to pay any and all Royalties to Purchaser.

2.    Stewart agrees that this agreement shall be binding on himself and Stewart's Heirs.

3.    This agreement and all claims or causes of action that may be based hereupon, arise out of or relate hereto shall be governed in accordance with the law of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction that would require the application of any other jurisdiction's laws.  All claims, disputes or disagreements that may arise out of the interpretation, performance or breach of this agreement shall be submitted exclusively to the jurisdiction of the state courts of the State of New York or the Federal District courts located in New York County, New York and Stewart and Purchaser agree and irrevocably consent to submit to the exclusive jurisdictions of such courts.

4.    This agreement shall not be modified except in writing signed by all parties hereto.

2

5.      This Agreement may be signed in any number of counterparts with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement.  This Agreement shall become effective when, and only when, each party hereto shall have received a counterpart hereof signed by all of the other parties hereto.  Delivery of an executed counterpart of this Agreement by facsimile or other electronic communication shall be effective as delivery of a manually executed counterpart of this Agreement.

[*Remainder of Page Intentionally Left Blank; Signature Page to Follow*]

IN WITNESS WHEREOF, the parties hereto set their hands as of the date first set forth above.

_____
Sylvester Stewart

Primary Wave Music IP Fund 1, LP

By: _____

Its: _____

# **EXHIBIT 3**

## **GENERAL LETTER OF DIRECTION**

Even St. Productions Ltd. f/k/a Stone Fire Productions Ltd. and Majoken, Inc.
c/o Loeb & Loeb
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
Attention: John Frankenheimer and Johnathan Altschul

As of July 1, 2018

To: All Payors of Income Including But Not Limited To
- ALL PERFORMING RIGHTS ORGANIZATIONS OR SOCIETIES
- ALL MECHANICAL RIGHTS ORGANIZATIONS OR SOCIETIES
- ALL NEIGHBORING RIGHTS ORGANIZATIONS OR SOCIETIES
- ALL RECORD LABELS, MANUFACTURERS, DISTRIBUTORS AND LICENSEES
- ALL PUBLISHERS, SUBPUBLISHERS AND LICENSEES

**RE:      Letter of Direction – Even St. Productions Ltd. f/k/a Stone Fire Productions Ltd.
and Majoken, Inc.**

To Whom It May Concern:

Please be advised that effective as of July 1, 2018 Even St. Productions Ltd. f/k/a Stone Fire
Productions Ltd. ("Even St.") and Majoken, Inc. ("Majoken") (individually and collectively, "Seller") have
irrevocably sold, assigned, transferred and set over to Primary Wave Music IP Fund 1, LP ("PWM") an
undivided one hundred percent (100%) of all right, title and interest of Seller and any other entities
controlling, controlled by or under common control with Seller (individually and collectively, the "Seller
Affiliates") in and to any and all credits, monies, fees, royalties, revenues, amounts and sums of any
kind or description (collectively, "Royalties") payable and/or becoming payable to Seller and/or any
Seller Affiliates (each, a "Seller Related Entity") from and after July 1, 2018 by any person or entity,
anywhere in the universe, derived from or otherwise in connection with the following:

(a)      any and all musical compositions and musical works written in whole or in part by
Sylvester Stewart p/k/a Sly Stone ("Stewart") on or before December 31, 1988, including, without
limitation, the musical compositions and musical works listed on Schedule A attached hereto, whether
the same were originally claimed or registered as a musical composition or as a musical part of a
dramatico-musical work, and any music, lyrics, titles or cues thereof, whether domestic or foreign,
and/or any direct or indirect interests therein or other rights arising therefrom, respecting which Seller
and/or any Seller Related Entity owns and/or controls any right, title or interest anywhere in the world,
as well as any derivative works based thereon now existing or hereafter created (including, for the
avoidance of doubt, any such derivative works created on or after January 1, 1989), in each instance to
the extent of Seller's and/or any Seller Related Entity's current or future interest therein (collectively, the
"Compositions"), it being understood that the Royalties directed to be paid under this clause (a) shall be
solely in connection with Stewart's capacity as an author, songwriter, lyricist, composer or arranger of
the Compositions;

(b)      the public performance of the Compositions, including, without limitation, the so-called
"writer's share" of Royalties payable by Broadcast Music, Inc. and/or any other performing rights society
or organization anywhere in the world or any other person or entity in respect of the public performance
of the Compositions, in connection with Stewart's capacity as an author, songwriter, lyricist, composer
or arranger of the Compositions;

(c)      any and all audio-only and audiovisual recordings, master recordings, sound recordings and phonorecords (i) embodying the performance of Stewart (individually or together with other recording artists, including as a member of the musical group known as Sly and the Family Stone), (ii) originally recorded on or before December 31, 1988, and (iii) respecting which Seller and/or any Seller Related Entity owns and/or controls any right, title or interest anywhere in the world, including, without limitation, the recordings and phonorecords listed on Schedule A-1 attached hereto, and/or any direct or indirect interests therein or other rights arising therefrom, as well as any derivative works based thereon now existing or hereafter created (but not including any re-recording by Stewart of any musical composition previously included in any recording created on or before December 31, 1988 which re-recording is created on or after January 1, 1989), in each instance to the extent of Seller's and/or any Seller Related Entity's current or future interest therein (collectively, the "Masters"), it being understood that the Royalties directed to be paid under this clause (c) shall be solely in connection with Stewart's capacity as a recording artist or performer of the Masters (and not as a producer of the Master);

(d)      the public performance of the Masters, including without limitation, any so-called "artist share" of Royalties payable by SoundExchange, Inc. and/or any other neighboring rights society or organization anywhere in the world or any other person or entity in respect of the public performance of the Masters, whether accorded pursuant to the laws and regulations currently in effect or hereinafter enacted in any country of the world or under any applicable collective bargaining or industrywide agreement, in connection with Stewart's capacity as a recording artist or performer of the Masters (and not as a producer of the Masters); and

(e)      the consultation agreement dated as of December 18, 2002 by and between Even St. and Sony Music Group, a Group of Sony Music Entertainment Inc.

Accordingly, from and after July 1, 2018, the undersigned hereby authorizes and irrevocably directs the recipient of this letter of direction to pay to PWM one hundred percent (100%) of the Royalties set forth in clauses (a) through (e) above.

All payments and statements as well as copies of any notices or correspondence in connection with the foregoing should be sent to PWM at the following address:

Primary Wave Music IP Fund 1, LP
c/o Primary Wave Music Publishing LLC
116 E 16th St., 9th Floor
New York, NY 10003
Attention: Royalties

Electronic royalty statements should be emailed in imaestro format, with an additional copy in Excel or csv format, to PWM at the following email address: royalties@primarywave.com

Wire remittances should be directed to the following bank account:

Account Name: Primary Wave Music IP Fund 1, LP
Bank Name: JP Morgan Chase Bank, NA
Account #: 826670536
Routing #: 021000021
SWIFT: CHASUS33

This notice terminates and supersedes any and all prior designations of mailing address or payment instructions furnished to the recipient of this letter of direction by the undersigned in connection with the Royalties described above.

Please update your records accordingly.  We appreciate your acknowledging receipt of this notification by executing the enclosed copy and returning to PWM at the address set forth above.

Very truly yours,

Even St. Productions Ltd.

By: _____

Its: _____

Majoken, Inc.

By: _____

Its: _____


ACKNOWLEDGED AND AGREED:

_____

By: _____

Its: _____

**EXHIBIT 4**

**BMI LETTER OF DIRECTION**

Even St. Productions Ltd. f/k/a Stone Fire Productions Ltd. and Majoken, Inc.
c/o Loeb & Loeb
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
Attention:  John Frankenheimer and Johnathan Altschul

As of July 1, 2018

Broadcast Music, Inc.
7 World Trade Center
250 Greenwich Street
New York, NY 10007-0030

RE:    **Letter of Direction – Even St. Productions Ltd. f/k/a Stone Fire Productions Ltd.
and Majoken, Inc.**

To Whom It May Concern:

Reference is made to any and all agreements by and between Broadcast Music, Inc., its affiliates, and/or any of their respective successors and/or predecessors (collectively, "BMI"), individually and/or together with any one or more additional parties, on the one hand, and Sylvester Stewart p/k/a Sly Stone ("Stewart"), Even St. Productions Ltd. f/k/a Stone Fire Productions Ltd. ("Even St."), Majoken, Inc. ("Majoken"), and/or any of their respective affiliates, successors, and/or predecessors, individually and/or together with any one or more additional parties, on the other hand, including, without limitation, the agreement between Stewart and BMI executed by Stewart and dated May 26, 2018, as of the same may have been amended or extended from time to time (collectively, the "BMI Agreements").

Reference is further made to the assignment dated February 27, 1989 from Stewart to Even St. pursuant to which Stewart assigned to Even St. any royalties or other income due or to become due from BMI.

Please be advised that effective as of July 1, 2018 Even St. and Majoken (individually and collectively, "Seller") have irrevocably sold, assigned, transferred and set over to Primary Wave Music IP Fund 1, LP ("PWM") certain assets of Seller, including, without limitation, an undivided one hundred percent (100%) of all right, title and interest of Seller and any other entities controlling, controlled by or under common control with Seller (individually and collectively, the "Seller Affiliates") in and to any and all credits, monies, fees, royalties, revenues, amounts and sums of any kind or description (collectively, "Royalties") payable and/or becoming payable to Seller and/or any Seller Affiliates (each, a "Seller Related Entity") from and after July 1, 2018 by any person or entity, including, without limitation, BMI, anywhere in the universe, pursuant to the BMI Agreements or otherwise, derived from or in connection with the following:

(a)    any and all musical compositions and musical works written in whole or in part by Stewart on or before December 31, 1988, including, without limitation, the musical compositions and musical works listed on Schedule A attached hereto, whether the same were originally claimed or registered as a musical composition or as a musical part of a dramatico-musical work and any music, lyrics, titles or cues thereof, whether domestic or foreign, and/or any direct or indirect interests therein or other rights arising therefrom, respecting which Seller and/or any Seller Related Entity owns and/or controls any right, title or interest anywhere in the world, as well as any derivative works based thereon now existing or hereafter created (including, for the avoidance of doubt, any such derivative works created on or after January 1, 1989), in each instance to the extent of Seller's and/or any Seller Related Entity's current or future interest therein (collectively, the "Compositions"), it being understood that the

Royalties directed to be paid under this clause (a) shall be solely in connection with Stewart's capacity as an author, songwriter, lyricist, composer or arranger of the Compositions; and

(b)    the public performance of the Compositions, including, without limitation, the so-called "writer's share" of Royalties payable by BMI and/or any other performing rights society or organization anywhere in the world or any other person or entity in respect of the public performance of the Compositions, in connection with Stewart's capacity as an author, songwriter, lyricist, composer or arranger of the Compositions.

Accordingly, from and after July 1, 2018, the undersigned hereby authorizes and irrevocably directs BMI to pay to PWM one hundred percent (100%) of the Royalties set forth in clauses (a) and (b) above.

All payments and statements as well as copies of any notices or correspondence in connection with the foregoing should be sent to PWM at the following address:

Primary Wave Music IP Fund 1, LP
c/o Primary Wave Music Publishing LLC
116 E 16th St., 9th Floor
New York, NY 10003
Attention: Royalties

Electronic royalty statements should be emailed in imaestro format, with an additional copy in Excel or csv format, to PWM at the following email address: royalties@primarywave.com

Wire remittances should be directed to the following bank account:

Account Name: Primary Wave Music IP Fund 1, LP
Bank Name: JP Morgan Chase Bank, NA
Account #: 826670536
Routing #: 021000021
SWIFT: CHASUS33

This notice terminates and supersedes any and all prior designations of mailing address or payment instructions furnished to BMI by the undersigned in connection with the Royalties described above.

Please update your records accordingly.  We appreciate your acknowledging receipt of this notification by executing the enclosed copy and returning to PWM at the address set forth above.

Very truly yours,

Even St. Productions Ltd.

By: _____

Its: _____

Majoken, Inc.

By: _____

Its: _____

ACKNOWLEDGED AND AGREED:

Broadcast Music, Inc.

By: _____

Its: _____

**EXHIBIT 5**

**MIJAC LETTER OF DIRECTION**

Even St. Productions Ltd. f/k/a Stone Fire Productions Ltd. and Majoken, Inc.
c/o Loeb & Loeb
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
Attention: John Frankenheimer and Johnathan Altschul

As of July 1, 2018

Mijac Music / Miran Publishing Corp.
c/o Sony/ATV Songs LLC
8 Music Sq. W.
Nashville, TN 37203-3204

**RE:    Letter of Direction – Even St. Productions Ltd. f/k/a Stone Fire Productions Ltd. and Majoken, Inc.**

To Whom It May Concern:

Reference is made to any and all agreements by and between Michael Jackson, Mijac Music, and Miran Publishing Corp., and each of their respective affiliates, successors, and/or predecessors, including, without limitation, Stone Flower Music, Stone Flower Productions, Inc., Daly City Music, Magic Mirror Management and Daedalus Productions, Inc. (individually and collectively, the "Mijac Entities"), individually and/or together with any one or more additional parties, on the one hand, and Sylvester Stewart p/k/a Sly Stone ("Stewart"), Even St. Productions Ltd. f/k/a Stone Fire Productions Ltd. ("Even St."), Majoken, Inc. ("Majoken"), and/or any of their respective affiliates, successors, and/or predecessors, individually and/or together with any one or more additional parties, on the other hand, as any of the same may have been amended or extended from time to time (collectively, the "Publishing Agreements").

Please be advised that effective as of July 1, 2018 Even St. and Majoken (individually and collectively, "Seller") have irrevocably sold, assigned, transferred and set over to Primary Wave Music IP Fund 1, LP ("PWM") certain assets of Seller, including, without limitation, an undivided one hundred percent (100%) of all right, title and interest of Seller and any other entities controlling, controlled by or under common control with Seller (individually and collectively, the "Seller Affiliates") in and to any and all credits, monies, fees, royalties, revenues, amounts and sums of any kind or description (collectively, "Royalties") payable and/or becoming payable to Seller and/or any Seller Affiliates (each, a "Seller Related Entity") from and after July 1, 2018 by any person or entity, including, without limitation, the Mijac Entities, anywhere in the universe, pursuant to the Publishing Agreements or otherwise, derived from or in connection with the following:

(a)    any and all musical compositions and musical works written in whole or in part by Stewart on or before December 31, 1988, including, without limitation, the musical compositions and musical works listed on Schedule A attached hereto, whether the same were originally claimed or registered as a musical composition or as a musical part of a dramatico-musical work and any music, lyrics, titles or cues thereof, whether domestic or foreign, and/or any direct or indirect interests therein or other rights arising therefrom, respecting which Seller and/or any Seller Related Entity owns and/or controls any right, title or interest anywhere in the world, as well as any derivative works based thereon now existing or hereafter created (including, for the avoidance of doubt, any such derivative works created on or after January 1, 1989), in each instance to the extent of Seller's and/or any Seller Related Entity's current or future interest therein (collectively, the "Compositions"), it being understood that the Royalties directed to be paid under this clause (a) shall be solely in connection with Stewart's capacity as an author, songwriter, lyricist, composer or arranger of the Compositions; and

(b)    the public performance of the Compositions, including, without limitation, the so-called "writer's share" of Royalties payable by Broadcast Music, Inc. and/or any other performing rights society or organization anywhere in the world or any other person or entity in respect of the public performance of the Compositions, in connection with Stewart's capacity as an author, songwriter, lyricist, composer or arranger of the Compositions.

Accordingly, from and after July 1, 2018, the undersigned hereby authorizes and irrevocably directs the Mijac Entities to pay to PWM one hundred percent (100%) of the Royalties set forth in clauses (a) and (b) above.

All payments and statements as well as copies of any notices or correspondence in connection with the foregoing should be sent to PWM at the following address:

Primary Wave Music IP Fund 1, LP
c/o Primary Wave Music Publishing LLC
116 E 16th St., 9th Floor
New York, NY 10003
Attention: Royalties

Electronic royalty statements should be emailed in imaestro format, with an additional copy in Excel or csv format, to PWM at the following email address: royalties@primarywave.com

Wire remittances should be directed to the following bank account:

Account Name: Primary Wave Music IP Fund 1, LP
Bank Name: JP Morgan Chase Bank, NA
Account #: 826670536
Routing #: 021000021
SWIFT: CHASUS33

This notice terminates and supersedes any and all prior designations of mailing address or payment instructions furnished to any of the Mijac Entities by the undersigned in connection with the Royalties described above.

Please update your records accordingly.  We appreciate your acknowledging receipt of this notification by executing the enclosed copy and returning to PWM at the address set forth above.

Very truly yours,

Even St. Productions Ltd.

By: _____

Its: _____

Majoken, Inc.

By: _____

Its: _____

ACKNOWLEDGED AND AGREED:

Mijac Music

By: _____

Its: _____

Miran Publishing Corp.

By: _____

Its: _____

## EXHIBIT 6

## SONY/ATV LETTER OF DIRECTION

Even St. Productions Ltd. f/k/a Stone Fire Productions Ltd. and Majoken, Inc.
c/o Loeb & Loeb
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
Attention:  John Frankenheimer and Johnathan Altschul

As of July 1, 2018

Sony/ATV Music Publishing, LLC
8 Music Sq. W.
Nashville, TN 37203-3204

     **RE:**   **Letter of Direction – Even St. Productions Ltd. f/k/a Stone Fire Productions Ltd.
and Majoken, Inc.**

To Whom It May Concern:

Reference is made to any and all agreements by and between Sony/ATV Music Publishing, LLC, its affiliates, and their respective predecessors and/or successors (individually and collectively, "Sony/ATV"), individually and/or together with any one or more additional parties, on the one hand, and Sylvester Stewart p/k/a Sly Stone ("Stewart"), Even St. Productions Ltd. f/k/a Stone Fire Productions Ltd. ("Even St."), Majoken, Inc. ("Majoken"), and/or any of their respective affiliates, successors, and/or predecessors, individually and/or together with any one or more additional parties, on the other hand, as any of the same may have been amended or extended from time to time (collectively, the "Sony/ATV Agreements").

Please be advised that effective as of July 1, 2018 Even St. and Majoken (individually and collectively, "Seller") have irrevocably sold, assigned, transferred and set over to Primary Wave Music IP Fund 1, LP ("PWM") certain assets of Seller, including, without limitation, an undivided one hundred percent (100%) of all right, title and interest of Seller and any other entities controlling, controlled by or under common control with Seller (individually and collectively, the "Seller Affiliates") in and to any and all credits, monies, fees, royalties, revenues, amounts and sums of any kind or description (collectively, "Royalties") payable and/or becoming payable to Seller and/or any Seller Affiliates (each, a "Seller Related Entity") from and after July 1, 2018 by any person or entity, including, without limitation, Sony/ATV, anywhere in the universe, pursuant to the Sony/ATV Agreements or otherwise, derived from or in connection with the following:

    (a)    any and all musical compositions and musical works written in whole or in part by Stewart on or before December 31, 1988, including, without limitation, the musical compositions and musical works listed on Schedule A attached hereto, whether the same were originally claimed or registered as a musical composition or as a musical part of a dramatico-musical work and any music, lyrics, titles or cues thereof, whether domestic or foreign, and/or any direct or indirect interests therein or other rights arising therefrom, respecting which Seller and/or any Seller Related Entity owns and/or controls any right, title or interest anywhere in the world, as well as any derivative works based thereon now existing or hereafter created (including, for the avoidance of doubt, any such derivative works created on or after January 1, 1989), in each instance to the extent of Seller's and/or any Seller Related Entity's current or future interest therein (collectively, the "Compositions"), it being understood that the Royalties directed to be paid under this clause (a) shall be solely in connection with Stewart's capacity as an author, songwriter, lyricist, composer or arranger of the Compositions; and

(b)    the public performance of the Compositions, including, without limitation, the so-called "writer's share" of Royalties payable by Broadcast Music, Inc. and/or any other performing rights society or organization anywhere in the world or any other person or entity in respect of the public performance of the Compositions, in connection with Stewart's capacity as an author, songwriter, lyricist, composer or arranger of the Compositions.

Accordingly, from and after July 1, 2018, the undersigned hereby authorizes and irrevocably directs Sony/ATV to pay to PWM one hundred percent (100%) of the Royalties set forth in clauses (a) and (b) above.

All payments and statements as well as copies of any notices or correspondence in connection with the foregoing should be sent to PWM at the following address:

Primary Wave Music IP Fund 1, LP
c/o Primary Wave Music Publishing LLC
116 E 16th St., 9th Floor
New York, NY 10003
Attention: Royalties

Electronic royalty statements should be emailed in imaestro format, with an additional copy in Excel or csv format, to PWM at the following email address: royalties@primarywave.com

Wire remittances should be directed to the following bank account:

Account Name: Primary Wave Music IP Fund 1, LP
Bank Name: JP Morgan Chase Bank, NA
Account #: 826670536
Routing #: 021000021
SWIFT: CHASUS33

This notice terminates and supersedes any and all prior designations of mailing address or payment instructions furnished to Sony/ATV by the undersigned in connection with the Royalties described above.

Please update your records accordingly.  We appreciate your acknowledging receipt of this notification by executing the enclosed copy and returning to PWM at the address set forth above.

Very truly yours,

Even St. Productions Ltd.

By: _____

Its: _____

Majoken, Inc.

By: _____

Its: _____

ACKNOWLEDGED AND AGREED:

Sony/ATV Music Publishing, LLC

By: _____

Its: _____

**EXHIBIT 7**

**WARNER/CHAPPELL LETTER OF DIRECTION**

Even St. Productions Ltd. f/k/a Stone Fire Productions Ltd. and Majoken, Inc.
c/o Loeb & Loeb
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
Attention: John Frankenheimer and Johnathan Altschul

As of July 1, 2018

Warner/Chappell Music, Inc.
10585 Santa Monica Blvd.
Los Angeles, CA 90025-4921

**RE:** **Letter of Direction – Even St. Productions Ltd. f/k/a Stone Fire Productions Ltd. and Majoken, Inc.**

To Whom It May Concern:

Reference is made to any and all agreements by and between Warner/Chappell Music, Inc., its affiliates, and/or any of their respective successors and/or predecessors (individually and collectively, "Warner/Chappell"), individually and/or together with any one or more additional parties, on the one hand, and Sylvester Stewart p/k/a Sly Stone ("Stewart"), Even St. Productions Ltd. f/k/a Stone Fire Productions Ltd. ("Even St."), Majoken, Inc. ("Majoken"), and/or any of their respective affiliates, successors, and/or predecessors, individually and/or together with any one or more additional parties, on the other hand, as any of the same may have been amended or extended from time to time (collectively, the "Warner/Chappell Agreements").

Reference is further made to the assignment dated February 27, 1989 from Stewart to Even St. pursuant to which Stewart assigned to Even St. any royalties or other income due or to become due from Warner/Chappell.

Please be advised that effective as of July 1, 2018 Even St. and Majoken (individually and collectively, "Seller") have irrevocably sold, assigned, transferred and set over to Primary Wave Music IP Fund 1, LP ("PWM") certain assets of Seller, including, without limitation, an undivided one hundred percent (100%) of all right, title and interest of Seller and any other entities controlling, controlled by or under common control with Seller (individually and collectively, the "Seller Affiliates") in and to any and all credits, monies, fees, royalties, revenues, amounts and sums of any kind or description (collectively, "Royalties") payable and/or becoming payable to Seller and/or any Seller Affiliates (each, a "Seller Related Entity") from and after July 1, 2018 by any person or entity, including, without limitation, Warner/Chappell, anywhere in the universe, pursuant to the Warner/Chappell Agreements or otherwise, derived from or in connection with the following:

(a)    any and all musical compositions and musical works written in whole or in part by Stewart on or before December 31, 1988, including, without limitation, the musical compositions and musical works listed on Schedule A attached hereto, whether the same were originally claimed or registered as a musical composition or as a musical part of a dramatico-musical work and any music, lyrics, titles or cues thereof, whether domestic or foreign, and/or any direct or indirect interests therein or other rights arising therefrom, respecting which Seller and/or any Seller Related Entity owns and/or controls any right, title or interest anywhere in the world, as well as any derivative works based thereon now existing or hereafter created (including, for the avoidance of doubt, any such derivative works created on or after January 1, 1989), in each instance to the extent of Seller's and/or any Seller Related Entity's current or future interest therein (collectively, the "Compositions"), it being understood that the Royalties directed to be paid under this clause (a) shall be solely in connection with Stewart's capacity as an author, songwriter, lyricist, composer or arranger of the Compositions; and

(b)    the public performance of the Compositions, including, without limitation, the so-called "writer's share" of Royalties payable by Broadcast Music, Inc. and/or any other performing rights society or organization anywhere in the world or any other person or entity in respect of the public performance of the Compositions, in connection with Stewart's capacity as an author, songwriter, lyricist, composer or arranger of the Compositions.

Accordingly, from and after July 1, 2018, the undersigned hereby authorizes and irrevocably directs Warner/Chappell to pay to PWM one hundred percent (100%) of the Royalties set forth in clauses (a) and (b) above.

All payments and statements as well as copies of any notices or correspondence in connection with the foregoing should be sent to PWM at the following address:

Primary Wave Music IP Fund 1, LP
c/o Primary Wave Music Publishing LLC
116 E 16th St., 9th Floor
New York, NY 10003
Attention: Royalties

Electronic royalty statements should be emailed in imaestro format, with an additional copy in Excel or csv format, to PWM at the following email address: royalties@primarywave.com

Wire remittances should be directed to the following bank account:

Account Name: Primary Wave Music IP Fund 1, LP
Bank Name: JP Morgan Chase Bank, NA
Account #: 826670536
Routing #: 021000021
SWIFT: CHASUS33

This notice terminates and supersedes any and all prior designations of mailing address or payment instructions furnished to Warner/Chappell by the undersigned in connection with the Royalties described above.

Please update your records accordingly. We appreciate your acknowledging receipt of this notification by executing the enclosed copy and returning to PWM at the address set forth above.

Very truly yours,

Even St. Productions Ltd.

By: _____

Its: _____

Majoken, Inc.

By: _____

Its: _____

ACKNOWLEDGED AND AGREED:

Warner/Chappell Music, Inc.

By: _____

Its: _____

# **EXHIBIT 8**

## **SONY ENTERTAINMENT LETTER OF DIRECTION**

Even St. Productions Ltd. f/k/a Stone Fire Productions Ltd. and Majoken, Inc.
c/o Loeb & Loeb
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
Attention:  John Frankenheimer and Johnathan Altschul

As of July 1, 2018

Sony Music Group, a Group of Sony Music Entertainment Inc.
25 Madison Avenue
New York, NY 10010

RE:    **Letter of Direction – Even St. Productions Ltd. f/k/a Stone Fire Productions Ltd.
and Majoken, Inc.**

To Whom It May Concern:

Reference is made to any and all agreements by and between Sony Music Group, a Group of Sony
Music Entertainment Inc., its affiliates, and/or any of their respective successors and/or predecessors,
including, without limitation, CBS Records, a Division of Columbia Broadcasting Systems (individually
and collectively, "Sony Entertainment"), individually and/or together with any one or more additional
parties, on the one hand, and Sylvester Stewart p/k/a Sly Stone ("Stewart"), Even St. Productions Ltd.
f/k/a Stone Fire Productions Ltd. ("Even St."), Majoken, Inc. ("Majoken"), and/or any of their respective
affiliates, successors and/or predecessors, individually and/or together with any one or more additional
parties, on the other hand, including, without limitation, the following: (i) the agreement dated June 6,
1967 between Stone Flower Productions and CBS Records, (ii) the agreement dated June 7, 1967
between Gerald L. Martini, Fredrick Stewart, Stewart, Lawrence Graham, Jr., Gregory Enrico and
Cynthia Robinson, on the one hand, and CBS Records, on the other hand, (iii) the memorandum of
agreement dated September 15, 1972, between Stewart, Fresh Productions, Inc., Stone Flower
Productions, Inc., Stone Flower Music Co., Daly City Music Co., Illili Entities, Inc., Illili Music Company
and David Kapralik, on the one hand, and CBS Records, on the other hand, (iv) the memorandum of
agreement dated December 1, 1977, between Stewart, Fresh Productions, Inc., Stone Flower
Productions, Inc., Stone Flower Music Co., Daly City Music Co., Illili Entities, Inc., Illili Music Company
and David Kapralik, on the one hand, and CBS Records on the other hand, (v) the letter agreement
between Sony Entertainment and Even St. dated December 18, 2002, and (vi) the consultation
agreement between Sony Entertainment and Even St. dated as of December 18, 2002, as any of the
same may have been amended or extended from time to time (collectively, the "Sony Agreements").

Reference is further made to the assignment dated February 27, 1989 from Stewart to Even St.
pursuant to which Stewart assigned to Even St. any royalties or other income due or to become due
from Sony Entertainment.

Please be advised that effective as of July 1, 2018 Even St. and Majoken (individually and collectively,
"Seller") have irrevocably sold, assigned, transferred and set over to Primary Wave Music IP Fund 1,
LP ("PWM") certain assets of Seller, including, without limitation, an undivided one hundred percent
(100%) of all right, title and interest of Seller and any other entities controlling, controlled by or under
common control with Seller (individually and collectively, the "Seller Affiliates") in and to any and all
credits, monies, fees, royalties, revenues, amounts and sums of any kind or description (collectively,
"Royalties") payable and/or becoming payable to Seller and/or any Seller Affiliates (each, a "Seller
Related Entity") from and after July 1, 2018 by any person or entity, including, without limitation, Sony

Entertainment, anywhere in the universe, pursuant to the Sony Entertainment Agreements or otherwise, derived from or in connection with the following:

(a)    any and all audio-only and audiovisual recordings, master recordings, sound recordings and phonorecords (i) embodying the performance of Stewart (individually or together with other recording artists, including as a member of the musical group known as Sly and the Family Stone), (ii) originally recorded on or before December 31, 1988, and (iii) respecting which Seller and/or any Seller Related Entity owns and/or controls any right, title or interest anywhere in the world, including, without limitation, the recordings and phonorecords listed on Schedule A-1 attached hereto, and/or any direct or indirect interests therein or other rights arising therefrom, as well as any derivative works based thereon now existing or hereafter created (but not including any re-recording by Stewart of any musical composition previously included in any recording created on or before December 31, 1988 which re-recording is created on or after January 1, 1989), in each instance to the extent of Seller's and/or any Seller Related Entity's current or future interest therein (collectively, the "Masters"), it being understood that the Royalties directed to be paid under this clause (a) shall be solely in connection with Stewart's capacity as a recording artist or performer of the Masters (and not as a producer of the Masters); and

(b)    the public performance of the Masters, including without limitation, any so-called "artist share" of Royalties payable by SoundExchange, Inc. and/or any other neighboring rights society or organization anywhere in the world or any other person or entity in respect of the public performance of the Masters, whether accorded pursuant to the laws and regulations currently in effect or hereinafter enacted in any country of the world or under any applicable collective bargaining or industrywide agreement, in connection with Stewart's capacity as a recording artist or performer of the Masters (and not as a producer of the Masters).

Accordingly, from and after July 1, 2018, the undersigned hereby authorizes and irrevocably directs Sony Entertainment to pay to PWM one hundred percent (100%) of the Royalties set forth in clauses (a) through (b) above.

All payments and statements as well as copies of any notices or correspondence in connection with the foregoing should be sent to PWM at the following address:

Primary Wave Music IP Fund 1, LP
c/o Primary Wave Music Publishing LLC
116 E 16th St., 9th Floor
New York, NY 10003
Attention: Royalties

Electronic royalty statements should be emailed in imaestro format, with an additional copy in Excel or csv format, to PWM at the following email address: royalties@primarywave.com

Wire remittances should be directed to the following bank account:

Account Name: Primary Wave Music IP Fund 1, LP
Bank Name: JP Morgan Chase Bank, NA
Account #: 826670536
Routing #: 021000021
SWIFT: CHASUS33

This notice terminates and supersedes any and all prior designations of mailing address or payment instructions furnished to Sony Entertainment by the undersigned in connection with the Royalties described above.

Please update your records accordingly.  We appreciate your acknowledging receipt of this notification by executing the enclosed copy and returning to PWM at the address set forth above.

Very truly yours,

Even St. Productions Ltd.

By: _____

Its: _____

Majoken, Inc.

By: _____

Its: _____

ACKNOWLEDGED AND AGREED:

Sony Music Group, a Group of Sony Music Entertainment Inc.

By: _____

Its: _____

## **EXHIBIT 9**

## **WARNER BROS. LETTER OF DIRECTION**

Even St. Productions Ltd. f/k/a Stone Fire Productions Ltd. and Majoken, Inc.
c/o Loeb & Loeb
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
Attention:  John Frankenheimer and Johnathan Altschul

As of July 1, 2018

Warner Bros. Music, a division of Warner Bros. Inc.
3300 Warner Blvd.
Burbank, CA 91505

RE:    **Letter of Direction – Even St. Productions Ltd. f/k/a Stone Fire Productions Ltd.
and Majoken, Inc.**

To Whom It May Concern:

Reference is made to any and all agreements by and between Warner Bros. Music, a division of
Warner Bros. Inc., its affiliates, and/or any of their respective successors and/or predecessors
(individually and collectively, "Warner Bros."), individually and/or together with any one or more
additional parties, on the one hand, and Sylvester Stewart p/k/a Sly Stone ("Stewart"), Even St.
Productions Ltd. f/k/a Stone Fire Productions Ltd. ("Even St."), Majoken, Inc. ("Majoken"), and/or any of
their respective affiliates, successors, and/or predecessors, individually and/or together with any one or
more additional parties, on the other hand, as any of the same may have been amended or extended
from time to time (collectively, the "Warner Bros. Agreements").

Please be advised that effective as of July 1, 2018 Even St and Majoken (individually and collectively,
"Seller") have irrevocably sold, assigned, transferred and set over to Primary Wave Music IP Fund 1,
LP ("PWM") certain assets of Seller, including, without limitation, an undivided one hundred percent
(100%) of all right, title and interest of Seller and any other entities controlling, controlled by or under
common control with Seller (individually and collectively, the "Seller Affiliates") in and to any and all
credits, monies, fees, royalties, revenues, amounts and sums of any kind or description (collectively,
"Royalties") payable and/or becoming payable to Seller and/or any Seller Affiliates (each, a "Seller
Related Entity")  from and after July 1, 2018 by any person or entity, including, without limitation,
Warner Bros., anywhere in the universe, pursuant to the Warner Bros. Agreements or otherwise,
derived from or in connection with the following:

(a)      any and all audio-only and audiovisual recordings, master recordings, sound recordings
and phonorecords (i) embodying the performance of "Stewart (individually or together with other
recording artists, including as a member of the musical group known as Sly and the Family Stone), (ii)
originally recorded on or before December 31, 1988, and (iii) respecting which Seller and/or any Seller
Related Entity owns and/or controls any right, title or interest anywhere in the world, including, without
limitation, the recordings and phonorecords listed on Schedule A-1 attached hereto, and/or any direct
or indirect interests therein or other rights arising therefrom, as well as any derivative works based
thereon now existing or hereafter created (but not including any re-recording by Stewart of any musical
composition previously included in any recording created on or before December 31, 1988 which re-
recording is created on or after January 1, 1989), in each instance to the extent of Seller's and/or any
Seller Related Entity's current or future interest therein (collectively, the "Masters"), it being understood
that the Royalties directed to be paid under this clause (a) shall be solely in connection with Stewart's
capacity as a recording artist or performer of the Masters (and not as a producer of the Masters); and

(b)      the public performance of the Masters, including without limitation, any so-called "artist
share" of Royalties payable by SoundExchange, Inc. and/or any other neighboring rights society or

organization anywhere in the world or any other person or entity in respect of the public performance of the Masters, whether accorded pursuant to the laws and regulations currently in effect or hereinafter enacted in any country of the world or under any applicable collective bargaining or industrywide agreement, in connection with Stewart's capacity as a recording artist or performer of the Masters (and not as a producer of the Masters).

Accordingly, from and after July 1, 2018, the undersigned hereby authorizes and irrevocably directs Warner Bros. to pay to PWM one hundred percent (100%) of the Royalties set forth in clauses (a) and (b) above.

All payments and statements as well as copies of any notices or correspondence in connection with the foregoing should be sent to PWM at the following address:

> Primary Wave Music IP Fund 1, LP
> c/o Primary Wave Music Publishing LLC
> 116 E 16th St., 9th Floor
> New York, NY 10003
> Attention: Royalties

Electronic royalty statements should be emailed in imaestro format, with an additional copy in Excel or csv format, to PWM at the following email address: royalties@primarywave.com

Wire remittances should be directed to the following bank account:

> Account Name: Primary Wave Music IP Fund 1, LP
> Bank Name: JP Morgan Chase Bank, NA
> Account #: 826670536
> Routing #: 021000021
> SWIFT: CHASUS33

This notice terminates and supersedes any and all prior designations of mailing address or payment instructions furnished to Warner Bros. by the undersigned in connection with the Royalties described above.

Please update your records accordingly. We appreciate your acknowledging receipt of this notification by executing the enclosed copy and returning to PWM at the address set forth above.

Very truly yours,

Even St. Productions Ltd.

By: _____

Its: _____

Majoken, Inc.

By: _____

Its: _____

ACKNOWLEDGED AND AGREED:

Warner Bros. Music, a division of Warner Bros. Inc.

By: _____

Its: _____

**EXHIBIT 11**

**ASSET ASSIGNMENT**

## ASSET ASSIGNMENT

For valuable consideration, receipt of which is hereby acknowledged, effective as of this __ day of _____, 2018 (the "Effective Date"), the undersigned Even St. Productions Ltd. f/k/a Stone Fire Productions Ltd. ("Even St.") and Majoken, Inc. ("Majoken") (Even St. and Majoken are sometimes hereinafter individually and jointly referred to as "Assignor") hereby irrevocably sell, assign, transfer, and convey to Primary Wave Music IP Fund 1, LP ("Assignee") in perpetuity an undivided one hundred percent (100%) of all right, title and interest of Assignor and any other entities controlling, controlled by or under common control with Assignor (individually and collectively, the "Assignor Affiliates") in and to any and all credits, monies, fees, royalties, revenues, amounts and sums of any kind or description (collectively, "Royalties") payable and/or becoming payable to Assignor from and after July 1, 2018 by any person or entity, anywhere in the universe, derived from or in connection with the following:

(a)    any and all musical compositions and musical works written in whole or in part by Sylvester Stewart p/k/a Sly Stone ("Stewart") on or before December 31, 1988, including, without limitation, the musical compositions and musical works listed on Schedule A attached hereto, whether the same were originally claimed or registered as a musical composition or as a musical part of a dramatico-musical work, and any music, lyrics, titles or cues thereof, whether domestic or foreign, and/or any direct or indirect interests therein or other rights arising therefrom, respecting which Assignor and/or any Assignor Affiliate and/or any predecessor of Assignor, but expressly excluding Stewart (individually and collectively, the "Assignor Related Entities") owns and/or controls any right, title or interest anywhere in the world, as well as any derivative works based thereon now existing or hereafter created (including, for the avoidance of doubt, any such derivative works created on or after January 1, 1989), in each instance to the extent of Assignor's and/or any Assignor Related Entities' current or future interest therein (collectively, the "Compositions"), including without limitation all of such interest in all rights under United States federal or state copyright or foreign copyright and all renewals, extensions, continuations, restorations, revivals and reversions thereof (whether vested, contingent or inchoate, whether registered or unregistered and whether such renewals, extensions, continuations, restorations, revivals and reversions are now in existence or come into existence for any reason, including, but not limited to, as a result of future legislation or the interpretation thereof), in all countries of the world or otherwise throughout the universe, as well as all United States or foreign applications for copyright registration and all causes of action, including without limitation those for infringement, arising from the date of creation of the work, whether now known or unknown to Assignor or Assignee in all events, to the extent of Assignor's and/or any Assignor Related Entities' current or future interest therein, it being understood that the Royalties assigned under this clause (a) shall be solely in connection with Stewart's capacity as an author, songwriter, lyricist, composer or arranger of the Compositions;

(b)    the public performance of the Compositions, including, without limitation, the so-called "writer's share" of Royalties payable by Broadcast Music, Inc. and/or any other performing rights society or organization anywhere in the world or any other person or entity in respect of the public performance of the Compositions, in connection with Stewart's capacity as an author, songwriter, lyricist, composer or arranger of the Compositions;

(c)    any and all audio-only and audiovisual recordings, master recordings, sound recordings and phonorecords (i) embodying the performance of Stewart (individually or together with other recording artists, including as a member of the musical group known as Sly and the Family Stone), (ii) originally recorded on or before December 31, 1988, and (iii) respecting which Assignor and/or any Assignor Related Entity owns and/or controls any right, title or

1

interest anywhere in the world, including, without limitation, the recordings and phonorecords listed on <u>Schedule A-1</u> attached hereto, and/or any direct or indirect interests therein or other rights arising therefrom, as well as any derivative works based thereon now existing or hereafter created (but not including any re-recording by Stewart of any musical composition previously included in any recording created on or before December 31, 1988 which re-recording is created on or after January 1, 1989), in each instance to the extent of Assignor's and/or any Assignor Related Entities' current or future interest therein (collectively, the "<u>Masters</u>"), including without limitation all such interest in all rights under United States federal or state copyright or foreign copyright and all renewals, extensions, continuations, restorations, revivals and reversions thereof (whether vested, contingent or inchoate, whether registered or unregistered and whether such renewals, extensions, continuations, restorations, revivals and reversions are now in existence or come into existence for any reason, including, but not limited to, as a result of future legislation or the interpretation thereof), in all countries of the world or otherwise throughout the universe, as well as all United States or foreign applications for copyright registration and all causes of action, including without limitation those for infringement, arising from the date of creation of the work, whether now known or unknown to Assignor or Assignee in all events, to the extent of Assignor's and/or any Assignor Related Entities' current or future interest therein, and by this reference made a part hereof, it being understood that the Royalties assigned under this clause (c) shall be solely in connection with Stewart's capacity as a recording artist or performer of the Masters (and not as a producer of the Masters);

(d)     the public performance of the Masters, including without limitation, any so-called "artist share" of Royalties payable by SoundExchange, Inc. and/or any other neighboring rights society or organization anywhere in the world or any other person or entity in respect of the public performance of the Masters, whether accorded pursuant to the laws and regulations currently in effect or hereinafter enacted in any country of the world or under any applicable collective bargaining or industrywide agreement, in connection with Stewart's capacity as a recording artist or performer of the Masters (and not as a producer of the Masters); and

(e)     the consultation agreement dated as of December 18, 2002 by and between Even St. and Sony Music Group, a Group of Sony Music Entertainment Inc.

If any provision of this instrument of transfer shall be held void, invalid or inoperative, no other provision of this instrument of transfer shall be affected as a result thereof and, accordingly, the remaining provisions of this instrument of transfer shall remain in full force and effect.

*[SIGNATURE PAGE TO FOLLOW]*

IN WITNESS WHEREOF, the undersigned have duly executed this Assignment the date first stated above.

ASSIGNOR:

Even St. Productions Ltd.

By: _____

Its: _____

Majoken, Inc.

By: _____

Its: _____

1  DAVID L. NEALE (SBN 141225)
2  KRIKOR J. MESHEFEJIAN (SBN 255030)
   LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
3  10250 Constellation Boulevard, Suite 1700
   Los Angeles, California 90067
4  Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
   Email: dln@lnbyb.com; kjm@lnbyb.com
5
6  Attorneys for Plaintiffs

7
                  UNITED STATES BANKRUPTCY COURT
8
                  CENTRAL DISTRICT OF CALIFORNIA
9
                        LOS ANGELES DIVISION
10

11
12  In re:                              Lead Case No.: 2:13-bk-24363-WB
                                        (Jointly administered with: 2:13-bk-
13  EVEN ST. PRODUCTIONS LTD.,          24389-WB)

14            Debtor.                   Chapter 11 Cases

15  In re:                             Adv. Pro. No.:  2:15-ap-01284-WB

16  MAJOKEN, INC.,                     **STIPULATION RE DISMISSAL OF
                                       ADVERSARY PROCEEDING**
17            Debtor.
                                       **Status Conference and Hearing On
18  ☒ Affects All Plaintiffs          Motion To Dismiss Complaint:**
    ☐ Affects Even St. Productions Ltd., only   Date:   January 10, 2017
19  ☐ Affects Majoken, Inc. only       Time:   2:00 p.m.
                                        Place:  Courtroom 1375
20                                              255 East Temple Street
    EVEN STREET PRODUCTIONS LTD., and          Los Angeles, CA 90012
21  MAJOKEN, INC.,

22            Plaintiffs,

23       v.

24  SYLVESTER STEWART,

25            Defendant.

26

27

28

Exhibit 11 - Publishing Agreements.pdf

Mr. SYLVESTER STEWART

Re: _____

Dear Mr. Stewart:

This letter shall set forth the agreement between us in connection with the engagement of your services as a composer, author, lyricist and creator of musical compositions on the following terms and conditions:

1. In consideration of the sum of ~~twenty-three~~, receipt of which is hereby acknowledged, and other good and valuable consideration set forth herein, we hereby employ you to render your sole and exclusive services as a composer, author, lyricist and creator of musical compositions and you agree to grant to us such sole and exclusive services. You are our employee for hire and nothing contained herein shall be deemed to create a partnership, joint venture, independent contractor, or other relationship between us.

2. The term of this agreement shall be for a period of one        (1 ) years, commencing with the date hereof and you hereby grant to us    five      ( 5 ) successive options each for   one      ( 1 ) years to renew this agreement upon all of the terms and conditions contained herein.  Such renewal(s) shall commence at the expiration of the term of this agreement or the previous renewal unless such terms or renewal period shall have been otherwise extended in which event it shall commence at the expiration date of any such extension.  Any option shall be exercised in our discretion upon thirty (30) days written notice given to you prior to the expiration of the term of this agreement, or any extension(s) or previous renewal(s) thereof.  Any reference to the term hereof shall include any extensions or renewals of such term.

3. All music, lyrics and titles of any arrangements, orchestrations, and musical compositions ("Compositions"), as soon as conceived, composed, written or created by you during the term hereof, and all your right, title and interest in and to such Compositions shall immediately become our sole and exclusive property throughout the world, and we may use and dispose of such Compositions and all rights thereto as we may desire, subject to the terms and conditions of this agreement.  We shall have the right to copyright any Composition in our name as the author or copyright proprietor thereof throughout the world.  You shall immediately deliver to us any and all Compositions hereunder as and when conceived, composed, written or created by you.

4. You hereby sell, assign, grant, transfer, and deliver all your right, title and interest throughout the world in and to all Compositions heretofore conceived, composed, written or created in whole or in part by you.  Attached hereto as a Schedule is a list of all such Compositions and any Composition omitted therefrom shall nonetheless be deemed a part thereof unless otherwise provided herein.

5. In consideration of the sums paid to you as set forth previously herein, and other good and valuable consideration, you have and hereby sell, assign, grant, transfer and convey to us all rights and interest in and to all Compositions hereunder ~~together with the worldwide~~ for the original term of the United States copyright or for the period of twenty-eight years from the date of publication in the United States, whichever may be shorter

EXHIBIT 2



# CBS RECORDS

A Division of Columbia Broadcasting System, Inc.
51 West 52 Street
New York, New York 10019
(212) 765-4321

June 6, 1967

Stone Flower Productions
c/o Mr. Sylvester Stone
700 Urbano Street
San Francisco, California

Dear Sirs:

The following, when signed by you and by us, will constitute the agreement
between you and us:

A.    You have made delivery to us of certain master recordings, hereinafter
described, and we have accepted such master recordings in accordance with
the following provisions of this agreement.

B.    You warrant, represent, covenant and agree that:

1.   You are the sole and exclusive owner of master recordings
in the form of acetate safety discs and/or magnetic recording
tape and/or metal parts, embodying the recorded performances
of the compositions listed below (Recorded May 17, 1967 in San Francisco, Ca
(hereinafter sometimes collectively called the "master recordings").
Such master recordings embody performances by GERALD L. MARTINI*,
FREDRICK STEWART*, SYLVESTER STEWART*, CYNTHIA ROBINSON*,
LAWRENCE GRAHAM, JR.* and GREGORY ENRICO* (PKA "SLY AND
THE FAMILY STONES")

| | |
|---|---|
| RUN, RUN, RUN | IF I MAKE IT TILL TOMORROW |
| BURN BABY, BURN | LET ME HEAR IT FROM YOU |
| DOG | HIGHER |
| WHY | TURN ME LOOSE |

2. You have not, nor has any third party, prior to the date of this
agreement, sold, leased or otherwise disposed of any right, title
or interest in or to any such master recordings, nor manufactured
phonograph records from such master recordings, or from any
copies or duplicates of such master recordings, or sold phonograph
records so manufactured. None of the persons listed above who are
marked with an asterisk have, during a period of five years prior to
the date of this agreement, performed any of such compositions for
any person other than us for the purpose of making recordings, other
than such master recordings delivered to us hereunder.

SONY MUSIC
A Group of Sony Music Entertainment Inc.
550 Madison Avenue
New York, NY 10022

Dated: As of December 18, 2002

Even St. Productions, Ltd.
C/o Glenn Stone, Esq.
276 Fifth Avenue  Suite 507
New York, NY 10001

Reference is made to (a) the agreement dated June 7, 1967 between CBS Records, A Division of Columbia Broadcasting System, Inc. (Sony's predecessor-in-interest) and Gerald L. Martini, Frederick Stewart, Sylvester Stewart, Lawrence Graham, Jr., Gregory Errico, Cynthia Robinson and Rose Stewart p/k/a "Sly and the Family Stone" (the "Artist"); (b) the agreement dated as of May __, 1967 between Stone Flower Productions and CBS Records, (c) the memorandum agreement dated September 15, 1972 among CBS Records, Sylvester Stewart, Fresh Productions, Stone Flower Music Co. , Daly City Music Co. Illili Entities, Inc., Illili Music Company and David Kapralik, (d) the Assignment from Sylvester Stewart to Stone Fire Productions Ltd. (your former name), pursuant to which you warrant and represent that Sylvester Stewart assigned all rights in the Masters (as defined below) to you and (d) the Settlement and Mutual Release dated April 1, 1991 among you, various members of the Artist and CBS Records (as an acknowledging party), pursuant to which you warrant that all such members of Artist assigned all rights in the Masters to you. (All of such agreements, together with all other agreements with Sony or its predecessor in interest with respect to Recordings featuring Artist (as then-constituted), are referred to herein as the "Agreements". We are sometimes referred to below as "Sony.") The following, when fully executed, will modify the Agreements.

1.    Definitions. All Capitalized terms used herein will have the meanings assigned to them in the Royalty Terms and Definitions attached hereto as Schedule A and made a part hereof, provided, the following additional terms will have the following meanings:

(a)    The "Best of Album" shall mean a single-CD (and/or equivalent in other configurations) Album comprised of Masters mutually selected by you and Sony and included in the Box Set (as defined in subparagraph 1(b) below).

(b)    The "Box Set" shall mean the box set compilation comprised of approximately three (3) or four (4) compact discs (or equivalent in other audio configurations) containing approximately  TBD/66  Masters (as defined below) mutually selected by you and Sony, including audio Masters not previously released by Sony.

(c)    The "Essentials Album" shall mean a two-CD or single-CD (and/or equivalent in other configurations) compilation containing approximately 35 or 36 Masters mutually selected by you and Sony including Masters not previously released by Sony if and as mutually selected by you and Sony.

(d)    The "Fillmore Live Album" shall mean a single-CD or two-CD (and/or equivalent in other configurations) Album comprised of Artist's "live" Recordings at the Fillmore East in ____

ID: 232947 v15

1          MS     SMU02-212.12(1)          12/18/2002

1 of 25

Exhibit 17 - Sony Consulting Agreement.pdf

## CONSULTATION AGREEMENT

Agreement made as of December 18, 2002 by and between Even St. Productions, Ltd., c/o Glenn Stone, Esq., 276 Fifth Avenue Suite 507, New York, NY 10001 ("you") and Sony Music, a Group of Sony Music Entertainment Inc. ("Sony").

### 1.    SERVICES

1.01.    Reference is made to the agreement of even date herewith between you and Sony (SMU 02-212) (the "New Releases Agreement") with respect, among other things, to the release by Sony of various Albums featuring Masters embodying the performances of Sly and the Family Stone ("Artist"). Capitalized Terms used and not defined in this agreement will have the same meanings assigned to them in the New Releases Agreement. Without limiting your obligations or Sony's rights under the New Releases Agreement, and solely to the extent requested by Sony, you agree to furnish your services in connection with the selection of repertoire to be included in the New Releases and the Catalog Re-releases, as defined in the New Releases Agreement, and you shall assist Sony in the prompt selection of Compositions for inclusion in the New Releases and Catalog Re-releases, as requested by Sony, in order to assist Sony in the release of the New Releases and Catalog Releases on such release schedule as is scheduled by Sony. Solely as requested by Sony, you will also assist Sony in generating marketing concepts for the New Releases and catalog Re-releases, and in obtaining the cooperation of Sylvester Stewart ("Stewart") in any promotional activities in relation to the New Releases and Catalog Re-releases which Stewart is willing to agree, provided, Stewart's failure to so agree will not be a breach of your obligations. (All such services referred to in the preceding two sentences are referred to herein as "Consulting Services".)

### 2.    COMPENSATION

2.01.    In consideration of the Consulting Services hereunder, Sony shall in perpetuity (subject to the terms hereof) account to you for a royalty with respect to the Masters, equal to the difference between the Mechanical Royalties Sony is paying with respect to Controlled Compositions embodied in the Masters as of the date hereof (the "Current Mechanical Rate"), and the Mechanical Royalties prescribed in Article 3 below with respect to Controlled Compositions (the "Mechanical Royalty Differential"). Sony will not be entitled to cease payment of the Mechanical Royalty Differential as a result of your failure to render services hereunder. If for any reason the Mechanical Royalty rate Sony pays with respect to the Controlled Compositions as embodied in the Masters increases following the date hereof, the amount of such increase will be deducted from all monies payable to you under this agreement, including without limitation the Mechanical Royalty Differential.

### 3.    MECHANICAL ROYALTY DIFFERENTIAL

3.01.    (a)    In consideration of the Consulting Services, Sony (or Sony's Licensees, as applicable) shall pay you the Mechanical Royalty Differential, on the basis of Net Sales, equal to the difference between the Current Mechanical Rate and the following rates ("New Mechanical Rate"): (A) with respect to Records sold in the United States on or after July 1, 2002 comprising the New Releases (other than the Essentials Album), one hundred percent (100%) of the minimum compulsory license rate applicable to the use of Compositions on phonorecords under the United States copyright law ("U.S. Minimum Statutory Rate") on the date of initial release in the United States of the New Release concerned (the U.S. Minimum Statutory Rate is 8¢ as of the date hereof); (B) with respect to Records sold in the United States on or after July 1, 2002 comprising

## ASSIGNMENT

For One ($1.00) Dollar, and other good and valuable consideration, receipt of which is hereby acknowledged SYLVESTER STEWART p/k/a Sly Stone ("Assignor") hereby assigns, transfers, sets over and conveys to STONE FIRE PRODUCTIONS LTD. ("Assignee"), all rights, title and interest in and to any and all claims, rights, causes of action and benefits now known or unknown resulting from the prior exploitation of the Assignor's skills talents and services, in the entertainment industry including but not limited to, as a musician, composer, arranger, publisher, recording artist, actor, writer and performing artist. Said assignment shall include but not be limited to the following:

1. Any royalty or other income now due past due or to become due from CBS RECORDS.

2. Any royalty or other income now due, past due, or to become due from WARNER/CHAPPELL MUSIC, INC. including but not limited to publishing royalties and income, and writer's royalties and income.

3. Any royalty or other income now due, past due, or to become due from BMI, INC. including but not limited to publisher's peformance royalties or income, and writer's performance royalties and income.

The within named assignment, transfer and conveyance includes without limitation any and all rights that Assignor now has or to which Assignor may become entitled under existing or subsequently enacted federal, state or foreign laws. The within grant further includes all proceeds from the foregoing accrued and unpaid and hereafter accruing and all such claims, rights, causes of action benefits arising therefrom without limitation with full right to

S.J. S.S. 1 of 21

DLN
KJM

Sylvester Stewart (p/k/a Sly Stone)
c/o Brent McBride
Copyright Recapture, LLC
PO Box 331253
Nashville, TN 37203
(615) 251-9077

## NOTICE OF TERMINATION

July 22, 2015

By Certified Mail, RRR and Regular Mail
**EVEN ST. PRODUCTIONS, LTD.**
**7095 HOLLYWOOD BOULEVARD**
**#810**
**LOS ANGELES, CA 90026**

**EVEN ST. PRODUCTIONS, LTD.**
**C/O DAVID L. NEALE, ESQ**
**LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.**
**10250 CONSTELLATION BOULEVARD, SUITE 1700**
**LOS ANGELES, CA 90067**

**RE:**   **Termination of Post-1977 Grant of Rights Under Copyright on Certain Works of**
**Sylvester Stewart (p/k/a Sly Stone)**

Gentlemen and Ladies:

In my capacity as duly authorized agent for Sylvester Stewart (p/k/a Sly Stone), I have been authorized by him to send this Notice of Termination pursuant to Section 203(a) of the Copyright Act of 1976 (Pub. L. 94-553), 17 United States Code § 203(a) and the regulations issued thereunder by the Register of Copyrights, Title 37, § 201.10, Code of Federal Regulations.   You are hereby notified that all rights under copyright heretofore granted by Sylvester Stewart (p/k/a Sly Stone) to Stone Fire Productions, Ltd. and its successors, assignees, and designees, if any, including but not limited to Even St. Productions, Ltd., pursuant to that certain Assignment dated February 27, 1989 (a true and correct copy of this Assignment is attached hereto as Exhibit A and is hereafter referred to as "Assignment"), which Assignment is incorporated by reference in that certain Employment Agreement dated February 27, 1989 between Stone Fire Productions, Ltd. and Sylvester Stewart p/k/a Sly Stone (a true and correct copy of which is attached hereto as Exhibit B), with respect to the musical works listed below are hereby terminated as of the Effective Date set forth in numbered paragraph 5 below.   For the avoidance of doubt, this termination shall apply specifically to, but shall not be limited to, (1) royalties or other income due, past due, or to become due to Sylvester Stewart p/k/a Sly Stone from CBS Records and its successors and assigns, if any; (2) royalties or other income due, past due, or to become due to Sylvester Stewart p/k/a Sly Stone from Warner/Chappell Music, Inc. and its successors and assigns, if any; (3) royalties or other income due, past due, or to become due to Sylvester Stewart p/k/a Sly Stone from BMI, Inc. and its successors and assigns, if any; and (4)  musical compositions written by Sylvester Stewart (p/k/a Sly Stone) and sound recordings created by Sylvester Stewart (p/k/a Sly Stone)  during the period from February 27, 1989 through February 15, 2007 and allegedly assigned to Even St. Productions, Ltd., pursuant to the Assignment.   For the further avoidance of doubt, Sylvester Stewart (p/k/a Sly Stone) denies that the Assignment transferred any rights under copyright whatsoever to musical compositions or sound recordings created after February 27, 1989. Upon information and belief, Stone Fire Productions, Ltd. either changed its name to Even Street

1 of 26

# SCHEDULE A: COMPOSITIONS

| COMPOSITION TITLE | ALTERNATIVE TITLE(S) | STEWART'S AUTHORSHIP PERCENTAGE SHARE / SELLER'S INTEREST | CO-WRITER(S) | COPYRIGHT REGISTRATION NUMBER | DATE COPYRIGHT WAS SECURED | SONY/ATV SONG NUMBER | BMI WORK ID |
|---|---|---|---|---|---|---|---|
| 3AM BOOGIE | | 1.20% | | | | | |
| 5 MINUTES | | 1.26% | Patrick Okogwu, Nathaniel Warner, George Clinton Jr., William Earl Collins, Gregory E. Jacobs, Zane Lowe, James Mccants, Leroy Mccants, Walter Morrison, Emmanuel Orelaja, Lalo Schifrin, James Todd Smith, Marlon Williams | | | 1470780 | 16245015 |
| ABC WORLD NEWS NOW-CUES | | 100.00% | | | | | |
| ADVICE | | 50.00% | | | | | 8426 |
| ADVICE | | 100.00% | | | | 1442122 | 8434 |
| AFRICA TALKS TO YOU (THE ASPHALT JUNGLE) | AFRICA TALKS TO YOU; AFRICA TALKS TO YOU ASPHALT JU | 100.00% | | | | 1441841 | 9038 |
| AFTER DINNER DRINK | | 2.00% | | | | | |
| AH-HA! | AHHA; AH HA; AH-HA | 20.00% | Dante Smith, Mark Richardson | | | 1442735 | 8616863 |
| AIN'T GOT NOBODY (CLEAN VERSION) | | 50.00% | R. Birch, N. Hallam | | | 4029979 | |
| ALL OUR DREAMS ARE COMING TRUE | | 2.00% | | | | | |
| ALL THE JIVE IS GONE | | 25.00% | | | | | |
| ALL THRU THE NIGHT | | 2.00% | | | | | |
| ALLIGATOR | | 16.60% | | | | | |
| ALONE | | 25.00% | | | | | |
| AMERICAN IDOL MIXED METAPHOR | | 20.00% | | | | | |
| AMERICA'S GOT TALENT | AMERICA S GOT TALENT | 2.00% | | | | | |
| AND ON AND ON | | 25.00% | James Harris III, Terry Lewis; NC: Janet Jackson | | | 720027 | 1922511 |
| ANGRY WALKING | | 2.00% | | | | | |
| ANIMAL | | 100.00% | | | | | 12737321 |
| ANOTHER WEEKEND | | 100.00% | Will Adams, Tony Butler, Jaime Gomez, Allan Pineda | | | 4158967 | |
| ANOTHER WEEKEND REMIX | | 60.00% | Will Adams, Tony Butler, Jamie Gomez, Allan Pineda | | | 1442757 | 10991998 |
| ANYTHING YOU WANT | | 20.00% | Tarrie Beth | | | 4030087 | 50368 |
| ANYWHERE IN GLORY | | 2.00% | | | | | |
| APPUNTAMENTO AL BUIO | | 20.00% | | | | | |
| ARE YOU READY | | 100.00% | | | | 1366213 | 54534 |
| AS I GET OLDER | | 50.00% | Billy Preston | | | 1442731 | 58216 |
| AT MY TILT | | 50.00% | | | | | 3886788 |
| B BOYS | | 2.00% | | | | | |
| B BOYS THEME | | 28.65% | | | | | 9423473 |

## <u>SCHEDULE C</u>

## <u>AUDITS PENDING OR THREATENED AGAINST ANY SELLER RELATED ENTITY RELATING TO THE TRANSFERRED ASSETS</u>

[None.]

## SCHEDULE D

## OUTSTANDING ADVANCES HERETOFORE
## RECEIVED BY SELLER OR STEWART WHICH ARE RECOUPABLE
## FROM EARNINGS OF THE COMPOSITIONS OR MASTERS

Seller has received Advances from Sony Entertainment in connection with the Contracts and corresponding royalty accounts ("Unrecouped Accounts") as set forth below. The outstanding amounts indicated as the "2017 H2 Ending Balance" below with respect to each of the Unrecouped Accounts shall be recoupable by Sony Entertainment solely against earnings of the Masters derived from the specific products released pursuant to the applicable Contract relating to such Unrecouped Account and not from any other earnings of the Masters generally. Seller hereby represents and warrants to Purchaser that no earnings derived by Seller pursuant to the Contracts relating to the Unrecouped Accounts are included in the calculation of Average Annual Net Income as set forth in this Agreement.

| Contract Number | Contract Name | 2017 H1 Ending Balance | 2017 H2 Ending Balance |
|---|---|---|---|
| R06405600 | Even Street Productions | (10,000.00) | (10,000.00) |
| S46019011 | SLY & FAMILY STONE/M | (462.05) | (462.05) |

## **SCHEDULE E**

## **CLAIMS FOR BROKERAGE, FINDERS OR OTHER ADVISORY FEES OR OTHER SIMILAR PAYMENTS IN CONNECTION WITH THE CONTEMPLATED TRANSACTIONS**

[None.]

# EXHIBIT "2"

## AGREEMENT TO MODIFY COMMISSION ARRANGEMENT

This Agreement to Modify Commission Arrangement ("Agreement") is entered into this

___ day of May, 2018, by and between R. Eli Ball dba Acklen Advisory Services, LLC,

(collectively, "Ball"), on the one hand, and Loeb & Loeb LLP ("Loeb"), on the other hand, and

is made with reference to the following facts:

### RECITALS

A.      The bankruptcy court approved Ball receiving 3.5% of the gross proceeds of a

sale of the Even Street Assets (the "Assets") as his commission. Ball has already received a

$25,000 retainer payment as an advance against his commission. This 3.5% commission was

memorialized in the "Order Granting Application of Debtors and Debtors in Possession to

Employ R. Eli Ball as Sale Agent and Broker to Debtor" and approved by the bankruptcy court

on June 25, 2015 [Docket No. 313].

B.      Subsequently, on or about February 21, 2017, pursuant to that certain Application

to (1) Employ Loeb & Loeb LLP as Special Counsel to Debtors, and (2) Modify Terms of

Employment of R. Eli Ball as Sales Agent and Broker to the Debtors ("Application"), Ball

agreed to reduce his percentage commission fee to 2.25%, and Loeb agreed to receive an

additional percentage commission of 2.25% for Loeb's efforts, for a total commission to be paid

upon the sale of the Assets of 4.5%. This 4.5% commission arrangement was approved by the

bankruptcy court on April 4, 2017 [Docket No. 714].

C.      Nothing in this Agreement changes the total percentage commission to be paid

upon a sale (4.5%).

NOW, THEREFORE, in consideration of the foregoing facts and recitals, the terms hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     Ball and Loeb agree to change the commission split from 2.25% to Ball and 2.25% to Loeb (4.5% total), to 1.5% to Ball and 3.0% to Loeb (4.5% total unchanged).

IN WITNESS WHEREOF, this Agreement has been duly executed as of the day and year first above written.

"BALL"                                                "LOEB"

R. Eli Ball dba Acklen Advisory Services,              Loeb & Loeb LLP
LLC

_____              By: _____
R. Eli Ball, for himself, and on behalf of dba          John T. Frankenheimer, Partner
Acklen Advisory Services, LLC


**The Debtor consents to this revised split of the 4.5% total commission to be paid to Ball and Loeb:**

Even St. Productions Ltd.

By: _____
Jerry Goldstein, President

# EXHIBIT "3"

1   DAVID L. NEALE (SBN 141225)
    KRIKOR J. MESHEFEJIAN (SBN 255030)
2   LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
    10250 Constellation Boulevard, Suite 1700
3   Los Angeles, California 90067
    Telephone: (310) 229-1234
4   Facsimile: (310) 229-1244
    Email: dln@lnbyb.com; kjm@lnbyb.com
5
6   Attorneys for Reorganized Debtors
7
8                  UNITED STATES BANKRUPTCY COURT
                   CENTRAL DISTRICT OF CALIFORNIA
9                      LOS ANGELES DIVISION

10  In re:                              Lead Case No. 2:13-bk-24363-WB

11  EVEN ST. PRODUCTIONS LTD.,          Jointly administered with:
                                        Case No. 2:13-bk-24389-WB
12          Reorganized Debtor.         (Majoken, Inc.)

13                                      Chapter 11

14  In re:                              ORDER GRANTING DEBTORS' MOTION
                                        FOR ENTRY OF AN ORDER: (1)
15  MAJOKEN, INC.,                      APPROVING SALE OF ASSETS FREE AND
                                        CLEAR OF ALL LIENS, CLAIMS,
16          Reorganized Debtor.         ENCUMBRANCES, AND OTHER
                                        INTERESTS; (2) APPROVING
17  ──────────────────────────         AGREEMENT TO MODIFY COMMISSION
                                        ARRANGEMENT; (3) WAIVING THE 14-
18  ☒ Affects Both Reorganized Debtors  DAY STAY PERIOD SET FORTH IN
                                        BANKRUPTCY RULE 6004(h); AND (4)
19  ☐ Affects Even St. Productions Ltd. only  GRANTING RELATED RELIEF

20  ☐ Affects Majoken, Inc. only

21

22                                      Date:   October 18, 2018
                                        Time:   10:00 a.m.
23                                      Place:  Courtroom 1375
                                                255 East Temple Street
24                                              Los Angeles, CA 90012

25

26

27

28

                                    1

On October 18, 2018, the Court held a hearing (the "Sale Hearing") on the motion ("Motion") [Docket No. ____] filed by Even St. Productions Ltd. and Majoken, Inc. (together, the "Debtors"), reorganized debtors in the above-entitled, jointly-administered, Chapter 11 bankruptcy cases, seeking the entry of an order of the Court pursuant to sections 105, 328 and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (as amended from time to time, the "Bankruptcy Rules"), and Rule 6004-1 of the Local Bankruptcy Rules (the "Local Rules"):

(A)    pursuant to Bankruptcy Code section 363(b) and (f) , approving the sale free and clear of all liens, claims, interests, charges, mortgages, encumbrances, security interests, proxies, pledges, equity, tax or other restriction or third party right of any kind (collectively, "Liens") of the Debtors' assets identified as the "Transferred Assets" in that certain "Asset Purchase Agreement" (the "APA")[1], a true and correct copy of which is attached as Exhibit "1" to the Motion, to Primary Wave Music IP Fund 1, LP (the "Purchaser");

(B)    pursuant to Bankruptcy Code sections 328 and 363, approving that certain "Agreement To Modify Commission Arrangement" (the "Commission Modification") by and between R. Eli Ball dba Acklen Advisory Services, LLC and Loeb & Loeb LLP, a true and correct copy of which is attached as Exhibit "2" to the Motion;

(C)    waiving the 14-day stay period set forth in Bankruptcy Rule 6004(h); and

(D)    granting certain other related relief.

The Court, having read and considered the Motion, the APA, the Commission Modification, the Declaration of Gerald Goldstein in support of the Motion, and all other pleadings filed in support of, and in opposition to, the Motion; and the Court having heard the statements of counsel and the evidence proferred or adduced in support of the relief requested by the Debtors in the Motion at the Sale Hearing; and it further appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted

---

[1] Capitalized terms not otherwise defined in this Order have the meanings ascribed to such terms in the APA.

herein; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT:**

A.    **Jurisdiction and Venue**.    This Court has jurisdiction over the Motion under 28 U.S.C. §§ 157 and 1334.    This matter relates to the administration of the Debtors' bankruptcy estates and is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).    Venue of the cases is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    **Statutory Predicates and Notice**.    As evidenced by the proofs of service filed with this Court, (i) due, proper, timely, adequate and sufficient notice of the Motion, the Sale Hearing, the APA and the Contemplated Transactions thereby, has been provided in accordance with sections 102(1), 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 9006, and in compliance with the APA; (ii) such notice was good, sufficient and appropriate under the circumstances; and (iii) no other or further notice of the Motion, the Sale Hearing, or the Contemplated Transactions, is or shall be required.

C.    **Findings of Fact and Conclusions of Law**.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.    To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.    To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

D.    **Opportunity to Object**.    A reasonable opportunity to object and be heard with respect to the Contemplated Transactions and the Motion has been afforded to all interested persons and entities.

E.    **Sale Free and Clear**.    The Debtors may sell the Transferred Assets, free and clear of all Liens in, on, and against, the Transferred Assets, because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.    Those holders of any such Lien who did not object, or who withdrew their objections, to the Motion, are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.    Those holders

of any such Liens who did object are adequately protected by having such Liens, if any, attach to the cash proceeds of the sale ultimately attributable to the property against or in which they claim a Lien, subject to the terms hereof.

**F.** **Sale in Best Interest**. Good and sufficient reasons for approval of the APA and the Contemplated Transactions have been articulated. The relief requested in the Motion is in the best interests of the Debtors, their respective estates, creditors, interest holders, and other parties in interest.

**G.** **Business Justification**. The Debtors have demonstrated both (i) a good, sufficient and sound business purpose and justification and (ii) compelling circumstances for the Contemplated Transactions other than in the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code, in that, among other things, the immediate consummation of the Contemplated Transactions is necessary and appropriate to maximize the value of the Debtors' estates; and the Contemplated Transactions will provide the means for the Debtors to maximize distributions to creditors and interest holders.

**H.** **Corporate Authority**. Subject only to the entry of this Order, the Debtors have full corporate power and authority to execute and implement the APA without further Court order, and all other documents contemplated thereby, and to consummate the transactions contemplated by the APA. The APA and the Contemplated Transactions have been duly and validly authorized by all necessary corporate action of the Debtors. All interest holders, including Sylvester Stewart, have provided written consent to the sale of the Transferred Assets to the Purchaser and the Contemplated Transactions pursuant to the terms of the APA. No further consents or approvals, other than the consent and approval of this Court, are required for the Debtors to consummate the Contemplated Transactions.

**I.** **Arms-Length Sale**. The APA was negotiated, proposed and entered into by the Debtors and the Purchaser without collusion, in good faith and from arms'-length bargaining positions. Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the APA or the Contemplated Transaction to be avoided under section 363(n) of the Bankruptcy Code.

**J.**    **Good Faith Purchaser**.  The Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.

**K.**    **Consideration**.  The consideration provided by the Purchaser pursuant to the APA (i) is fair and reasonable, (ii) is the highest and best offer for the Transferred Assets, and (iii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.

**L.**    **No Fraudulent Transfer**.  The APA was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.  The consideration under the APA provided by the Purchaser is the highest and otherwise best offer received by the Debtors, and such consideration constitutes reasonably equivalent value for the Transferred Assets under the Bankruptcy Code and other applicable law.

**M.**    **Legal and Valid Transfer**.   The transfer of the Transferred Assets to the Purchaser pursuant to the APA, is a legal, valid, and effective transfer of the Transferred Assets, and vests or will vest the Purchaser with all right, title, and interest of the Debtors to the Transferred Assets free and clear of any and all Liens (except as expressly stated in the APA) with all such Liens to attach to the Debtors' interest in the proceeds of the sale (the "**Sale Proceeds**"), in order of priority, subject to any rights, claims and defenses of the Debtors with respect thereto.

**N.**    **Purchaser Not Insider**.  Immediately prior to the Closing Date, the Purchaser was not an "insider" or "affiliate" of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors or stockholders existed between the Purchaser and the Debtors.  Pursuant to the APA, the Purchaser is not purchasing any of the Excluded Assets, and the Purchaser is not holding itself out to the public as a continuation of the Debtors. The Contemplated Transactions do not amount to a consolidation, merger or de facto merger of the Purchaser and the Debtors and/or the Debtors' estates, there is not substantial continuity between the Purchaser and the Debtors, there is no continuity of enterprise between the Debtors and the Purchaser, the Purchaser is not a mere continuation of the Debtors or the Debtors' estates,

and the Purchaser does not constitute a successor to the Debtors or the Debtors' estates to the extent allowed under state law.

**O.    Not a Sub Rosa Plan**.  The sale does not constitute a sub rosa chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford. The sale neither impermissibly restructures the rights of the Debtors' creditors, nor impermissibly dictates a liquidating plan of reorganization for the Debtors.

**P.    Prompt Consummation**.  The sale of the Transferred Assets pursuant to the terms of the APA must be approved and consummated promptly in order to preserve the value of the Transferred Assets.  Therefore, time is of the essence in consummating the Contemplated Transactions, and the Debtors and the Purchaser intend to close the sale as soon as possible. Notwithstanding Bankruptcy Rule 6004(h), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

**IT IS HEREBY ORDERED THAT:**

1.    The Motion is **GRANTED** and **APPROVED**, and the Contemplated Transactions are approved.

2.    All objections and responses to the Motion that have not been withdrawn, waived, settled or resolved, and all reservations of rights included therein, are hereby overruled and denied on the merits with prejudice.

3.    The consideration provided by the Purchaser for the Transferred Assets, as embodied in the APA, (i) is fair and reasonable; (ii) is the highest and otherwise best offer for the Transferred Assets; and (iii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, and the laws of any state, territory, possession, and the District of Columbia. The Purchaser's consideration for the Transferred Assets is hereby approved.

4. Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the sale by the Debtors to the Purchaser of the Transferred Assets as defined in the APA and transactions related thereto, upon the Closing, are authorized and approved in all respects.

5. The APA is hereby approved pursuant to section 363(b) of the Bankruptcy Code and the Debtors are authorized to consummate and perform all of their obligations under the APA and to execute such other documents, and take such other actions as are necessary or appropriate to effectuate the Contemplated Transactions. The Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to consummate the Contemplated Transactions.

6. Pursuant to section 363(b) and 363(f) of the Bankruptcy Code, the Debtors are authorized to sell and transfer the Transferred Assets to the Purchaser, pursuant to the APA, and all applicable provisions of the Bankruptcy Code, free and clear of all Liens on, in, and against, the Transferred Assets within the meaning of section 363(f) of the Bankruptcy Code, with any and all Liens on, in, and against, the Transferred Assets, to attach to the Sale Proceeds, with the same validity, priority, force and effect such Liens had on the Transferred Assets immediately prior to the Contemplated Transactions and subject to the rights, claims, defenses, and objections, if any, of the Debtors and all interested parties with respect to any such asserted Liens.

7. The transfer of the Transferred Assets from the Debtors to the Purchaser does not and will not subject the Purchaser or its affiliates, successors or assigns or their respective properties (including the Transferred Assets) to any Excluded Liabilities by reason of such transfer under the laws of the United States or any state, territory or possession thereof applicable to such transactions.

8. On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Transferred Assets or a bill of sale transferring good and marketable title in the Transferred Assets to the Purchaser. Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.

9.      This Order is and shall be effective as a determination that, all Liens shall be, and are, without further action by any person or entity, released with respect to the Transferred Assets as of the Closing Date (except as expressly provided in the APA).

10.      This Order shall be binding upon and shall govern the acts of all entities, including without limitation all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, administrative boards, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Transferred Assets.

11.      Nothing contained in any order dismissing the bankruptcy cases or converting them to chapter 7 shall conflict with or derogate from the provisions of the APA, any documents or instrument executed in connection therewith, or the terms of this Order, and any subsequent trustee in this case or any following chapter 7 case shall be bound by the terms hereof.

12.      The stay provided for in Bankruptcy Rule 6004(h) is hereby waived and this Order shall be effective immediately upon its entry.

13.      The terms of this Order shall be binding on the Purchaser and its successors, the Debtors, creditors of the Debtors, the Debtors' interest holders, and all other parties in interest in these cases, and any successors of the Debtors, including any trustee or examiner appointed in these bankruptcy cases or upon a conversion of these bankruptcy cases to chapter 7 of the Bankruptcy Code.

14.      The Purchaser is a purchaser without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and is entitled to the benefits and protections afforded by section 363(m) of the Bankruptcy Code.  Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale shall not affect the validity of the sale (including, without limitation, the transfer of the Transferred Assets to the Purchaser under the APA), unless such authorization is duly stayed pending such appeal.

15.     The APA was negotiated, proposed and entered into by the Debtors and the Purchaser without collusion, in good faith and from arms'-length bargaining positions.  Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Contemplated Transactions or the APA to be avoided under section 363(n) of the Bankruptcy Code or otherwise.

16.     This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to interpret, implement and enforce the terms and provisions of, and resolve any disputes arising under or related to, this Order and the APA, all amendments thereto, any waivers and consents thereunder, and each of the agreements and documents executed pursuant to or in connection therewith in all respects.

17.     The failure specifically to include any particular provisions of the APA or any of the documents, agreements or instruments executed in connection therewith in this Order shall not diminish or impair the force of such provision, document, agreement or instrument, it being the intent of the Court that the APA and each such document, agreement or instrument executed in connection therewith, be authorized and approved in its entirety by this Order.

18.     The APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

21.     The Purchase Price shall be deposited into Even St.'s debtor in possession account. The Debtors are authorized to distribute the Sale Proceeds pursuant to this Order, the APA, and the Debtors' confirmed *First Amended Plan Of Reorganization (Dated February 10, 2017), As Modified*.

22.     The Commission Modification is approved and the Debtors are authorized and directed to pay from the Purchase Price, at the Closing, the commissions set forth in the Commission Modification.

# # #

**EXHIBIT "4"**

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This **SETTLEMENT AGREEMENT AND MUTUAL RELEASE** (the "Agreement") dated effective as of September 20, 2016 (the "Effective Date"), is entered into by and among Sylvester Stewart ("Stewart"), on the one hand, and Even St. Productions, Ltd. ("Even St."), Majoken, Inc. ("Majoken," and, together with Even St., the "Debtors"), Gerald Goldstein, aka Jerry Goldstein ("Goldstein"), Audio Visual Entertainment, Inc. dba Avenue Records ("AVE"), Far Out Productions, Inc. ("Far Out"), Jerry Goldstein Music, Inc. ("Music"), TMC Music, Inc. ("TMC") and T.A.G. Management, Inc. ("TAG," and, together with Goldstein, AVE, Far Out, Music and TMC, the "Goldstein Parties"), Glenn Stone ("Stone") and Gradstein & Marzano, P.C. ("G&M"), on the other hand, all sometimes collectively referred to as the "Parties," or individually as a "Party."

### RECITALS

**A.**    The master recordings and musical compositions of Sylvester Stewart p/k/a Sly Stone ("Stewart") and the musical group Sly & the Family Stone have generated royalties and licensing income for over forty (40) years ("Royalties").

**B.**    Since approximately 2010, the Debtors and Stewart, among other parties, have engaged in litigation in the Los Angeles Superior Court (the "State Court") regarding, among other things, the right to receive the Royalties (the "Royalty Litigation").  One of the issues in the Royalty Litigation concerned the rights to the Royalties granted to Even St. by Stewart under an Assignment dated and signed by Stewart on February 27, 1989 (the "1989 Assignment").

**C.**    The Debtors commenced their respective bankruptcy cases (collectively, the "Cases," and each a "Case") by filing voluntary petitions under Chapter 11 of 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") on May 31, 2013 (the "Petition Date") in the Central District of California, Los Angeles Division (the "Bankruptcy Court") and the Cases were assigned to the Honorable Julia W. Brand, United States Bankruptcy Judge.  The Debtors' Cases are being jointly administered.

**D.**    Prior to the Petition Date, the Royalties, with the exception of those being collected and held by Broadcast Music, Inc. ("BMI"), Sony/ATV Music Publishing LLC ("Sony/ATV") and SoundExchange were being deposited into an interpleader account maintained by the Clerk of the State Court.  On March 5, 2015, the Superior Court entered an Order requiring Sony/ATV to deposit the Royalties it was then holding, and all future Royalties with the Clerk of the State Court.

**E.**    On June 28, 2013, Even St. filed its Schedules of Assets and Liabilities.  In its Schedule F – Creditors Holding Unsecured Nonpriority Claims, Even St. listed Stewart as a creditor holding an unliquidated, contingent and disputed unsecured claim.  Even St. listed Stone as a creditor holding an undisputed unsecured claim in the amount of $900,000 (the "Stone Claim").

**F.**     On June 28, 2013, Majoken filed its Schedules of Assets and Liabilities.  In its Schedule F – Creditors Holding Unsecured Nonpriority Claims, Majoken also listed Stewart as a creditor holding an unliquidated, contingent and disputed unsecured claim.  Majoken also listed the Stone Claim.

**G.**     By order entered July 23, 2013, the Bankruptcy Court fixed September 25, 2013 (the "Bar Date") as the deadline by which proofs of claim were to be filed against the Debtors.

**H.**     On or about September 25, 2013, Stewart filed a proof of claim against each of the Debtors, asserting a general unsecured claim in an unliquidated amount based upon Stewart's causes of action in the Royalty Litigation.  These proofs of claim were each assigned claim number 5-1 on the Claims Registers maintained by the Bankruptcy Court (the "Original Stewart Claims").

**I.**     On or about September 24, 2013, Stone filed a proof of claim against Majoken, asserting a general unsecured claim in the amount of $908,332 (the "Stone Majoken Claim," and, together with the Stone Claim, the "Stone Claims").  This proof of claim was assigned claim number 12 on the Claims Register for Majoken maintained by the Bankruptcy Court.

**J.**     On or about October 24, 2013, the Bankruptcy Court entered its order authorizing the Debtors to employ G&M as counsel in connection with the Royalty Litigation.

**K.**     On or about May 29, 2015, the Debtors commenced an adversary proceeding by filing a complaint against Stewart to, among other things, avoid and recover allegedly fraudulent transfers made by the Debtors to Stewart.  This adversary proceeding was assigned Adv. Pro. No. 2:15-ap-01284-WB (the "Stewart Avoidance Litigation").

**L.**     On June 26, 2015, the Bankruptcy Court entered an *Order Granting Application of Debtors and Debtors in Possession to Employ R. Eli Ball as Sale Agent and Broker to Debtor Pursuant to 11 U.S.C. §§ 327, 328 and 330* (the "Ball Employment Order").  The Ball Employment Order authorizes the Debtors to employ R. Eli Ball d/b/a Acklen Advisory Services ("Ball") as sales agent and broker to the Debtors to market and potentially sell the Debtors' assets.

**M.**     On July 13, 2015, the Bankruptcy Court entered its *Order Directing Release of Interpleaded Funds to Even St. Productions Ltd. and Directing Payment of Royalties to Even St. Productions Ltd.* (the "Turnover Order").  Pursuant to the Turnover Order, all of the funds held in the State Court interpleader account were delivered to Even St. and placed into a segregated debtor-in-possession bank account (the "Royalty Account").  All additional Royalty payments that have been received by the Debtors since the entry of the Turnover Order have been deposited into the Royalty Account.

**N.**     On or about August 13, 2015, the Debtors filed their *Motion for Entry of Order Releasing Royalties in the Possession of Broadcast Music, Inc. to Even St. Productions Ltd. and Directing Payment of Future Royalties to Even St. Productions Ltd.* (the "BMI Turnover Motion"), pursuant to which the Debtors requested that all Royalties in the possession of Broadcast Music, Inc. ("BMI") be delivered to the Debtors for deposit in the Royalty Account.

- 2 -

On September 14, 2015, the Bankruptcy Court entered its order denying the BMI Turnover Motion. As a result, BMI has remained in possession of all of the Royalties otherwise payable by BMI (together with all future Royalties payable by BMI, the "BMI Royalties").

 **O.** On February 24, 2016, the State Court issued its *Final Statement Of Decision On Plaintiff's 16th Cause Of Action For Declaratory Relief*, pursuant to which the State Court concluded, among other things, that Stewart had irrevocably assigned his interest in the Royalties to the Debtors, and, therefore, that the Royalties under the 1989 Assignment are owned by the Debtors. Stewart and Even St. acknowledge the State Court's *Final Statement Of Decision On Plaintiff's 16th Cause Of Action For Declaratory Relief* and agree not to dispute this decision in any way or in any forum.

 **P.** On September 13, 2016, Stewart filed an amended proof of claim against Even St. (the "Amended Stewart Claim"). The Amended Stewart Claim was assigned claim number 5-2 on the Creditor Registry maintained by the Bankruptcy Court.

 **Q.** On September 20, 2016, Stewart filed his objection to the Stone Claims (the "Stone Claim Objection").

 **R.** G&M have an administrative expense priority claim for legal fees and costs incurred on behalf of the Debtors. A portion of those fees and costs have been approved by the Bankruptcy Court. There are substantial fees and costs that remain to be paid to G&M.

 **S.** On September 20, 2016, the Parties participated in mediation before the Honorable Meredith A. Jury, United States Bankruptcy Judge for the Central District of California, Riverside Division ("Judge Jury"). At that time, and as acknowledged orally by the Parties on the record before Judge Jury in this matter, the Parties reached a settlement in principle on the terms so stated on the record, specifically enforceable under California Code of Civil Procedure section 664.6.

 **T.** Nevertheless, and as a result of the settlement reached by the Parties, and without any admission of liability, the Parties desire to memorialize and reduce to writing through this Agreement the full terms of the compromise, settlement and resolution of all claims, disputes and differences among the Parties regarding the Cases and the Royalty Litigation reached in principle on September 20, 2016.

**AGREEMENT**

 In consideration of the foregoing and the other good and valuable consideration stated herein, the Parties hereto agree as follows:

1. **Recitals.**

 1.1. The Recitals are incorporated herein by this reference and the Parties agree that the information recited above is true and correct.

2.      **Terms of Settlement.**

2.1.    This Agreement shall become effective and binding on the Parties upon entry of a "Final Order" approving the Settlement Motion (as defined below).  For purposes of this Agreement, the date of entry of a "Final Order" shall be 15 days after entry of an order approving the Settlement Motion pursuant to Federal Rule of Bankruptcy Procedure 9019 on the docket in the Bankruptcy Case and no timely appeal has been taken against the Final Order and the Final Order is unstayed and enforceable.  The Parties may consummate this Agreement notwithstanding a pending appeal so long as there is no stay of the order approving the Settlement Motion.

2.2.    The Parties agree, as follows:

2.2.1.  Subject to the provisions herein the Amended Stewart Claim shall be compromised, deemed to be further amended, and Stewart shall have an allowed general unsecured claim against the Debtors, jointly and severally, in the amount of $1,600,000 (the "Allowed Stewart Claim"). Any payments to Stewart on account of the Allowed Stewart Claim shall be made payable to "Allan Law Group P.C. in trust for Sylvester Stewart or his assignees";

2.2.2.  The Stone Claims shall be deemed amended, and Stone shall have an allowed general unsecured claim against the Debtors, jointly and severally, in the amount of $500,000 (the "Allowed Stone Claim"); provided, however, that the Allowed Stone Claim is subordinated to the other general unsecured claims of the Debtors, including the Allowed Stewart Claim, and shall only be paid after all other allowed general unsecured claims against the Debtors have been paid in full; and

2.2.3.  In full and final satisfaction of its unpaid administrative expense priority claim against the Debtors, G&M has agreed to compromise its claim for unpaid attorney's fees and expenses, and accept a reduced amount of $600,000 for attorney's fees not yet awarded and paid, which shall be in addition to prior payments made and approved by the Honorable Julia W. Brand of the United States Bankruptcy Court for the Central District of California, pursuant to the Order Re: First Interim Application submitted by G&M for approval of fees and reimbursement of expenses entered on June 26, 2015, and the Order entered on September 1, 2016. G&M shall submit a final fee application for payment of its attorney's fees and reimbursement of expenses in accordance with the Court's previously entered Orders which shall seek the Court's approval for a final additional payment of attorney's fees in the compromised sum of $600,000 (the "G&M Fee").

2.3.    The Debtors shall propose a plan of reorganization (the "Plan") which shall incorporate the terms of this Agreement and provide, in addition to terms and conditions

- 4 -

consistent with the requirements of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure and Local Rules of Bankruptcy Procedure, that the Debtors shall transfer all right, title and interest in and to certain specified assets pursuant to Section 363 of the Bankruptcy Code (the "Asset Disposition").  The assets which shall be subject to the Asset Disposition shall be the right to receive Royalties pursuant to the 1989 Assignment derived from the use or exploitation of  (a) all musical compositions written in whole or part by Stewart which are now owned by Mijac Music (excluding any rights to recapture or reversionary rights available to Stewart or his heirs, which the Debtors agree do not constitute property of the Debtors' respective bankruptcy estates, and, as between the Debtors and Stewart, are the sole and exclusive property of Stewart or his heirs as described in paragraph 2.10 below); and (b) all the master recordings of Sly & the Family Stone and Sly Stone which are now owned by Sony Music Entertainment and Warner Brothers Records, and (c) all rights now known or hereafter created or derived from Royalties in connection with the collective assets described in (a) and (b), above, and hereafter referred to as the "Sale Assets."  For the avoidance of doubt, the Sale Assets shall include (i) the songwriters' Royalties payable from Sony ATV/Mijac Music; (ii) the Royalties and consulting fees payable to Even St. for Sly & the Family Stone and Sylvester Stewart p/k/a Sly Stone from Warner Brothers Records and Sony Music Entertainment pursuant to the letter agreement and related Consultation Agreement between Even St. and Sony Music Entertainment, Inc. dated December 18, 2002; (iii) the public performance Royalties related to the Mijac catalogue payable by BMI or any other public performance payors; and (iv) the digital public perfomances royalties payable by SoundExchange relating to Sony Music Entertainment and Warner Brothers Records master recordings.  The Debtors shall not include any other assets other than the Sale Assets in the Asset Disposition.  For avoidance of ambiguity, any Royalties payable to Stewart from AFM, AFTRA, SAG, Talent Partners, and PPM [Public Performance Malaysia Sdn Bhd] for live public performance in Malaysia, shall be the sole property of Stewart, and the Debtors disclaim any interest therein.

2.4.    Stewart, the Debtors, and, if necessary, the Goldstein Parties shall jointly instruct BMI to deliver the BMI Royalties to the Royalty Account.  Stewart, the Debtors, and, if necessary, the Goldstein Parties, shall jointly instruct SoundExchange to deliver any Royalties in its possession to the Royalty Account.  Any future Royalties payable by SoundExchange shall also be directed into the Royalty Account.

2.5.    The Plan shall further provide that all funds on deposit in the Royalty Account, any additional Royalties received prior to the closing of the Asset Disposition, all BMI Royalties and any Royalties delivered by SoundExchange shall be paid to holders of all allowed administrative expense priority claims, other priority claims and general unsecured claims in their relative order of priorities as established by the Bankruptcy Code.  The Plan will provide for partial distributions to holders of allowed claims and for the establishment of adequate reserves for the payment of disputed claims.  Any partial distribution (or contribution to a reserve) pursuant to the Plan shall be on a *pro rata* basis among the holders of claims of the same priority.  After payment of all allowed claims in full, any remaining funds in the Debtors' estates shall be divided 50% to Allan Law Group P.C. in trust for Sylvester Stewart or his assignees and 50% to TAG or its assignees. The Plan may also establish a reserve for disputed claims in an amount to be agreed upon by Stewart and the Debtors and approved by the Court.

- 5 -

2.6.    Stewart, the Goldstein Parties and the Debtors agree that John T. Frankenheimer, Esq. of Loeb & Loeb LLP ("Frankenheimer") may serve as the Debtors' representative for purposes of the Asset Disposition.  Frankenheimer may be employed by the Debtors to serve as representative on the same economic terms and conditions as those approved by the Ball Employment Order and may be paid from the fee agreed to be paid to pursuant to the Ball Employment Order ("Agent Fee") only, or as may otherwise be agreed by Stewart, the Goldstein Parties, the Debtors, Frankenheimer and Ball.  Frankenheimer may also be used to provide legal advice with respect to the Asset Disposition.  Stewart, the Goldstein Parties and the Debtors agree that Frankenheimer shall be responsible for composing language that accurately describes the Sale Assets consistent with the terms of this Agreement.  Notwithstanding the Ball Employment Order, the Debtors shall use their best efforts to negotiate terms and conditions upon which Ball shall continue to serve as sales agent acting in association with Frankenheimer on terms and conditions that are acceptable to Stewart, the Goldstein Parties and the Debtors subject to the condition that both Frankenheimer and Ball are not paid an aggregate fee in excess of the Agent Fee approved in the Ball Employment Order without the further agreement of Stewart, the Goldstein Parties and the Debtors. If the Debtors are unable to reach an agreement with Ball to work with and share the Agent Fee with Frankenheimer then the Debtors may negotiate a termination of Ball as sales agent.

2.7.    Stewart, the Goldstein Parties and the Debtors agree that, prior to the Asset Disposition, the Debtors may consult with tax counsel and/or an accountant to be selected by the Debtors and subject to approval by Stewart, which approval may not be unreasonably withheld, and may use up to twenty-five thousand dollars ($25,000) of the funds in the Royalty Account to pay the reasonable fees and expenses associated with such professional(s) in order to structure the Asset Disposition to comply with the requirements of all applicable tax codes and regulations and to minimize the taxes payable by the Debtors and/or by the equity owners of Even St. as a result of the Asset Disposition.

2.8.    Stewart, the Goldstein Parties and the Debtors jointly approve the Asset Disposition at a minimum purchase price of                         (the "Floor Price"). Should the Debtors obtain a bid below the Floor Price or a bid above the Floor Price that requires payment of the purchase price above the Floor Price over time which, in the opinion of Frankenheimer, nonetheless represents the highest and best bid for the Sale Assets, Stewart, the Goldstein Parties and the Debtors agree to meet and confer and negotiate in good faith with respect to the decision as to whether or not to accept a bid below the Floor Price or a bid above the Floor Price that requires payment of the purchase price above the Floor Price over time.  In the event of any disputes between Stewart, the Goldstein Parties and/or the Debtors regarding the acceptance of a bid below the Floor Price or bid above the Floor Price that requires payment of the purchase price above the Floor Price over time, Stewart, the Goldstein Parties and the Debtors agree to submit such dispute to Judge Jury for mediation and/or a determination of any such dispute.  The Parties shall use their commercially reasonable best efforts to obtain the permission of the Bankruptcy Court to redact information regarding the Floor Price from this Agreement, the transcript of the mediation before Judge Jury and any motion to approve this Agreement.

2.9.    No Party shall take any action or refrain from taking any action which is

reasonably likely to interfere with the Asset Disposition or impair the ability of the Debtors to maximize the bid obtained for the Sale Assets.

2.10.    In the event Stewart recaptures the copyright ownership of any, or all of the musical compositions described in 2.3(a) above by exercising his right pursuant to 17 U.S.C. § 203 to terminate the grant or assignment of any copyrights in musical compositions written in whole or in part by Stewart, Stewart or his heirs shall have the right to receive the publisher's share of the Royalties as the owner of the copyrights.  In conjunction with the Asset Disposition, Stewart shall warrant and represent that Stewart and his successors, assigns, heirs, licensees, or administrator of the musical compositions, if any, shall acknowledge the terms and conditions of the Asset Disposition and be bound and required to pay any and all songwriters' royalties to the successful bidder at the Asset Disposition or the successful bidder's successor as so directed in writing on the same basis that the songwriters' royalties are now being paid to Even St., *i.e.*, no administrative fee on the songwriter's royalties shall be deducted from any payment to be made.

2.11.    Even St. specifically and irrevocably waives and quit claims any and all claims or rights to all copyrights in musical compositions and master recordings of musical compositions by Stewart created between 1989 to 2010 and as between Even St. and Stewart all such rights belong solely to Stewart.

2.12.    Even St. acknowledges and agrees that as between itself and Stewart, that from and after February 15, 2007, Stewart has the sole right to receive compensation for: (i) services provided by him, (ii) works authored by him; (iii) sound recordings made by him; and (iv) the commercial exploitation of his person or his right to publicity.  Even St. specifically and irrevocably waives and quit claims any and all claims Even St. may have, if any, from and after February 15, 2007, to any compensation payable to Stewart as above, for (i) services provided by him, (ii) works authored by him; (iii) sound recordings made by him; and (iv) the commercial exploitation of his person or of his right to publicity.

2.13.    Even St. on behalf of itself and its successors and assigns quitclaims any interest Even St. may have anywhere in the world including, but not limited to, the U.S., Canada, the European Union and Australia in the trademark/trade name "Sly & the Family Stone" ("Mark") or any substantially similar trade names or marks including, but not limited to, "The Family Stone" to Stewart, his nominee or assignee and agrees to execute the attached Assignment of Mark for Even St.'s registered Mark in Canada and in any other jurisdiction in which Even St. has registered the Mark.

2.14.    All musical compositions written by Stewart and any master sound recordings thereof, other tangible property and all intellectual property created by Stewart from 1989 to date currently in the possession, custody or control of the Debtors or of Goldstein ("Works") are to be physically delivered by or on behalf of Even St. to Allan Law Group P.C. in trust for Stewart or his assignee within fifteen (15) days following the date upon which a Final Order approving this Agreement has been entered by the Bankruptcy Court.

2.15.    Even St. assigns any interest it may have anywhere in the world as to any musical compositions written by Stewart and any master sound recordings thereof and any other

intellectual property created or authored by him from 1989 to date and to the right to receive any and all royalties or other consideration payable for the use or commercial exploitation of the Works.

2.16.    Stewart and the other Parties to this Agreement shall not object to any final fee application by G&M for allowance of fees and costs as an administrative expense in the amount of the G&M Fee subject to entry of a Final Order approving the Settlement Motion, and shall affirmatively support such request at any hearing but shall not be required to file any papers in that regard.

2.17.    Within five (5) business days following the entry of a Final Order approving this Agreement, Stewart shall dismiss the Stone Claim Objection with prejudice.

2.18.    Within five (5) business days following the entry of a Final Order approving this Agreement, (a) the Debtors and Stewart shall file a stipulation with the Bankruptcy Court jointly dismissing the Stewart Avoidance Litigation with prejudice; and (b) the Parties shall take such steps as may be necessary to dismiss the Royalty Litigation with prejudice, with each such Party to bear its/his own attorney's fees and costs and waiving any claim any Party or its independent contractors, employees or agents may have against any other Party for malicious prosecution, if any.

3.    **Bankruptcy Court Approval of the Settlement, Means of Implementation.**

3.1.    Immediately following the execution of this Agreement by all Parties, the Debtors shall file a motion in the Bankruptcy Court seeking approval of the Agreement pursuant to Federal Rule of Bankruptcy Procedure 9019 (the "Settlement Motion").

3.2.    The Parties shall all vote in favor, and support confirmation, of any Plan that comports with the terms and conditions of this Agreement.  The Plan  shall provide that, following the entry of final decrees in the Cases, the Debtors shall be deemed dissolved.

4.    **Release by Stewart.**

4.1.    Stewart, for himself, and for his agents, heirs, executors, administrators, successors and assigns (collectively, the "Stewart Releasing Parties," or individually, a "Stewart Releasing Party") forever releases and discharges the Debtors, the Goldstein Parties and Stone (the Debtors, Goldstein Parties, and Stone are collectively referred to as the "Even St. Parties," or each individually, an "Even St. Party"), their respective agents, servants, employees, attorneys, shareholders, members, officers, directors, heirs, executors, administrators, successors and assigns, from any and all claims, demands, liabilities, accounts, obligations, costs, expenses, liens, actions, causes of action, rights to indemnity (legal or equitable), rights to subrogation, rights to contribution and remedies of any nature whatsoever, known or unknown, which any Stewart Releasing Party had, now has, or has acquired, individually or jointly, arising from any facts, actions or inactions occurring at any time prior to the date of the execution of this Agreement related to the Cases, the Royalty Litigation, the Stewart Avoidance Litigation or based on the execution of this Agreement by, or on behalf of, any of the Parties; provided, however, that such release shall not apply to the obligations created by this Agreement.

- 8 -

4.2.    The Stewart Releasing Parties expressly waive and relinquish all rights and benefits afforded by Section 1542 of the *Civil Code of the State of California*, and do so understanding and acknowledging the significance and consequences of such specific waiver of Section 1542, which provides as follows:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

4.3.    The Stewart Releasing Parties further acknowledge and agree that they may hereafter discover facts in addition to or different from those which they now know or believe to be true with respect to the claims they may have, but that nonetheless it is their intention to fully, finally and forever settle and release all claims, whether known, unknown, fixed, contingent, suspected, unsuspected, or otherwise as to the claims referenced in Section 4.1, above.

5.    **Release by Even St. Parties.**

5.1.    The Even St. Parties, and their respective members, beneficiaries, agents, servants, employees, shareholders, subsidiaries, officers, directors, heirs, executors, administrators, successors and assigns forever release and discharge each other and the Stewart Releasing Parties and their respective agents, servants, employees, attorneys, shareholders, subsidiaries, officers, directors, heirs, executors, administrators, successors and assigns from any and all claims, demands, liabilities, accounts, obligations, costs, expenses, liens, actions, causes of action, rights to indemnity (legal or equitable), rights to subrogation, rights to contribution and remedies of any nature whatsoever, known or unknown, which any Even St. Party had, now has, or has acquired, individually or jointly, arising from any facts, actions or inactions occurring at any time prior to the date of the execution of this Agreement related in any way to the Cases, the Royalty Litigation, the Stewart Avoidance Litigation or based on the execution of this Agreement by, or on behalf of, any of the Parties; provided, however, that such release shall not apply to the obligations created by this Agreement.

5.2.    The Even St. Parties expressly waive and relinquish all rights and benefits afforded by Section 1542 of the *Civil Code of the State of California*, and do so understanding and acknowledging the significance and consequences of such specific waiver of Section 1542, which provides as follows:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."**

5.3.    The Even St. Parties further acknowledge and agree that they may hereafter discover facts in addition to or different from those which they now know or believe to be true with respect to the claims they may have, but that nonetheless it is their intention to fully, finally and forever settle and release all claims, whether known, unknown, fixed, contingent, suspected, unsuspected, or otherwise as to the claims referenced in Section 5.1, above.

6.    **Cooperation.**

The Parties shall use their reasonable best efforts and cooperate to the extent necessary to obtain a Final Order from the Bankruptcy Court approving the terms of this Agreement and confirming the Plan.  The Parties shall take such reasonable additional steps as may be necessary to implement this Agreement fully, including, without limitation, by executing and delivering such additional documents as may reasonably be required to give full effect to the terms hereof.

7.    **Liens and Taxes**.

Stewart acknowledges and agrees that he is solely responsible for the resolution, waiver, satisfaction, and/or discharge of any taxes, equitable or contractual claims, subrogation claims or liens, known or unknown, past or future, asserted against the settlement proceeds or this settlement by any person or entity that provided benefits or payments of any kind to Stewart.  Stewart agrees to indemnify the Even St. Parties from and against any and all claims, judgments, or suits for any such claims, subrogation claims or liens, including but not limited to any claims or liens by Stewart's prior counsel in the Royalty Litigation or Cases, if any.

The Goldstein Parties each acknowledges and agrees that he, she or it is solely responsible for the resolution, waiver, satisfaction, and/or discharge of any taxes, equitable or contractual claims, subrogation claims or liens, known or unknown, past or future, asserted against the settlement proceeds or this settlement by any person or entity that provided benefits or payments of any kind to any of the Goldstein Parties.  The Goldstein Parties agree to indemnify Stewart from and against any and all claims, judgments, or suits for any such claims, subrogation claims or liens.

The Debtors agree to provide drafts of any and all tax returns to be filed following the Effective Date of this Agreement to Stewart and the Goldstein Parties prior to filing any such returns with any taxing authority.  Stewart and/or the Goldstein Parties shall each have ten (10) days from receipt of the draft of any return(s) to raise issues with respect to such returns, and agree to meet and confer in good faith with any tax preparer to address any such issues in a manner designed to avoid any adverse tax consequences to any of them.  The Debtors shall use their commercially reasonable best efforts to obtain draft returns by not later than December 31, 2016, but shall coordinate the preparation and filing of any such returns with the advice of any tax advisor in connection with the Asset Disposition, or any tax advisor for any of the Parties.

8.    **No Admission of Liability**

This Agreement represents the compromise of disputed claims and neither this Agreement, nor any negotiations or proceedings connected with it, shall constitute or be construed as or be deemed to be evidence of any admission on the part of any of the Parties of

- 10 -

any liability or wrongdoing whatsoever, or the truth or untruth, or merit or lack of merit, of any claim or defense of any of the Parties.

9.      **Attorneys' Fees and Costs.**

Each of the Parties hereto shall be responsible for his/her/its own attorneys' fees and costs as it pertains to this Agreement and incurred in the Royalty Litigation or in the Cases.  In the event that it becomes necessary to commence an action to enforce the rights or obligations created by this Agreement, the prevailing Party in such action shall be entitled to reasonable attorneys' fees and costs as they are incurred to enforce the rights or obligations against any other Party or Parties to this Agreement.

10.     **Interpretation of Agreement.**

This Agreement has been negotiated at arms' length between persons knowledgeable in the matters dealt with herein.  In addition, the Parties have been represented by experienced and knowledgeable legal counsel.  Accordingly, the Parties hereto agree that any rule of law, including, but not limited to, California Civil Code Section 1654, and all other statutes, legal decisions, or common law principles of similar effect, that would require interpretation of any ambiguities in this Agreement against the Party that drafted this Agreement, is of no application and is hereby expressly waived.  The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intentions of the Parties hereto.

11.     **Successors and Assigns.**

This Agreement, including the general releases contained herein, shall inure to the benefit and be binding on the Parties and, as applicable, their assigns, and their successors in interest, including successors in interest by assignment or otherwise.

12.     **Third Party Beneficiaries.**

This Agreement is solely for the benefit of the Parties hereto, and their respective successors and permitted assigns, and no other persons or entities are intended to be third party beneficiaries hereunder, or to have any right, benefit, priority or interest under, or because of the existence of, or to have any right to enforce, this Agreement.  The Parties hereto shall have the right to modify this Agreement at any time without notice to or approval of any other person or persons, subject to the provisions of Paragraph 18.

13.     **Governing Law; Venue.**

This Agreement shall be governed by and construed, interpreted, and enforced in accordance with and under the laws of the State of California.  The proper venue for the filing of any lawsuit in connection with this Agreement shall, in the first instance, in the Bankruptcy Court, for so long as the Debtors' Cases remain open.  The Parties agree that, for so long as the Debtors' Cases remain open, the Bankruptcy Court shall have sole and exclusive jurisdiction, sitting without a jury, to hear and determine any disputes that arise under or on account of this Agreement.  Thereafter, the proper venue for the filing of any lawsuit in connection with this

Agreement shall be in any court of competent jurisdiction in Los Angeles County, California.

14.    **Representative Capacity.**

Each person whose signature is affixed hereto in a representative capacity represents and warrants that he or she is authorized and empowered to execute this Agreement on behalf of, and to bind, the person or entity on whose behalf his or her signature is affixed.

15.    **Advice of Counsel.**

All Parties hereto represent and warrant that they understand the terms of this Agreement and have had the benefit of advice of counsel of their choice before signing this Agreement.

16.    **Severability.**

If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law, but only as long as the continued validity, legality and enforceability of such provision or application does not materially (a) alter the terms of this Agreement, (b) diminish the benefits of this Agreement or (c) increase the burdens of this Agreement, for any person.

17.    **Entire Agreement.**

This Agreement contains the entire understanding between the Parties concerning the subject matter of this Agreement and supersedes all prior and contemporaneous agreements, statements, understandings, terms, conditions, negotiations, representations and warranties, whether oral or written, made by any of the Parties concerning the matters covered by this Agreement.  Without limiting the generality of the preceding sentence, each of the Parties acknowledges and agrees that no promise, inducement, agreement, representation or warranty of any kind which is not expressly set forth in this Agreement has been made to induce such Party to enter into this Agreement.

18.    **Amendment.**

None of the Parties shall have the right to unilaterally terminate, modify or abridge any of their respective rights or obligations under this Agreement.  None of the Parties shall have the right to rescind, retract, revoke, void or otherwise seek to invalidate the terms of this Agreement pending the approval of this Agreement by the Bankruptcy Court.  Any amendment to this Agreement must be in writing executed by all Parties and their counsel in the Royalty Litigation or the Cases.

19.    **Duplicate Originals; Counterparts; Copies.**

The Parties may execute duplicate originals to this Agreement or have this Settlement executed in counterparts, each of which shall be deemed an original, and all of which shall

constitute one and the same agreement.  In addition, a copy of a signature by the executing Party (either by facsimile, email, or other format) shall have the same force and effect as an original.

20.    **No Prior Transfer of Released Items.**

Each Party represents and warrants that it has not heretofore sold, assigned, transferred, conveyed or otherwise disposed of, including by way of subrogation, any of the charges, claims, complaints, actions, causes of action, liabilities, obligations, promises, benefits, agreements, controversies, rights, damages, debts, costs, losses of services, attorneys' fees, expenses, costs and compensation of any nature whatsoever released in this Agreement.

21.    **Understanding of Agreement.**

The Parties hereto acknowledge that they have had the opportunity to be represented by independent legal counsel of their own choice throughout all of the negotiations which preceded the execution of this Agreement and have either done so, or voluntarily decided not to do so and proceed without the consent or advice of independent legal counsel.  The Parties hereto acknowledge that they have had adequate opportunity to make whatever investigation or inquiry that may be necessary or desirable in connection with the subject matter of this Agreement prior to the execution hereof.  The Parties further represent and acknowledge that they fully understand and appreciate the meaning of each of the terms of this Agreement and that they understand that they may be waiving legal rights or claims by signing this Agreement and that they are voluntarily entering into this Agreement with a full and complete understanding of its terms and legal effect and with the intent to be legally bound by this Agreement.

22.    **Enforcement of Agreement.**

The Parties specifically agree that:  (1) this Agreement is admissible as evidence and subject to disclosure in enforcement proceedings; (2)  all of the material terms of the settlement are set forth herein; (3) this Agreement is enforceable under Federal Rule of Civil Procedure 58 or other similar state laws, and the court, upon motion of either Party, may enter judgment pursuant to the terms hereof; and (4) neither Party shall oppose a motion under Federal Rule of Civil Procedure 58 or other similar state laws to enter judgment pursuant to the terms of this Agreement on the ground that this Agreement is confidential or otherwise privileged.

23.    **Headings.**

Headings contained in this Agreement are inserted as a matter of convenience and for reference, and are not intended and shall not be construed to define, limit, extend or otherwise describe the scope of this Agreement or any provision of this Agreement.

- 13 -

(remainder of this page intentionally left blank)

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be executed as of the Effective Date.

SYLVESTER STEWART                           EVEN ST. PRODUCTIONS, LTD.

                                            By:  _____
                                            Name:  _____
_____                Its:  _____

                                            MAJOKEN, INC.

                                            By:  _____
                                            Name:  _____
                                            Its:  _____

                                            AUDIO VISUAL ENTERTAINMENT, INC.
                                            dba AVENUE RECORDS

                                            By:  _____
                                            Name:  _____
                                            Its:  _____

                                            FAR OUT PRODUCTIONS, INC.

                                            By:  _____
                                            Name:  _____
                                            Its:  _____

                                            JERRY GOLDSTEIN MUSIC, INC.

                                            By:  _____
                                            Name:  _____
                                            Its:  _____

                                            TMC MUSIC, INC.

                                            By:  _____
                                            Name:  _____
                                            Its:  _____

                                            [Signatures Continue]

- 15 -

T.A.G. MANAGEMENT, INC.

By: _____

Name: _____

Its: _____


GERALD GOLDSTEIN


_____

GLENN STONE


_____

GRADSTEIN & MARZANO, P.C.

By: _____

Name: _____

Its: _____

**EXHIBIT "5"**

## SETTLEMENT AND MUTUAL GENERAL RELEASE

This Settlement and Mutual General Release Agreement ("Agreement"), is made and entered into by and between Virginia Pope ("Pope"), Majoken Inc. ("Roberts Majoken"), Even St. Productions Ltd. ("Even St."), Majoken, Inc., located at 7095 Hollywood Blvd. #810, Los Angeles, CA 90028, ("Even St. Majoken") Gerald Goldstein ("Goldstein"), Glenn Stone ("Stone") and Broadcast Music, Inc. ("BMI"), as of October 13, 2017 (the "Agreement Date"). Pope and Roberts Majoken are referred to collectively herein as the "Pope Parties." Even St., Even St. Majoken, Goldstein and Stone are referred to collectively herein as the "Even St. Parties." The Pope Parties, Even St. Parties and BMI are sometimes referred to herein as the "Parties."

## RECITALS

A.      Ken Roberts ("Roberts") was a plaintiff in a case captioned *Stewart v Goldstein, et al.*, Los Angeles Superior Court No. BC 430809 (the "Superior Court Action").  In the Superior Court Action, Roberts asserted claims against the Even St. Parties and BMI, the Even St. Parties asserted a declaratory relief claim against Roberts and Roberts Majoken asserted cross-claims against the Even St. Parties.   BMI and the Even St. Parties preserved their respective rights to pursue claims against each other after the final resolution of the Superior Court Action.

B.      Roberts died on May 22, 2014.  In the Superior Court Action, the Court entered an order dated June 19, 2014 substituting Pope as Plaintiff and Cross-Defendant in the Superior Court Action in place of Ken Roberts, based on Pope's express and sworn representations that she is "Mr. Roberts' successor in interest as defined in Section 377.11 of the California Code of Civil Procedure, and succeed[s] to Roberts' interest in" the Superior Court Action, and that "No other person has a superior right to commence this action or proceeding or to be substituted for the decedent in the pending action or proceeding."   Thereafter, Pope commenced a second action against BMI in the Los Angeles Superior Court, captioned *Virginia Pope v. Broadcast Music Inc.*, No. BC553094 (the "Second Action").

C.      The claims between Roberts and the Even St. Parties in the Superior Court Action resulted in a Final Judgment in favor of the Even St. Parties on each of the causes of action asserted by the Pope Parties, which is the subject of a pending appeal and cross-appeal before the Court of Appeal, Second District, No. B275199 ("Even St. Appeal").

D.      The claims between Roberts and BMI resulted in a Final Judgment (in the Superior Court Action) and a dismissal with prejudice (of the Second Action) in favor of BMI. Pope appealed both cases in one consolidated appeal. A decision from the Court of Appeals, Second District overturned the judgment in the Superior Court Action and upheld the dismissal with prejudice of the Second Action.  The remaining claims in the

#4846-0382-3962v6

Superior Court action were set for re-trial on August 14, 2017 and have been adjourned until a status conference set for February 21, 2018.

E.      Even St. and Even St. Majoken filed Chapter 11 proceedings in the United States Bankruptcy Court for the Central District of California ("Bankruptcy Court"), now consolidated, No. 2:13-bk-24363-WB (Even St.) and 2:13-bk-24389-WB (Even St. Majoken) (the "Bankruptcy Actions"), respectively.

F.      Pope and Roberts Majoken filed proofs of claim (collectively, the "Pope/Roberts Claims") in the Bankruptcy Actions and argued that performance royalties from the Sylvester Stewart catalogue ("Performance Royalties") were not property of the estates of Even St. or Even St. Majoken.  The Bankruptcy Court entered an order disallowing the Pope/Roberts Claims, or estimating such claims at zero for purposes of the Bankruptcy Actions.

G.      On February 22, 2017, the Bankruptcy Court entered an order directing BMI to "turnover and pay to the Debtors all performance royalties from the Stewart catalog accrued since January 7, 2010, administered by and in the possession of BMI, and all of the future performance royalties from the Stewart catalog administered and collected by BMI" and directing Even St. and Even St. Majoken to put the funds into a segregated bank account in the name of Even St. Majoken not to be used without further order of the Court, which order is presently the subject of consolidated appeals by both the Pope Parties and BMI to the United States District Court for the Central District of California (the "Bankruptcy Appeals").

H.      On March 20, 2017, BMI filed amended proofs of claim against each of Even St. and Even St. Majoken (collectively the "BMI Claims").  Even St. and Even St. Majoken objected to the BMI Claims and disputed the contentions made by BMI in support of such claims.

I.      On August 24, 2017, the Bankruptcy Court entered its order confirming the plan of reorganization for Even St. and Even St. Majoken (the "Plan").  Initial distributions to creditors have been made under the Plan, including, without limitation a deposit by Even St. and Even St. Majoken into a segregated account of $143,714.96 for the benefit of BMI (the "BMI Reserve").  According to the Bankruptcy Court's order confirming the Plan, the reserve for BMI will be funded from *pro rata* distributions to creditors of Even St. and Even St. Majoken up to a maximum reserve of $350,000.  Upon a disposition of the assets of the estate under the terms of the Plan, the reserve amount for BMI increases to $1,000,000, funded by *pro rata* distributions to creditors of Even St. and Even St. Majoken.  The amount of the reserve established does not constitute a determination by the Court with respect to the ultimate allowance or disallowance of any or all claims asserted by BMI or a cap on the actual amount of the BMI Claim.

J.      A proceeding was commenced in the New York Surrogate's Court, New York County (the "Surrogate's Court"), by Pope (the "Probate Proceeding") to administer the

Estate of Kenneth Roberts (the "Roberts Estate"). In the Probate Proceeding, Pope was appointed as preliminary executor of the Roberts Estate. *See* Order Directing Issuance of Preliminary Letters Testamentary, attached hereto at **Exhibit A**. Thereafter, her authority as preliminary executor was limited by the Surrogate's Court in response to a challenge by a third-party creditor to Pope's capacity as executor. The limitation prevents Pope from "selling, leasing, disposing of, assigning, transferring, or encumbering" (1) a New York condominium apartment (the "Condo") owned by Roberts prior to his death and (2) 721 5455B Condo, LLC, an entity with ownership interest in the Condo. *See* Amended Order Granting Preliminary Letters Testamentary with Restrictions ("Surrogate's Court Amended Order"), attached hereto as **Exhibit B**. As preliminary executor, Pope represents that she has authority to enter into agreements and collect funds on behalf of the Roberts Estate, including this Agreement, notwithstanding the limitations as described in the Surrogate's Court Amended Order. As of the date of this Agreement, the Surrogate's Court has not ruled on the challenge to Pope's service as preliminary executor.

K.     In an effort to conserve time and money and conclude the uncertainties of litigation, the Parties hereby agree to settle all claims between them, known and unknown as of the Agreement Date, on the terms, and contingent on the events, set forth in this Agreement.

## AGREEMENT

1.     *Recitals*.  The Recitals are incorporated herein by this reference and the Parties agree that the information recited above is true and correct.

2.     *Settlement Transactions and Conditions to Effectiveness*.  The effectiveness of this Agreement and the releases given herein are conditioned on, and only on, the satisfaction of the following events in the following order:

   a.   By no later than ten business days after the full execution of this Agreement, the Pope Parties, the Even St. Parties and BMI shall take such action as may be necessary to advise all courts (including appellate courts) of the execution of this Agreement and the Parties' conditional settlement of their disputes, and shall jointly request a stay of any and all actions among them and a suitable extension of any relevant briefing schedules.  Should any decision be rendered in any pending appeal, the Parties hereto shall proceed with the terms of this Agreement regardless of any favorable or unfavorable outcome in such appeal.

   b.   By no later than ten business days after the full execution of this Agreement by all Parties, Pope, as preliminary executor of the Roberts Estate, shall file in the Surrogate's Court either a Petition for Voluntary Accounting in the Matter of the Judicial Settlement of the First Intermediate Accounting of the Preliminary Executor or a Petition to Resign and for Voluntary Accounting in

the Matter of the Judicial Settlement of the First and Final Accounting of the Preliminary Executor (either such proceeding, or any such other proceeding as the Parties may agree that satisfies the requirements of this paragraph 2(b), the "Accounting Proceeding," as the case may be) that includes in the account (the "Account") submitted the Settlement Payment as a receivable as part of the Accounting Proceeding and attaches this Agreement to the preliminary executor's petition in the Accounting Proceeding, and then timely takes such other action as may be necessary in connection with the Probate Proceeding to: (i) provide the Surrogate's Court with notice of this Agreement; (ii) provide all parties required to be cited in an accounting proceeding by the preliminary executor, including, without limitation, known creditors of the Roberts Estate, with notice of the Settlement Payment as defined in this Agreement; (iii) allow all parties required to be cited in an accounting proceeding by the preliminary executor, including, without limitation, known creditors of the Roberts Estate, the opportunity to object to the Settlement Payment as defined in this Agreement; and (iv) seek and obtain  from the Surrogate's Court a Decree of Judicial Settlement of the Account under which the Account is judicially settled and allowed (the "Surrogate's Court Accounting Decree").  Pope, as preliminary executor of the Roberts Estate, shall provide all Parties hereto with copies of any and all papers filed by any parties in connection with the Accounting Proceeding and any Petition filed pursuant hereto must be in form and substance reasonably acceptable to each of the Parties.

c.  Entry of the Surrogate's Court Accounting Decree.

d.  By no later than five business days after the entry of the Surrogate's Court Accounting Decree, Even St. and Even St. Majoken shall have filed a motion with the Bankruptcy Court seeking approval of this Agreement; provided that any order approving this Agreement must be in form and substance reasonably acceptable to each of the Parties (the "Settlement Order").

e.  Entry of the Settlement Order.

f.  Within five business days after the Bankruptcy Court's entry of the Settlement Order:

   (i)  Payment of all sums set forth in ¶ 3 below.

   (ii)  the Pope Parties shall deliver: (w) to BMI's counsel a fully executed request for dismissal with prejudice of any and all claims pending in the Superior Court Action, in form and substance attached hereto as **Exhibit C** (the "Superior Court Action Dismissal"), which executed Superior Court Action Dismissal shall be held by BMI's counsel in escrow pending its authorization to release in accordance with the

4

terms hereof; (x) to the Even St. Parties' counsel, a fully executed request for dismissal with prejudice of the cross-appeals in the Even St. Appeal in form and substance attached hereto as **Exhibit D** (the "Even St. Parties Appeal Dismissal"), which the Even St. Parties will also execute, and a fully executed request for dismissal with prejudice of all claims and cross-claims against the Even St. Parties in form and substance attached hereto as **Exhibit E** (the "Even St. Parties Superior Court Action Dismissal"), which executed Dismissals shall be held by the Even St. Parties' counsel in escrow pending its authorization to release in accordance with the terms hereof; and (y) to counsel for Even St., a form of request for dismissal of the Bankruptcy Appeals with prejudice executed by the Pope Parties and BMI, in form and substance attached hereto as **Exhibit F** (the "Bankruptcy Appeal Dismissals"), which Bankruptcy Court Dismissals shall be held by the Even St. Parties' counsel in escrow pending its authorization to release and file in accordance with the terms hereof.

(iii)     The Even Street Parties shall deliver to the Pope Parties' counsel a fully executed request for dismissal with prejudice of the cross-claims asserted by the Even St. Parties in form and substance attached hereto as **Exhibit G** (the "Cross-Claim Dismissal"), which executed Cross-Claim Dismissal shall be held by the Pope Parties' counsel in escrow pending its authorization to release in accordance with the terms hereof.

(iv)     The Even Street Parties and BMI shall exchange mutual general releases of any and all claims that could have been brought against each other in the Superior Court Action, but for the parties' mutual dismissal of claims without prejudice and tolling of applicable statutes of limitations.

3.     *Settlement Payments*.  Subject to the satisfaction of and in accordance with the conditions to effectiveness set forth in ¶ 2 above, Even St. and BMI will each wire the sum of $400,000, for payments totaling $800,000 in the aggregate (the "Settlement Payment"), to the Spillane Trial Group PLC Client Trust unless otherwise required by the Surrogate's Court Accounting Decree.  BMI shall not use any portion of any Performance Royalties to make the Settlement Payment required hereunder.  The $400,000 payment by BMI is to settle the claims asserted by the Pope Parties without conceding their validity.  The $400,000 payable by the Even St. Parties may be paid from the Performance Royalties currently held by Even St. Majoken, and shall be allocated as follows: (a) $250,000 to settlement of the issues in the Bankruptcy Actions and Bankruptcy Appeals; and (b) $150,000 to settlement of the Even St. Appeal, without conceding the validity of any claims or causes of action raised therein. The Pope Parties will promptly notify the Parties of receipt of both wires for the Settlement Payment,

#4846-0382-3962v6

whether received by the Pope Parties directly or by a third-party on their behalf, in which case the Parties are authorized to file the dismissals set forth in ¶ 2(c), above.  If no one pays or only one payment is made within the five business day time period, then the payment from the paying Party will promptly be returned, this Agreement will be of no force or effect and the receiving Parties will return the dismissals set forth in ¶ 2(c).

4.      ***Performance Royalties and Claims of Pope Parties***.   Subject to occurrence of the conditions expressed in ¶ 2 and payment of all of the Settlement Payment as set forth in ¶ 3, the Pope Parties agree and acknowledge that they have no rights or interest in the past, present or future Performance Royalties, and have no further claims of any nature whatsoever, including, without limitation, any claims based in contract, law or equity, against BMI and the Even St. Parties, or any of them, concerning the Performance Royalties in any manner whatsoever.   The Pope Parties will execute any further instructions or consents that Even St. and/or BMI may reasonably require to effectuate the intent of this Agreement.  The Parties agree that the Performance Royalties held by Even St. Majoken may immediately be distributed to creditors pursuant to the terms of the Plan and shall enter into a stipulation or take such other action as may be necessary to effectuate such action; <u>provided</u>, however, that Even St. Majoken shall reserve from the Performance Royalties the $400,000 to be paid to the Pope Parties in accordance with the terms hereof.

5.      ***No Third Party Beneficiaries***.  Except as set forth in Section 8 and 9.b, there are no third party beneficiaries to this Agreement.   Nothing in this Agreement releases Robert Allan or the Allan Law Group.  The claims of Pope and Roberts Majoken in the pending arbitration with Robert Allan and the Allan Law Group are reserved and not released.

6.      ***Resolution and Satisfaction of BMI Claims.***  Upon approval by the Bankruptcy Court of the terms and conditions of this Agreement, and subject to the satisfaction of all of the conditions set forth in ¶¶ 2 and 3 above, (i) the BMI Claims shall be deemed fully and finally satisfied pursuant to the terms of this Agreement, (ii) BMI shall be entitled to receipt of the BMI Reserve, but shall be deemed to have waived any right to any other distributions under the Plan, (iii) within five business days thereafter, BMI shall deliver to Even St. and Even St. Majoken a direction to immediately pay the BMI Reserve to Stone, in the balance of any amount then owing to Stone under the Plan, with any excess amount of the BMI Reserve to be used for payment of other creditors, and any payment to Stone will serve as a full or partial credit, as the case may be, against any balance outstanding and then owed to Stone and (iv) BMI shall not be entitled to any payment from Even St. and/or Even St. Majoken, whether in the Bankruptcy Actions or otherwise, or Goldstein or Stone, relating to any and all time periods prior to the date of this Agreement.

7.      ***Specific Performance.***  The Parties agree that in the event of any breach of or dispute regarding this Agreement, each Party (i) consents to the exclusive jurisdiction of

the Bankruptcy Court to adjudicate such matter and (ii) is entitled to seek specific performance of this Agreement.

8. *Mutual General Releases.*

   a. Except as expressly set forth in the Agreement and subject to occurrence of the conditions expressed in ¶¶ 2 and 3, the Pope Parties, for themselves and their heirs, estates, executors, successors and assigns, and each of them (the "Pope Releasors"), hereby release any and all claims, demands, disputes, remedies or causes of action whatsoever, that the Pope Releasors have, may have, or claim to have as of the Agreement Date, of whatever nature, character, or description, whether in contract, in law, in equity or otherwise, whether known or unknown, asserted or unasserted, fixed, liquidated or contingent, anticipated or unanticipated, direct or indirect, against the Even St. Parties and BMI and any of their respective directors, officers, employees, managers, shareholders, members, partners, representatives, agents, attorneys, insurers, accountants, sureties, affiliates, heirs, executors, administrators, conservators, predecessors, successors and assigns, and each of them.

   b. Except as expressly set forth in the Agreement and subject to occurrence of the conditions expressed in ¶¶ 2 and 3, the Even St. Parties, for themselves and their heirs, estates, executors, successors and assigns, and each of them (the "Even St. Releasors"), hereby release any and all claims, demands, disputes, remedies or causes of action whatsoever, that the Even St. Releasors have, may have, or claim to have as of the Agreement Date, of whatever nature, character, or description, whether in law, in equity or otherwise, whether known or unknown, asserted or unasserted, fixed, liquidated or contingent, anticipated or unanticipated, direct or indirect, against the Pope Parties and BMI and any of their respective directors, officers, employees, managers, shareholders, members, partners, representatives, agents, attorneys, insurers, accountants, sureties, affiliates, heirs, executors, administrators, conservators, predecessors, successors and assigns, and each of them; provided that nothing herein shall release BMI from its obligation to pay future Performance Royalties coming due after the date hereof subject to and in accordance with the terms of any Affiliation Agreement entered into by Sylvester Stewart and BMI.

   c. Except as expressly set forth in the Agreement and subject to occurrence of the conditions expressed in ¶¶ 2 and 3, BMI, for itself and its successors and assigns, and each of them (the "BMI Releasors"), hereby release any and all claims, demands, disputes, remedies or causes of action whatsoever that the BMI Releasors have, may have, or claim to have as of the Agreement Date, of whatever nature, character, or description, whether in law, in equity or otherwise, whether known or unknown, asserted or unasserted, fixed,

7

liquidated or contingent, anticipated or unanticipated, direct or indirect, against the Pope Parties and the Even St. Parties and any of their respective directors, officers, employees, managers, shareholders, members, partners, representatives, agents, attorneys, sureties, affiliates, insurers, accountants, heirs, executors, administrators, conservators, predecessors, successors and assigns, and each of them; provided that nothing herein shall release BMI's rights, defenses and remedies in respect of any future Performance Royalties coming due after the date hereof subject to and in accordance with the terms of any Affiliation Agreement entered into by Sylvester Stewart and BMI.

d.  The Parties acknowledge that there is a risk that subsequent to the execution of this Agreement, one or more of them will discover facts, claims, or disputes that were unknown or unanticipated at the time this Agreement was executed and that, if known on the date of this Agreement, might have materially affected their respective decisions to enter into this Agreement or to give the releases contained in this Agreement.   Despite this knowledge and understanding, the Parties agree and consent that such Party is assuming the risk of such unknown and unanticipated facts, claims, and disputes, and in connection herewith, each expressly waives Section 1542 of the California Civil Code, which reads as follows:

> **"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."**

9.  *Other Provisions*.

a.  Each person and Party whose signature is affixed hereto represents and warrants that such person is authorized to execute this Agreement on behalf of, and to bind, the Party on whose behalf s/he signs this Agreement and has obtained the consent of anyone and everyone necessary to enter into this Settlement Agreement.

b.  This Agreement will inure to the benefit of, and will be binding upon, the Parties' successors, heirs, executors, and assigns, including, without limitation, any successor administrator, executor or similar fiduciary appointed in the Probate Proceeding or any proceeding in the New York Surrogate's Court or any other court or jurisdiction involving the Roberts Estate, and each of them.

c.  Each Party represents and warrants that he/she/it owns all right, title and interest in and to the claims released herein and has not assigned, transferred, conveyed or encumbered any claim or right of action that such Party has as against each other, or any claims released herein, including without limitation

8

any claim, debt, liability, demand, obligation, cost, expense, action, defense, or cause of action released. The Parties agree to indemnify the opposing Parties and releasees for any claim assigned, transferred, conveyed, or otherwise disposed and/or released.

d. This Agreement is a fully integrated agreement. This Agreement contains the entire agreement of the Parties with respect to its subject matter, and all prior oral or written agreements, contracts, negotiations, representations and discussions, if any, pertaining to this matter and the Parties hereto as merged into this Agreement. No Party to this Agreement has made any oral or written representation other than those set forth in this Agreement, and no Party has relied upon, or is entering into, this Agreement in reliance upon any representation, promises or agreements other than those expressly set forth in this Agreement.

e. No waiver, modification, or amendment of any provision of this Agreement shall be effective unless executed in writing by the Parties to be bound by such waiver, modification, or amendment.

f. Each Party is represented by counsel of such Party's choice and, having conferred with such counsel and having carefully read and understood the meaning and effect of each provision contained herein, is entering into this Agreement deliberately, advisedly, and of such Party's own free will and volition.

g. This Agreement will not be construed against any of the Parties on the grounds that such Party was the author of this Agreement.

h. Inapplicability or unenforceability for any reason of any provision of this Agreement shall neither limit nor impair the operation or validity of any other provision of this Agreement so long as the general intent of the Parties can still be effectuated.

i. This Agreement may be executed in two or more counterparts, each of which shall constitute one and the same instrument, and be binding and enforceable to the same extent as if all Parties had executed the same copy hereof. A fax, PDF or imaged signature will be binding and enforceable to the same extent as an original signature.

j. The Parties will execute and deliver such further documents that may be reasonably required to effectuate the purposes of this Agreement.

k. Each of the Parties acknowledges and agrees that (i) all disputes among the Parties as of the date of this Agreement are resolved by this Agreement and (ii) each Party is providing and receiving significant and valuable consideration for the settlement and release of the claims pursuant to this

9

Agreement.

_____
Virginia Pope

_____
Virginia Pope
Preliminary executor of the
Estate of Kenneth Roberts

MAJOKEN INC.

_____
Virginia Pope

By: _____
Its:  Sole Shareholder

EVEN ST. PRODUCTIONS LTD.

By: _____
Its: _____

MAJOKEN, INC.

By: _____
Its: _____

BROADCAST MUSIC, INC.

By: _____
Its: _____

_____
Gerald Goldstein

_____
Glenn Stone

10

Agreement.

_____
Virginia Pope

MAJOKEN INC.

By: _____
Its:  Sole Shareholder

_____
Virginia Pope, as preliminary executor of
the Estate of Kenneth Roberts

EVEN ST. PRODUCTIONS LTD.

By: _____
Its: _____

MAJOKEN, INC.

By: _____
Its: _____

BROADCAST MUSIC, INC.

By: _____
Its: U P , Legal

_____
Gerald Goldstein

_____
Glenn Stone

10

#4846-0382-3962v6

Agreement.

MAJOKEN INC.

_____
Virginia Pope

By: _____
Its:  Sole Shareholder

_____
Virginia Pope, as preliminary executor of
the Estate of Kenneth Roberts

EVEN ST. PRODUCTIONS LTD.

By: _____
Its: _PASS_____

MAJOKEN, INC.

By: _____
Its: _PASS_____

BROADCAST MUSIC, INC.

By: _____
Its: _____

_____
Gerald Goldstein

_____
Glenn Stone

10

Agreement.

MAJOKEN INC.

_____
Virginia Pope

By: _____
Its:  Sole Shareholder

_____
Virginia Pope, as preliminary executor of
the Estate of Kenneth Roberts

EVEN ST. PRODUCTIONS LTD.                   MAJOKEN, INC.

By: _____         By: _____
Its: _____        Its: _____

BROADCAST MUSIC, INC.

By: _____
Its: _____        _____
                                        Gerald Goldstein

_____
Glenn Stone

10

#4846-0382-3962v6

Exhibit A

At the Surrogate's Court, held in and for the
County of New York, at the Surrogate's Court
House on the _12th_ day of
_October_ in the year _2016_

PRESENT

Honorable _RiTA MeLLA_

Surrogate

New York County Surrogate's Court
DATA ENTRY DEPT.

OCT 1 2 2016

PROBATE PROCEEDING, WILL OF

_KENNETH J. ROBERTS_

a/k/a

Deceased.

ORDER DIRECTING
ISSUANCE OF PRELIMINARY
LETTERS TESTAMENTARY

File No. _2014-3510/B_

Upon reading and filing the petition of ___ _VIRGINIA POPE_

dated ___ _9/21_ , 20 _16_ , requesting that Preliminary Letters Testamentary on the estate

of ___ _KENNETH J. ROBERTS_ ___ issue to said petitioner, now on motion of

___ _VIRGINIA POPE_ ___ , ~~pro se~~

~~Esq., attorney for the petitioner~~, it is

**Ordered** that the Preliminary Letters Testamentary on the estate of ___ _KENNETH J. ROBERTS_

issue to ___ _VIRGINIA POPE_ ___ without bond - ~~upon filing the amount of~~

$ ___ ~~upon his/her~~ qualifying according to law.

Ordered that pursuant to SCPA § 1412 (3) (b), the preliminary executor shall give notice, to
all parties who have appeared, of his appointment within ten days of such appointment.

_____
Surrogate

Exhibit B

At the Surrogate's Court, held in and for the
County of New York, at the Surrogate's
Court House on the _14th_ day of November,
2016.

**Present:**

    **Honorable**    RITA MELLA,
                 **Surrogate.**

| |
|---|
| Probate Proceeding, Will of<br><br>KENNETH J. ROBERTS,<br><br>      Deceased. |

           **Amended Order Granting
Preliminary Letters
Testamentary with Restrictions**

           File No.: 2014-3510/B

Allegations having come to the court's attention from which it appears that the nominated
executor of the will of Kenneth J. Roberts may not be eligible to continue to serve as fiduciary, it
is hereby

ORDERED, that the order dated October 12, 2016 granting preliminary letters
testamentary to Virginia Pope on the estate of Kenneth J. Roberts is hereby amended to restrict
the authority of the preliminary executor from selling, leasing, disposing of, assigning,
transferring, or encumbering: (1) condominium apartment 54B, at 721 5th Avenue, New York,
NY ; or (2) any entity that has an ownership interest in such apartment, including, without
limitation, 721 5455B Condo, LLC.  Such restrictions shall remain in place until the further order
of the court.

The parties are directed to appear for a conference following the call of the probate
calendar at 9:30 am on December 2, 2016 in room 503 of the courthouse.

Clerk to mail a copy of this order to Virginia Pope, counsel to objectant Palm Finance
Corporation, and counsel to the Public Administrator.

                                    _____

                                 S U R R O G A T E

Exhibit C

CIV-110

| | |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY:**   STATE BAR NO. 126364 <br> NAME: Jay M. Spillane <br> FIRM NAME: Spillane Trial Group PLC <br> STREET ADDRESS: 468 N. Camden Drive, Second Floor <br> CITY: Beverly Hills   STATE: CA   ZIP CODE: 90210 <br> TELEPHONE NO.: 424-217-5980   FAX NO.: 888-590-1683 <br> E-MAIL ADDRESS: jspillane@spillaneplc.com <br> ATTORNEY FOR (Name): Virginia Pope and Majoken Inc. | **FOR COURT USE ONLY** |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Central

Plaintiff/Petitioner: Sylvester Stewart et. al.
Defendant/Respondent: Gerald Goldstein et. al.

| | |
|---|---|
| **REQUEST FOR DISMISSAL** | CASE NUMBER: <br> BC430809 |

A conformed copy will not be returned by the clerk unless a method of return is provided with the document.

This form may not be used for dismissal of a derivative action or a class action or of any party or cause of action in a  class action. (Cal. Rules of Court, rules 3.760 and 3.770.)

1.  TO THE CLERK: Please **dismiss** this action as follows:
    a. (1) [x] With prejudice   (2) [ ] Without prejudice
    b. (1) [x] Complaint   (2) [ ] Petition
       (3) [ ] Cross-complaint filed by (name):   on (date):
       (4) [ ] Cross-complaint filed by (name):   on (date):
       (5) [ ] Entire action of all parties and all causes of action
       (6) [ ] Other (specify):*

2.  (Complete in all cases except family law cases.)
    The court [ ] did   [x] did not   waive court fees and costs for a party in this case. (This information may be obtained from the  clerk. If court fees and costs were waived, the declaration on the back of this form must be completed).

Date:
Jay M. Spillane
(TYPE OR PRINT NAME OF [x] ATTORNEY   [ ] PARTY WITHOUT ATTORNEY)

*If dismissal requested is of specified parties only of specified causes of action only, or of specified cross-complaints only, so state and identify the parties, causes of action, or cross-complaints to be dismissed.

Attorney or party without attorney for:
[x] Plaintiff/Petitioner   [ ] Defendant/Respondent
[ ] Cross Complainant

3.  **TO THE CLERK:** Consent to the above dismissal is hereby given.**

Date:
Linda Dakin-Grimm
(TYPE OR PRINT NAME OF [x] ATTORNEY   [ ] PARTY WITHOUT ATTORNEY)

** If a cross-complaint – or Response (Family Law) seeking affirmative relief – is on file, the attorney for cross-complainant (respondent) must sign this consent if required by Code of Civil Procedure section 581 (i) or (j).

Attorney or party without attorney for:
[ ] Plaintiff/Petitioner   [x] Defendant/Respondent
[ ] Cross Complainant

(To be completed by clerk)

4. [ ] Dismissal entered as requested on (date):
5. [ ] Dismissal entered on  (date):   as to only (name):
6. [ ] Dismissal **not entered** as requested for the following reasons (specify):

7. a. [ ] Attorney or party without attorney notified on (date):
    b. [ ] Attorney or party without attorney not notified. Filing party failed to provide
       [ ] a copy to be conformed   [ ] means to return conformed copy

Date:   Clerk, by _____, Deputy

Page 1 of 2

| | | |
|---|---|---|
| Form Adopted for Mandatory Use <br> Judicial Council of California <br> CIV-110 [Rev Jan 1 2013] | **REQUEST FOR DISMISSAL** | Code of Civil Procedure, § 581 et seq.; Gov. Code, <br> § 68637(c), Cal. Rules of Court, rule 3 1390 <br> www.courts.ca.gov |

CIV-110

| | CASE NUMBER |
|---|---|
| Plaintiff/Petitioner: Sylvester Stewart et. al. | BC430809 |
| Defendant/Respondent: Gerald Goldstein et. al. | |

## COURT'S RECOVERY OF WAIVED COURT FEES AND COSTS

If a party whose court fees and costs were initially waived has recovered or will recover $10,000 or more in value by way of settlement, compromise, arbitration award, mediation settlement, or other means, the court has a statutory lien on that recovery. The court may refuse to dismiss the case until the lien is satisfied. (Gov. Code, § 68637.)

## Declaration Concerning Waived Court Fees

1. The court waived court fees and costs in this action for *(name):*

2. The person named in item 1 is *(check one below):*

    a. ☐  not recovering anything of value by this action.

    b. ☐  recovering less than $10,000 in value by this action.

    c. ☐  recovering $10,000 or more in value by this action.  *(If item 2c is checked, item 3 must be completed.)*

3. ☐  All court fees and court costs that were waived in this action have been paid to the court  *(check one):*    Yes    No

I declare under penalty of perjury under the laws of the State of California that the information above is true and correct.

Date: _____

_____      ▶     _____

(TYPE OR PRINT NAME OF ☐ ATTORNEY ☐ PARTY MAKING DECLARATION)       (SIGNATURE)

Exhibit D

Case No. B275199

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION 5

_____

VIRGINIA POPE, MAJOKEN INC.

Plaintiff, Cross-Complainant and Appellants,

vs.

EVEN ST. PRODUCTIONS, LTD., et al.,

Defendants, Cross-Defendants and Respondents.

_____

Appeal from the Superior Court of the State of California,

County of Los Angeles

Hon. Mark V. Mooney, LASC No. BC 430809

_____

## DISMISSAL WITH PREJUDICE

_____

Jay M. Spillane (Bar No. 126364)
jspillane@spillaneplc.com
SPILLANE TRIAL GROUP PLC
468 N. Camden Drive, Second Floor
Beverly Hills, CA 90210-4507
Tel: (424) 217-5980
Fax: (888) 590-1683

Attorneys for Plaintiff, Cross-Complainant and Appellants
VIRGINIA POPE and MAJOKEN INC.

Appellants Virginia Pope and Majoken Inc. and Cross-Appellants Gerald

Goldstein, Glenn Stone, Even St. Productions, Ltd. ("Even St.") and Majoken Inc.

("Even St. Majoken") hereby dismissal all appeals and cross-appeals in this action

with prejudice.

DATED: _____          SPILLANE TRIAL GROUP PLC


By: _____
        Jay M. Spillane
Attorneys for Plaintiff, Cross-Complainant and
Appellants VIRGINIA POPE and MAJOKEN
INC.

DATED: _____          KLAPACH & KLAPACH P.C.


By: _____
        Joseph S. Klapach
Attorneys for Cross-Appellants and
Respondents Gerald Goldstein and Glenn Stone

DATED: _____          ERVIN COHEN & JESSUP LLP


By: _____
        David N. Tarlow
Attorneys for Cross-Appellants and
Respondents Even St. Productions Ltd. and
Majoken Inc.

Exhibit E

CIV-110

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY:  STATE BAR NO:  126364<br>NAME: Jay M. Spillane<br>FIRM NAME: SPILLANE TRIAL GROUP PLC<br>STREET ADDRESS: 468 N. Camden Drive, Second Floor<br>CITY: Beverly Hills    STATE: CA    ZIP CODE: 90210<br>TELEPHONE NO.: (424) 217-5980    FAX NO.: (888) 590-1683<br>E-MAIL ADDRESS: jspillane@spillaneplc.com<br>ATTORNEY FOR (Name): Virginia Pope and Majoken Inc. | FOR COURT USE ONLY |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** LOS ANGELES
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, CA 90017
BRANCH NAME: Stanley Mosk Courthouse

Plaintiff/Petitioner: Sylvester Stewart et al.

Defendant/Respondent: Gerald Goldstein et al.

| | |
|---|---|
| **REQUEST FOR DISMISSAL** | CASE NUMBER:<br>BC 430809 |

**A conformed copy will not be returned by the clerk unless a method of return is provided with the document.**

**This form may not be used for dismissal of a derivative action or a class action or of any party or cause of action in a class action. (Cal. Rules of Court, rules 3.760 and 3.770.)**

1.  TO THE CLERK: Please **dismiss** this action as follows:
    a. (1) [x] With prejudice  (2) [ ] Without prejudice
    b. (1) [ ] Complaint  (2) [ ] Petition
    (3) [ ] Cross-complaint filed by (name):    on (date):
    (4) [ ] Cross-complaint filed by (name):    on (date):
    (5) [x] Entire action of all parties and all causes of action
    (6) [ ] Other (specify):*

2.  (Complete in all cases except family law cases.)
    The court [ ] did [x] did not  waive court fees and costs for a party in this case. (This information may be obtained from the clerk. If court fees and costs were waived, the declaration on the back of this form must be completed).

Date:
Jay M. Spillane
_____
(TYPE OR PRINT NAME OF  [x] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)

*If dismissal requested is of specified parties only of specified causes of action only, or of specified cross-complaints only, so state and identify the parties, causes of action, or cross-complaints to be dismissed.

► _____
(SIGNATURE)

Attorney or party without attorney for:
[x] Plaintiff/Petitioner  [ ] Defendant/Respondent
[ ] Cross Complainant

3.  **TO THE CLERK:  Consent to the above dismissal is hereby given.****

Date:
Gregory Bodell
_____
(TYPE OR PRINT NAME OF  [x] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)

** If a cross-complaint – or Response (Family Law) seeking affirmative relief – is on file, the attorney for cross-complainant (respondent) must sign this consent if required by Code of Civil Procedure section 581 (i) or (j).

► _____
(SIGNATURE)

Attorney or party without attorney for:
[ ] Plaintiff/Petitioner  [x] Defendant/Respondent
[ ] Cross Complainant

(To be completed by clerk)

4.  [ ] Dismissal entered as requested on (date):

5   [ ] Dismissal entered on  (date):    as to only (name):

6.  [ ] Dismissal **not entered** as requested for the following reasons (specify):

7.  a.  [ ] Attorney or party without attorney notified on (date):
    b.  [ ] Attorney or party without attorney not notified. Filing party failed to provide
          [ ] a copy to be conformed  [ ] means to return conformed copy

Date: _____    Clerk, by _____ , Deputy

Page 1 of 2

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CIV-110 [Rev. Jan. 1, 2013] | **REQUEST FOR DISMISSAL** | Code of Civil Procedure, § 581 et seq.; Gov. Code,<br>§ 68637(c); Cal. Rules of Court, rule 3.1390<br>www.courts.ca.gov |

Attachment to Request for Dismissal
Stewart v. Goldstein
LASC No. BC 430809

TO THE CLERK: Consent to the above dismissal is hereby given.

Date: _____

GRADSTEIN & MARZANO P.C.

By: _____
        Maryann Marzano
Attorneys for Defendants and Cross-Defendants
Even St. Productions Ltd. and Majoken Inc.

Exhibit F

1  Linda Dakin-Grimm (CA Bar No. 119630)
   Ldakin-grimm@milbank.com
2  Lisa M. Northrup (CA Bar No. 293784)
   Lnorthrup@milbank.com
3  MILBANK, TWEED, HADLEY & McCLOY LLP
   2029 Century Park East, 33rd Floor
4  Los Angeles, CA 90067
   Telephone:  (424) 386-4000
5  Facsimile:  (213) 629-5063

6  *Attorneys for Broadcast Music, Inc.*

7

8

9                    **UNITED STATES DISTRICT COURT**
10                   **CENTRAL DISTRICT OF CALIFORNIA**

11

12  IN RE EVEN ST. PRODUCTIONS          District Court Case Number:
    LTD. ET AL.                         2:17-cv-1424-JGB
13                                      Related District Court Case Number:
                                        2:17-cv-01756-JGB
14  _____

15                                      Bankruptcy Court Case Numbers:
         BROADCAST MUSIC, INC.          2:13−bk−24363−WB lead case,
16                                      2:13−bk−24389−WB Jointly
                          APPELLANT     administered
17
                               v.       **APPELLANTS AND APPELLEES'**
18                                      **JOINT STIPULATION TO DISMISS**
    EVEN ST. PRODUCTIONS LTD.           **APPEALS WITH PREJUDICE**
19                          ET. AL.

20
                          APPELLEES
21  _____

22

23

24

25

26

27

28

1    Appellant Broadcast Music, Inc. ("BMI"), by and through its undersigned

2    counsel, Appellants Virginia Pope and Majoken Inc. by and through its

3    undersigned counsel, and Appellees Even St. Productions Ltd. and Majoken, Inc.,

4    by and through its undersigned counsel, hereby jointly stipulate as follows:

5    1.    The appeals in case numbers 2:17-cv-1424-JGB and 2:17-cv-01756-

6    JGB should be dismissed with prejudice.

7    2.    The parties agree that each will bear payment of its own costs and

8    fees.

9

10   Dated: _____    MILBANK, TWEED, HADLEY & McCLOY LLP

11

12   By: _____

13

14   Linda Dakin-Grimm
     *Attorneys for Appellant Broadcast Music, Inc.*

15

16   Dated: _____    LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.

17

18   By: _____

19

20   David L. Neale
     *Attorneys for Appellees Even St. Productions Ltd. and
     Majoken, Inc.*

21

22   Dated: _____    SPILLANE TRIAL GROUP PLC

23

24   By: _____

25

26   Jay M. Spillane
     *Attorneys for Appellants Virginia Pope and Majoken
     Inc.*

27

28

-2-

1    Linda Dakin-Grimm (CA Bar No. 119630)
     Ldakin-grimm@milbank.com
2    Lisa M. Northrup (CA Bar No. 293784)
     Lnorthrup@milbank.com
3    MILBANK, TWEED, HADLEY & McCLOY LLP
     2029 Century Park East, 33rd Floor
4    Los Angeles, CA 90067
     Telephone:   (424) 386-4000
5    Facsimile:   (213) 629-5063

6    *Attorneys for Broadcast Music, Inc.*

7

8

9                    **UNITED STATES DISTRICT COURT**
10                   **CENTRAL DISTRICT OF CALIFORNIA**

11

12   IN RE EVEN ST. PRODUCTIONS         District Court Case Number:
     LTD. ET AL.                        2:17-cv-1424-JGB
13                                       Related District Court Case Number:
                                         2:17-cv-01756-JGB
14
     _____        Bankruptcy Court Case Numbers:
15                                       2:13−bk−24363−WB lead case,
           BROADCAST MUSIC, INC.        2:13−bk−24389−WB Jointly
16                                       administered
                          APPELLANT
17                              v.      **[PROPOSED] ORDER ENTERING
18                                       APPELLANTS AND APPELLEES'
     EVEN ST. PRODUCTIONS LTD.           JOINT STIPULATION TO DISMISS
19                         ET. AL.       APPEALS WITH PREJUDICE**
20
                          APPELLEES
21
     _____
22

23

24

25

26

27

28

1    Upon consideration of Appellant Broadcast Music, Inc., Appellants Virginia

2    Pope and Majoken Inc., and Appellees' Joint Stipulation to Dismiss Appeals with

3    Prejudice, it is hereby:

4    ORDERED that the appeal in case number 2:17-cv-1424-JGB is dismissed

5    with prejudice;

6    ORDERED that the appeal in case number 2:17-cv-01756-JGB is dismissed

7    with prejudice; and

8    ORDERED that each party is to bear its own costs and fees.

9

10

11

12    Dated:_____        _____

13                                            Judge Jesus G. Bernal

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the **DEBTORS' MOTION FOR ENTRY OF AN ORDER: (1) APPROVING SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; (2) APPROVING AGREEMENT TO MODIFY COMMISSION ARRANGEMENT; (3) WAIVING THE 14- DAY STAY PERIOD SET FORTH IN BANKRUPTCY RULE 6004(h); AND (4) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; DECLARATION OF GERALD GOLDSTEIN** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On August 28, 2018, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **James Cornell Behrens    jbehrens@milbank.com, gbray@milbank.com;mshinderman@milbank.com;hmaghakian@milbank.com;dodonnell @milbank.com;jbrewster@milbank.com;JWeber@milbank.com**
- **Anthony Bisconti    tbisconti@bmkattorneys.com, 4579179420@filings.docketbird.com**
- **Jonathan E Burke    jburke@pmcos.com, malvarado@pmcos.com,efilings@pmcos.com**
- **Teresa C Chow    tchow@bakerlaw.com, daguilar@bakerlaw.com**
- **Alexandre I Cornelius    aicornelius@costell-law.com, ssaad@costell-law.com;mharris@costell-law.com;jstambaugh@costell-law.com;ladelson@costell-law.com;jlcostell@costell-law.com**
- **Penny M Costa    penny.costa@ffslaw.com**
- **Jeffrey Lee Costell    jlcostell@costell-law.com, aicornelius@costell-law.com;ssaad@costell-law.com;mharris@costell-law.com;smcduffie@costell-law.com;jstambaugh@costell-law.com**
- **Sanaea Daruwalla    sdaruwalla@rjallanlaw.com**
- **Michael T Delaney    mdelaney@bakerlaw.com**
- **Michael T Delaney    amcdow@@foley.com**
- **Fahim Farivar    ffarivar@foley.com, amcdow@foley.com;khernandez@foley.com**
- **William H Forman    wforman@scheperkim.com, mvasquez@scheperkim.com**
- **Todd S Garan    ch11ecf@aldridgepite.com, TSG@ecf.inforuptcy.com;tgaran@aldridgepite.com**
- **Elizabeth A Green    egreen@bakerlaw.com, jdriggers@bakerlaw.com;orlbankruptcy@bakerlaw.com**
- **Steven J. Katzman    SKatzman@bmkattorneys.com, admin@bmkattorneys.com;chowland@bmkattorneys.com;4579179420@filings.docketbird .com**
- **Mary D Lane    mal@msk.com, mec@msk.com**
- **Daniel A Lev    dlev@sulmeyerlaw.com, asokolowski@sulmeyerlaw.com;dlev@ecf.inforuptcy.com;dwalker@sulmeyerlaw.com**
- **Claire Levine    clairegoldstein@gmail.com**
- **Alvin Mar    alvin.mar@usdoj.gov**
- **Maryann R Marzano    , ssummers@gradstein.com**
- **Maryann R Marzano    mmarzano@gradstein.com, ssummers@gradstein.com**
- **Ashley M McDow    amcdow@foley.com, Khernandez@foley.com;Ffarivar@foley.com**
- **Krikor J Meshefejian    kjm@lnbrb.com**
- **David L. Neale    dln@lnbyb.com**
- **Richard J Reynolds    rreynolds@bwslaw.com, psoeffner@bwslaw.com,tmims@bwslaw.com,rjr-nef@bwslaw.com;fcabezas@bwslaw.com**

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                    **F 9013-3.1.PROOF.SERVICE**

- **David J Richardson    drichardson@sulmeyerlaw.com, drichardson@ecf.inforuptcy.com**
- **Peter J Rudinskas    pjr.legal@gmail.com**
- **Rod Rummelsburg    rod@rjallanlaw.com, rod.rummelsburg@roadrunner.com**
- **Melanie Scott    melanie.scott@usdoj.gov**
- **Richard A Shaffer    rick@raslaw.com**
- **Jay M Spillane    jspillane@spillaneplc.com,
  cdale@spillaneplc.com;smargetis@spillaneplc.com**
- **Andrew Spitser    acs@msk.com, egd@msk.com**
- **Wayne R Terry    wterry@hemar-rousso.com**
- **United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov**
- **Delilah Vinzon    dvinzon@milbank.com**
- **David R. Weinstein    dweinstein@weinsteinlawfirm.net**

2. <u>**SERVED BY UNITED STATES MAIL**</u>: On **August 28, 2018,** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒ Service information continued on attached page

3. <u>**SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**</u> (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **August 28, 2018** I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

<u>***Served via Attorney Service***</u>
The Honorable Julie W. Brand
U.S. Bankruptcy Court
255 E. Temple Street
Los Angeles, CA 90012

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| August 28, 2018 | Stephanie Reichert | /s/ Stephanie Reichert |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

Even St. Productions Ltd.
7095 Hollywood Blvd. #810
Los Angeles, CA 90028

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

Sylvester Stewart
c/o Allen Law Group P.C.
23823 Malibu Road, Suite 50-378
Malibu, CA 90265

Glenn Stone
1233 Beech St
#22 The Water Club
Atlantic Beach, NY 11509

United States Attorney's Office
Federal Building, Room 7516
300 North Los Angeles Street
Los Angeles, CA 90012

Broadcast Music, Inc.
c/o Theodore Stolman
Stutman Treister & Glatt
1901 Avenue of the Stars, 12th Fl.
Los Angeles, CA 90067-6013

Sony Music Entertainment
Attn: Wade Leak
25 Madison Avenue, 22nd floor
New York, New York  10010

United States Department of Justice
Ben Franklin Station
P. O. Box 683
Washington, DC 20044

United States Trustee (LA)
915 Wilshire Blvd, Suite 1850
Los Angeles, CA 90017-3560

Franchise Tax Board
Bankruptcy Section, MS: A-340
P. O. Box 2952
Sacramento, CA 95812-2952

Elisa B. Wolfe-Donato
Business & Taxation Section; Civil Div.
California Attorney General's Office
300 South Spring Street, Suite 1700
Los Angeles, California 90013-1256

Marc E. Mayer, Esq.
Andrew C. Spitser, Esq.
Mitchell Silberberg & Knupp
11377 West Olympic Blvd.
Los Angeles CA 90064-1683

City Of Los Angeles, Office Of Finance
Los Angeles City Attorney's Office
Attn Wendy Loo
200 N Main St, Ste 920
Los Angeles, CA 90012-4128

Jay M. Spillane, Esq.
Spillane Trial Group PLC
15260 Ventura Blvd
Penthouse, Suite 2250
Sherman Oaks CA 91403-5338

Leslie Yorston
Mail Stop A240
State of CA Franchise Tax Board
PO Box 2952
Sacramento CA 95812-2952

State Board of Equalization
Special Operations Bankruptcy Team, MIC:
74
P.O. Box 942879
Sacramento, CA 94279-
0074

T.A.G. MANAGEMENT, INC.
7095 Hollywood Blvd, Ste 810
Los Angeles, CA 90028-8912

Mary Lane
Mitchell Silberberg & Knupp LLP
11377 West Olympic Blvd.
Los Angeles, CA 90064

Internal Revenue Service
300 North Los Angeles St., MS 5022
Los Angeles, CA 90012-3478

Virginia Pope
c/o Spillane Trial Group PLC
468 N. Camden Drive, Second Floor
Beverly Hills, CA 90210-4507

Jeffrey Lee Costell
Alexandre Ian Cornelius
Costell & Cornelius Law Corporation
1299 Ocean Ave, Suite 450
Santa Monica, CA 90401

New York State Department of
Taxation and Finance
Bankruptcy Section
P.O. Box 5300
Albany, NY 12205-0300

Broadcast Music Inc.
7 World Trade Center
New York, NY 10007-0042

Ken Roberts
c/o Spillane Trial Group PLC
468 N. Camden Drive, Second Floor
Beverly Hills, CA 90210-4507

Linda Dakin-Grimm, Esq.
Milbank, Tweed, Hadley & McCloy LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067